SIGMUND S. WISSNER GROSS (SW-0001)
MAY ORENSTEIN (MO-2948)
PETER ADELMAN (PA-1562)
DAVID E. MILLER (DM-7179)
BROWN RUDNICK BERLACK ISRAELS LLP
SEVEN TIMES SQUARE
NEW YORK, NEW YORK 10036
(212) 209-4800
ATTORNEYS FOR PLAINTIFF



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

ES-KO INTERNATIONAL, INC.,

06 CV 2422

                  Plaintiff,

Case No. CV-06-____

     -against-

COMPASS GROUP PLC, ESS SUPPORT
SERVICES WORLDWIDE, EUREST SUPPORT
SERVICES (CYPRUS) INTERNATIONAL
LIMITED, PETER HARRIS, ANDREW SEIWERT,
STEVE KEMP, LEN SWAIN, STEVE
BICKERSTAFF, DOUG KERR, IHC SERVICES,
INC., EZIO TESTA, ALEXANDER YAKOVLEV,
DMITRY YAKOVLEV, VLADIMIR KUZNETSOV,
and JOHN DOES 1 TO 100.

**COMPLAINT AND
JURY DEMAND**

                  Defendants.

--------------------------------------------------------------X

Plaintiff, by its attorneys, Brown Rudnick Berlack Israels LLP, for its Complaint,

alleges on knowledge with respect to itself and its own conduct, and on information and belief as

to all other matters:

**INTRODUCTION**

1.      This action arises out of the perpetration by Defendants Compass Group PLC ("Compass Group") and its division, ESS Support Services Worldwide ("ESS") (hereinafter collectively referred to as "Compass Group/ESS") of a criminal scheme and conspiracy to rig bidding for the award of hundreds of millions of dollars of United Nations contracts for food and related services to be supplied to peacekeeping missions around the world.[1]  During the period beginning in or about late 1999 through late 2005 (the "Relevant Period"), when the criminal scheme was publicly exposed, Compass Group/ESS conspired, inter alia, with IHC Services, Inc. ("IHC"), a New York corporation, to bribe United Nations officials, including, among others, Alexander Yakovlev ("Yakovlev"), and to engage in related misconduct to steal valuable United Nations contracts that otherwise would have been awarded to ES-KO International, Inc. ("ES-KO") and to otherwise undermine ES-KO's business relationship with the United Nations.

2.      But for the illegal conduct of Compass Group/ESS, the United Nations would have awarded ES-KO contracts having a value of approximately $574 million during the Relevant Period.  The contracts at issue were instead awarded to Compass Group/ESS, which, aided and abetted, inter alia, by IHC, illegally obtained and unlawfully used ES-KO's proprietary and highly confidential non-public information and engaged in related illegal conduct to secure the contracts for itself.

3.      The full extent of the criminal conspiracy perpetrated by Compass Group/ESS, IHC and the other Defendants named herein is not yet known. Based upon

---

[1]  For purposes of this Complaint, "ESS" means and includes each and every subsidiary, direct or indirect, and any unincorporated division or other entity through which Compass Group has engaged or currently engages, directly or indirectly, in the business of seeking, securing or performing any contract with the United Nations for the provisioning of food services and related supplies and services.

.

information currently available to ES-KO, ES-KO calculates that Defendants' misconduct has caused ES-KO damages in the amount of at least $123 million, exclusive of pre-judgment interest, and treble and/or punitive damages that may be awarded.

4.    At the core of the bid-rigging scheme was a conspiracy among Compass Group/ESS, IHC, supposedly acting as "vendor intermediary" for ESS, Yakovlev, formerly an officer of the United Nations with responsibility for receiving contract proposals and the award of contracts, other Defendants named herein and unknown co-conspirators (the "John Doe Defendants"), inter alia, to illegally obtain and provide to Compass Group/ESS highly confidential, non-public information submitted to the United Nations by ES-KO in connection with its contract proposals and to engage in related illegal conduct to secure for Compass Group/ESS such contracts, prevent disclosure of the bid-rigging scheme both within the United Nations and to the general public, and to illegally preserve the status of Compass Group/ESS as a United Nations contract vendor.

5.    On August 8, 2005, Yakovlev pled guilty in the Southern District of New York to charges of conspiracy, wire fraud and money laundering arising from his receipt of approximately $950,000 in bribes received by him through the exploitation and abuse of his official capacity as an officer of the United Nations. Yakovlev's associate, Vladimir Kuznetsov ("Kuznetsov"), who headed the United Nations' Advisory Committee on Administrative and Budgetary Questions, and assisted Yakovlev in the bid-rigging scheme, has been indicted for laundering money for Yakovlev.

6.    Since late 1999, proposals for contracts made by ES-KO to provide food and related services to United Nations peacekeeping forces in East Timor, Lebanon, Syria, Liberia, Eritrea, Burundi, Cyprus, Kosovo and Sudan, which contracts should have been awarded

to ES-KO based on the technical merit of the proposals it submitted, the pricing it proposed, ES-KO's proven capacity to perform and other objective factors pertinent to the contract award procedures established by the United Nations, were instead awarded to ESS. The total value of these contracts is approximately $574 million. As a result of having been wrongfully denied the award of these contracts, ES-KO has suffered damages of approximately $86 million, excluding pre-judgment interest.

7.      In addition to damages resulting from denied contract awards, ES-KO also has sustained damages as a result of being forced to reduce its profit margins on food contracts for United Nations peacekeeping forces in at least eight countries, namely, Sierra Leone, Congo, Kosovo, Eritrea, Cyprus, Liberia, Burundi and Haiti. Such reduced margins were adopted by ES-KO, unaware that the bid-rigging scheme had been implemented, in the belief that it was responding to authentic and legitimate pricing competition from Compass Group/ESS. The total value of contracts awarded to ES-KO and adversely impacted by the bid-rigging scheme was approximately $430 million. ES-KO has sustained approximately $37 million in damages, excluding pre-judgment interest, as a result of the reduced profit margins it was forced to establish in connection with such contract and other separate, further related damages.

8.      Based upon the foregoing described scheme and conspiracy, ES-KO asserts claims against the Defendants herein, inter alia, pursuant to (i) the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), (d) and 1964(c), (ii) Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c) and Section 4 of the Clayton Act, 15 U.S.C. § 15, and (iii) the common law of the State of New York.

## JURISDICTION AND VENUE

9.      The jurisdiction of this Court is founded, inter alia, on 28 U.S.C. § 1331 and 28 U.S.C. § 1337.   This Court has jurisdiction under 28 U.S.C. § 1331 since this action arises, inter alia, under Sections 1962(c)(d) and 1964(c) of RICO, Section 2(c) of the Robinson-Patman Act and Section 4 of the Clayton Act.  Supplemental jurisdiction is founded on 28 U.S.C. § 1367.

10.     Venue is proper in this district, inter alia, because many of the acts and much of the conduct charged herein occurred in this District.   Moreover, several of the Defendants maintain offices and/or reside in this District.

11.     This Court has personal jurisdiction over Defendants because Defendants either reside, maintain offices, or conduct substantial business in New York and/or conspired to and engaged in substantial conduct in connection with the bid-rigging scheme and in furtherance of their conspiracy in this District.

## PARTIES

12.     Plaintiff ES-KO International, Inc. is a foreign corporation headquartered in Monaco. ES-KO has been a qualified vendor with the Procurement Division of the United Nations since 1988. ES-KO maintains places of business at 1 Rue des Genêts, "Le Millefiori", MC 98000, Monaco, and, through a subsidiary, at 9821 Katy Freeway, Houston, Texas 77024.

13.     Defendant Compass Group PLC is a corporation organized under the laws of the United Kingdom.  Compass Group PLC maintains a registered office at Guildford Street, Chertsey, Surrey, United Kingdom, KT16 9BQ.  Compass Group is the largest food services company in the world, with business operations in over ninety countries, including substantial operations in the United States and this District.  Compass Group reported revenues

of $22,193,400,000 for fiscal year 2005.   Compass Group's shares are publicly traded in the United Kingdom, and are traded over-the-counter in the United States through American Depositary Receipts.

14.     Defendant ESS Support Services Worldwide is a division of Compass Group PLC.   Defendant ESS Support Services Worldwide is managed and operated out of Compass Group PLC's offices at Parklands Court, 24 Parklands, Birmingham Great Park, Rubery, Birmingham, West Midlands B45 9PZ, United Kingdom.

15.     Defendant Eurest Support Services (Cyprus) International Limited is a business entity which maintains an office at 84 Nicou Pattichi Street, Maritania Building, 3070 Limassol, Cyprus through which Compass Group also conducts a portion of the operations of ESS.

16.     Defendant Peter Harris joined Compass Group in 1993.   During the Relevant Period, he served as Chief Executive Officer of ESS Support Services Worldwide, and thereafter as Chief Executive Officer of Compass Group PLC's United Kingdom, Ireland, Middle East and Africa division.   During 2005, Harris served as a member of Compass Group's Board of Directors and was widely touted as a likely successor to the then-Chief Executive Officer of Compass Group, Michael Bailey.[2]   Harris was terminated by Compass Group in

---

[2]   For his part, Bailey was frequently in New York during the Relevant Period.  At the outset of the Relevant Period, Bailey maintained an apartment at 200 East 57th Street, PHK, in New York, New York, and Bailey was involved along with Harris in formulating the initial "business relationship" between Compass Group/ESS and the United Nations.  As alleged infra, at paragraph 266, when Compass Group/ESS declined in early 2005 to acquire IHC, instead of terminating Defendant Harris, Bailey participated in promoting Harris to the third-ranking executive position at Compass Group, grooming Harris as a likely successor to Bailey as Chief Executive Officer of Compass Group.  As of March 24, 2006, Compass Group has announced that Bailey will step down as Chief Executive Officer on or about June 1, 2006.  Plaintiff reserves the right to add Bailey individually as a defendant based, inter alia, on further

November 2005.  Peter Harris also was a Director of Strategic International Alliance Limited, a company registered in the British Virgin Islands and now known as Alliance Investment Development Ltd, which purchased IHC in June 2005.  During the Relevant Period, Harris visited New York and communicated with Yakovlev in furtherance of the scheme to secure the award of United Nations contracts for Compass Group/ESS.   Harris is named as a defendant herein based upon his participation in the bid-rigging scheme.  During the Relevant Period, Harris maintained a residence at 31, Leopard Creek Country Club, Malelane, Mpumalanga South Africa.

17.    Defendant Andrew Seiwert was Business Director of ESS Support Services Worldwide during the Relevant Period, prior to his termination by Compass Group in November 2005.  During the Relevant Period, Seiwert frequently visited New York and communicated regularly with Yakovlev, IHC, and Defendant Ezio Testa in furtherance of the scheme to secure the award of United Nations contracts to Compass Group/ESS.  Seiwert is named as a defendant herein based upon his participation in the bid-rigging scheme.

18.    Defendant Steve Kemp was employed by ESS Support Services Worldwide as a Regional Operations Director during the Relevant Period, and, in such capacity, had responsibility for performance of ESS's United Nations food rations contracts.  He is still so employed.  Kemp is named as a defendant herein based upon his participation in the bid-rigging scheme.

19.    Defendant Len Swain is employed by Compass Group and, during the Relevant Period, had responsibility for ESS's food purchases in connection with ESS's performance of its contracts with the United Nations.  Compass Group has disclosed that

---

investigation of the bid-rigging scheme and Bailey's personal knowledge of and/or involvement in the bid-rigging scheme.

Swain's employment with Compass Group will shortly be terminated.   Swain is named as a defendant herein based upon his participation in the bid-rigging scheme.

20.    Defendant Steve Bickerstaff, during the Relevant Period, was employed by Compass Group. Bickerstaff is named as a defendant herein based upon his participation in the bid-rigging scheme.

21.    Defendant Doug Kerr, during the Relevant Period, was an executive of ESS Support Services Worldwide.  Defendant Kerr worked directly with Defendant Seiwert to prepare ESS's contract bids at issue, and was terminated by Compass Group in November 2005.[3] Kerr is named as a defendant herein based upon his participation in the bid-rigging scheme.

22.    Defendant IHC Services, Inc. is a corporation organized under the laws of the State of New York, with its headquarters and principal place of business at 192 Lexington Avenue, Suite 600, New York, New York 10016-6823. During the Relevant Period, IHC also maintained an office at Via dei Piatti, 20123, Milan, Italy.  IHC is named as a defendant herein based on its role in the bid-rigging scheme pursuant to which, supposedly acting as a vendor intermediary for ESS, it received millions of dollars as compensation for its participation in a conspiracy to secure for Compass Group/ESS valuable contracts by bribery and other illegal means. During the period from in or about 1998 through 2000, veteran United Nations diplomat Giandomenico Picco ("Picco") served as IHC's Chairman of the Board. During part of the Relevant Period, Picco simultaneously served as an United Nations Undersecretary-General and personal representative of Kofi Annan. The former 100% shareholder of IHC, a Luxembourg firm called Torno S.A.H., was majority owned until June 2005 by Dario Fischer and Engelbert

---

[3]  At the time of Kerr's termination, Compass Group/ESS did not disclose either his identity or his involvement in the bid-rigging scheme.

Shreiber, Jr. ("Schreiber").   Schreiber has business ties to Ahmed Idris Nasreddin, who reportedly has served as a money launderer for Al Qaeda.

23.   Defendant Ezio Testa was President and Chief Executive Officer of IHC Services from in or about 1998 through 2005, and is currently a Board member of IHC.  Testa is named as a defendant herein based upon his participation in the bid-rigging scheme.  Testa maintains an apartment at 1365 York Avenue, Apt. 21K, New York, New York.

24.   Defendant Alexander Yakovlev was an employee of the United Nations from in or about 1985 to 2005.  During the Relevant Period, Yakovlev was employed as Team Leader for the Field Procurement Section of the Procurement Division of the United Nations.  From about 1999 through June 22, 2005, Yakovlev was the sole or primary United Nations procurement officer responsible for the contracts at issue in this case and/or was otherwise involved with the award of such contracts, and used his authority to modify proposals while they were pending, to affect the selection of the winning proposal, and to affect the response of the United Nations to problems with ESS's performance.  As alleged herein throughout, Yakovlev was a key figure in the bid-rigging scheme pursuant to which he, among others, received and accepted bribes for illicit assistance rendered to Compass Group/ESS to secure, by improper means, hundreds of millions of dollars of United Nations contracts that would, but for his misconduct and the misconduct of his co-conspirators, have been awarded to ES-KO.  Yakovlev currently resides at 38 Ellsworth Ave, Yonkers, New York.

25.   Defendant Dmitry Yakovlev is Alexander Yakovlev's son.   During portions of the Relevant Period, Dmitry Yakovlev was employed by IHC.  As alleged herein, Dmitry Yakovlev participated in the bid-rigging scheme by, among other means, serving as a

conduit to IHC of illicitly obtained proprietary, non-public information belonging to ES-KO. Defendant Dmitry Yakovlev currently resides at 38 Ellsworth Ave, Yonkers, New York.

26.     Defendant Vladimir Kuznetsov was an employee of the United Nations during the Relevant Period.   Starting in or about 2000, Defendant Kuznetsov served on the United Nations Advisory Committee on Administrative and Budgetary Questions, and starting on or about January 1, 2004, served as Chairman of such Committee.   Kuznetsov is named as a defendant herein based upon his participation in the bid-rigging scheme.   Kuznetsov received some of the bribe money for participating in the bid-rigging scheme.

27.     Defendants John Does 1 to 100 are other Defendants who are liable to ES-KO based upon their participation in the scheme and conspiracy alleged herein but whose identities are currently unknown to ES-KO.

## STATEMENT OF FACTS

### I.     United Nations Peacekeeping Forces and the Procurement Division

28.     Since 1948, the United Nations has conducted approximately sixty peacekeeping operations.   At present, approximately 71,000 uniformed personnel from 107 different countries are deployed by the United Nations in fifteen separate peacekeeping operations.   The United Nations provides these peacekeeping troops with fresh food rations and drinking water together with associated logistical support services on a daily basis.

29.     The United Nations Procurement Division (the "Procurement Division") is responsible for procuring goods and services for a wide variety of end-users, including, but not limited to, all United Nations peacekeeping missions worldwide and, until recently, the Oil for Food Program in Iraq.   During the Relevant Period, the Procurement Division was located at

United Nations Headquarters in New York City, most recently located at 304 East 45th Street, New York, New York.

30.     As of September 2005, the Procurement Division had a staff of seventy personnel, divided among four sections: Logistics and Transportation, Headquarters Procurement, Field Procurement, and Support Services. The Field Procurement section has administrative responsibility for all purchases over $200,000 on behalf of peacekeeping missions, with the exception of transportation equipment and services. During the Relevant Period, a handful of United Nations personnel in the Field Procurement Section at United Nations Headquarters in New York were responsible for most of the procurement actions pertaining to peacekeeping missions.

31.     In 2004, the Procurement Division procured $1.37 billion in goods and services, approximately 85% of which was for the Department of Peacekeeping Operations, and more than $2 billion in goods and services were procured in 2005.

32.     The Procurement Division procures goods and services through competitive solicitations from qualified vendors registered with the Procurement Division. Vendors must apply and be approved before they can bid on contracts with the United Nations. The market for supplying United Nations peacekeeping missions with food services is difficult to enter because of the physical, financial and logistical risks inherent in operating in the often hostile locations where such missions are deployed.

33.     Typically, the Procurement Division begins the process of finding suppliers by issuing a request for Expressions of Interest ("EOIs") to qualified vendors. Solicitations to bid on a contract are then circulated to qualified vendors that have responded to an EOI.

34.    The form of solicitation used depends on the complexity and value of the goods and services to be procured. All of the contracts at issue here involved solicitations in the form of a formal Request for Proposal (an "RFP"). RFPs typically are issued by the Procurement Division in New York, and proposals are submitted to that Division as well.

35.    In order to be considered by the Procurement Division, the response to an RFP for food services must include both a technical and a financial proposal. Technical and financial proposals typically are submitted in separate, sealed envelopes in New York. Pursuant to procedures established by the United Nations, technical proposals submitted to the Procurement Division are opened publicly in the Procurement Division Bid Room, located in New York.[4] United Nations procedures state that the sole purpose of the public opening is "to record the proposals submitted by the due date and time." The procedures further mandate that (i) "[n]o price will be extrapolated or announced at the time of the public opening," (ii) "only technical proposals will be opened to record the name of the proposers" and (iii) "[f]inancial proposals will not be opened at the public opening."

36.    Generally, each RFP is the responsibility of a designated United Nations Procurement Officer who plays a critical role in the contract award process. The Procurement Officer assigned to the RFP is identified to bidders as the "Point of Contact" and bidders are instructed to direct any questions regarding the RFP to such Procurement Officer. At the time of the public opening, the designated Procurement Officer takes custody of all copies of both technical and financial proposals. The designated Procurement Officer is also responsible for preparing an evaluation of the financial proposals.

---

[4]  As set forth below, RFPs issued by a mission headquarters on occasion may be opened at local headquarters. See, e.g., paragraph 111, infra.

37.     Technical proposals are evaluated by the Logistics Support Division, formerly known as the Field Administration Logistics Division. After receipt of the technical evaluation from the Logistics Support Division, the Procurement Officer then presents his final recommendations, through the Chief of the Procurement Division and together with his/her financial evaluation, to the Headquarters Committee on Contracts (the "HCC"). The HCC may either approve the recommendation of the Procurement Officer or ask for further clarifications. Following approval of the recommendation, the Procurement Division issues an award letter to the successful vendor.

38.     After the Procurement Division has issued an award letter, the terms of the final written contract between the United Nations and the selected vendor are negotiated by the Procurement Officer and the selected vendor.

39.     Upon award of the contract, a selected vendor is required to post a performance bond of 10 percent of the contract value, recoverable only after its contractual obligations have been fully performed.

40.     Payments to vendors providing goods and services, including vendors providing food rations, are generally made through banking facilities and accounts in New York.

## II.     ES-KO and Its Relationship with the Procurement Division

41.     ES-KO has been providing a wide range of products and services to hundreds of commercial and other clients, including the United Nations, NATO and multinational corporations in difficult regions around the world for over fifty years, and has been a qualified vendor with the Procurement Division since 1988.

42.     ES-KO is expert in selecting, purchasing, transporting, warehousing, and distributing food items to the United Nations and other multi-national clients in remote and

difficult regions.    ES-KO specializes in food supply; camp construction, maintenance, infrastructures and utilities; supply and erection of pre-fabricated buildings and mobile camp facilities; catering, laundry and housekeeping services; and operation of duty free retail shops.

43.    ES-KO's business is to provide rapid, realistic and effective solutions to logistical problems in the world's harshest environments, including Africa, the Balkans, Southeast Asia, Iraq and Afghanistan.

44.    ES-KO originally specialized in the provision of catering services to large oil and construction companies operating in remote areas of the world, with an international workforce made up of multinational managerial staff and laborers of various nationalities.

45.    Thus, ES-KO acquired the skills of operating in remote locations, overcoming the difficulties in delivering and handling large quantities of perishable food stocks, including operating the necessary kitchen and canteen equipment, hygienic storage of food and water on site and the distribution of these goods to multiple site locations within a single project. With experience gained over many years, ES-KO has been able to offer its services to an increasing and ever-wider international clientele and to expand its knowledge and know-how of the various regions in which it operates to become a major provider of food and related services to United Nations peacekeeping missions.

46.    In 1988, ES-KO was awarded its first major contract with the United Nations for the provisions of food rations to 6,000 troops in the United Nations Mission in Namibia ("UNTAG").   The requirements of the mission called upon the core skills which ES-KO had been building over a number of years.   ES-KO received praise from both the United Nations and the individual national contingents for its professional efficiency and its flexibility in overcoming logistical problems and accommodating peacekeeping troops' needs.

47.     Since 1988, ES-KO has been awarded numerous additional contracts for the provisioning of United Nations peacekeeping forces.  Contracts performed by ES-KO for the United Nations include the initial contract for the provision of food services to multinational United Nations military and civilian personnel in Angola ("UNAVEM") commencing in 1990. Thereafter ES-KO was awarded contracts to provide food delivery to United Nations forces, in the Buffer Zone between Kuwait and Iraq ("UNIKOM") following the Gulf War, Croatia ("UNTAES"), Bosnia – Herzegovina ("UNPROFOR"), the Former Yugoslav Republic of Macedonia ("UNPREDEP"), Rwanda ("UNAMIR"), Central African Republic ("MINURCA"), the Democratic Republic of Congo ("MONUC"), Haiti ("MINUSTAH"), Kosovo ("UNMIK") and Cyprus ("UNFICYP").   In many cases, ES-KO had to begin delivering its services to thousands of troops deployed in remote, isolated, or hostile locations within days of notice that it had been awarded a contract.

48.     As a result of its extensive experience, ES-KO has substantial expertise in the cost-effective provisioning of food and services to missions whose multinational members typically comprise troops and other personnel with varied dietary needs, preferences, habits and/or restrictions.  ES-KO has developed extensive, confidential, proprietary databases on the consumption habits and preferences of United Nations peacekeeping troops from various countries and the most efficient and cost-effective supply and storage points for deliveries of food to United Nations missions around the world, which, together with extensive other relevant data and expertise, enabled ES-KO to submit uniquely well-designed proposals in response to RFPs issued by the Procurement Division.  By the commencement of the Relevant Period, ES-KO had established itself as a leading supplier for United Nations peacekeeping troops and the leading such supplier in Africa. However, during the Relevant Period, notwithstanding its

expertise and the technical superiority of its proposals and its pricing, numerous bids by ES-KO for contracts from the United Nations were unsuccessful as a result of the active criminal conspiracy among the Defendants described herein.

**III.    Compass Group/ESS, IHC, Alexander Yakovlev, and the Bid-Rigging Scheme**

        **A.    Compass Group/ESS Paid IHC for its Illegal "Assistance" as a "Vendor Intermediary."**

        49.    ESS Support Services Worldwide is a division of Compass Group whose operations involve the provision of food services and related support to clients in remote sites or at military locations around the world.  According to United Nations records, ESS first became a qualified vendor with the Procurement Division on or about September 17, 2001, although as alleged, infra, it was awarded its first United Nations contract prior to that date.

        50.    Prior to the Relevant Period, Compass Group/ESS had no experience in the provision of food supply services to United Nations overseas missions and was not recognized as a qualified vendor by the United Nations.  Yet, according to a report by Compass Group of its Interim Unaudited Results, released on or about May 18, 2005, ESS revenues totaled $514,000,000 in the first six months of 2005, a significant part of which represented revenues from United Nations contracts secured by it through its participation in the scheme and conspiracy at issue here.  ESS's lack of expertise extended to both its ability to formulate the complex and detailed logistical and technical proposals necessary to satisfy the requirements of the United Nations bidding process and to its ability to satisfactorily perform the duties which such contracts entail.  Due to this lack of experience, know-how and expertise, ESS would not have been awarded any of the contracts at issue but for the bid-rigging scheme and related illegal conduct of Compass Group/ESS and its co-conspirators.

51.     Commencing in or about late 1999, IHC was engaged by Compass Group/ESS to secure United Nations contracts on behalf of Compass Group/ESS. Until its recent suspension by the United Nations, IHC was a registered vendor of the Procurement Division, and acted both as a contractor selling goods directly to the United Nations and as a "vendor intermediary," or go-between, for other United Nations contractors.[5]  Compass Group/ESS paid IHC millions of dollars to be its so-called "vendor intermediary" for the purpose of obtaining United Nations contracts.   As "vendor intermediary," IHC routinely engaged, during the Relevant Period, in illegal bid-rigging and paid bribes to secure United Nations contracts for "clients" such as Compass Group/ESS.  Compass Group/ESS, at all times during the Relevant Period, knew that its substantial payments to IHC were being used to illegally arrange for ESS to secure awards for United Nations contracts through bribes, kick-backs and related illegal conduct.   At all times during the Relevant Period, Compass Group/ESS knew that it was engaging, both directly and indirectly through IHC, in an illegal bid-rigging scheme designed to steal business from ES-KO and that, if such scheme had not been implemented, ES-KO otherwise would have received such United Nations contract awards.

52.     Commencing on or before March 2000, another of Compass Group PLC's 100% owned subsidiaries, Restaurant Associates Corporation, was awarded the first of several contracts to provide catering services for United Nations Headquarters in New York.  As

---

[5] The Procurement Division's website advises vendors and prospective vendors against the use of "vendor intermediaries."   *See* http://www.un.org/Depts/ptd/.   Specifically, the website contains the following  warning: "There are indications that certain parties have approached prospective vendors offering to act as intermediaries in dealings with the United Nations. Some of these intermediaries purport to have various arrangements with the United Nations or to possess support facilities within UN missions or projects which can place a vendor in a more advantageous position in competitive bidding exercise. Vendors are advised that the UN prefers to deal directly with principals to the extent possible. Vendors are therefore urged to consult with the Procurement Service before deciding to submit offers or negotiate contracts through any intermediary." Id.

of July 7, 2000, Michael Bailey, Compass Group's then-recently promoted Group Chief Executive was also identified on New York State records as Chairman or Chief Executive Officer of Restaurant Associates Corporation.

53.     ESS's initial foray, under the guidance of IHC, into the United Nations procurement process occurred in connection with the United Nations Transitional Administration in East Timor ("UNTAET").

54.     In or about late 1999, the Procurement Division issued an Invitation to Bid for the provision of two ships to house UNTAET troops or personnel from mid-November 1999 to mid-January 2000 and from mid-December 1999 to mid-March 2000, respectively.

55.     IHC assisted a company known as Intership Limited ("Intership") in the preparation of a bid on the contract, which was submitted on or about October 4, 1999.  Tax authorities in East Timor have reported that during 2000, Intership paid commissions or "spotter's fees" totaling $650,000 to unknown persons in connection with the UNTAET contract.

56.     To ensure that the contract would be awarded to Intership, at least part of that "fee" was transferred by IHC to a secret bank account held by Yakovlev in the name of Moxyco Ltd. at Antigua Overseas Bank or to another covert bank account maintained by Yakovlev.

57.     The Procurement Division thereafter awarded this contract to Intership. Andrew Toh, who was recently suspended by the United Nations pending a full investigation of his role in the bid-rigging scheme, signed this contract on behalf of the United Nations.

58.     Food and related services were required for the troops or personnel on the aforementioned ships.  Although ESS had no prior experience as a vendor to the United Nations and, according to the Procurement Division's own records, was not registered as a United

Nations vendor until September 17, 2001, IHC, as "vendor intermediary" was able to secure for

ESS the subcontract to provision the ships provided by its other client, Intership.  The award of

the Intership subcontract was approved by the Procurement Division in or about late 1999.

**B.**     **Alexander Yakovlev Supplied IHC and Compass Group/**
           **ESS with Confidential Information in Exchange**
           **for Substantial Bribes and/or Other Illegal**
           **Consideration or Remuneration.**

59.     As a Team Leader for the Headquarters Procurement Section of the

Procurement Division, Yakovlev was responsible for procuring some of the major contracts for

the Oil-for-Food Program in Iraq.  As a Team Leader for the Field Procurement Section of the

Procurement Division, Yakovlev, inter alia, was the sole or primary United Nations procurement

officer responsible for processing the technical and financial proposals received in response to

RFPs issued by the Procurement Division for contracts at issue in this case and/or otherwise

played a significant role in affecting the award of these contracts, and therefore was in a unique

position to facilitate the bid-rigging scheme.

60.     On or about August 8, 2005, Yakovlev pled guilty in the Southern

District of New York to charges of conspiracy, wire fraud and money laundering arising from his

receipt of approximately $950,000 in connection with the performance of his duties as a Team

Leader for the Headquarters Procurement Section of the Procurement Division between 1993 and

2005.

61.     The Committee on International Relations of the United States House of

Representatives (the "International Relations Committee") concluded in a report on corruption in

the Oil-for-Food Program in Iraq that Yakovlev had funneled almost $1 million in bribe money

into a secret account at Antigua Overseas Bank in the Caribbean.  According to the International

Relations Committee, such bribes were paid in return for information and assistance pertaining to both the Oil-for-Food program and non-Oil-for-Food contracts.

62.     Some of those bribes were paid by Compass Group/ESS through IHC and/or directly, in exchange for highly confidential non-public information pertaining to ES-KO's bids on the contracts discussed below and for the related criminal conduct by Yakovlev and his confederates.

63.     IHC was directly linked to Yakovlev, by, among other means, IHC's employment of his son, Dmitry Yakovlev, at the request of his father.  Dmitry Yakovlev, who had not yet finished college and lived with his parents in Yonkers, New York, was employed initially as an Administrative Assistant (i.e., an intern) from in or about May-August 2000, shortly after the United Nations signed a supply contract with IHC (for which Yakovlev was the procurement officer) for IHC to sell the United Nations nearly $1.2 million in portable generators for peacekeeping missions. From in or about May-August 2001 and in or about December 2002-December 2003, Dmitry's job title was Assistant to the Vice-President. (Collectively, Alexander Yakovlev and Dmitry Yakovlev are referred to as "the Yakovlevs" herein.)  His employment by IHC, at the request of his father, violated United Nations conflict of interest prohibitions.

64.     Through his father, Dmitry Yakovlev routinely had access to confidential non-public information regarding bids on food contracts for United Nations peacekeeping forces. Dmitry Yakovlev received and made numerous calls to and from IHC, some of which were closely followed by calls to and from his father at the United Nations Headquarters in New York City.  These calls apparently continued even after he was no longer officially employed by IHC.

65.     Yakovlev resigned his position as Team Leader of the Field Procurement Section of the United Nations' Procurement Division once his son's relationship with IHC became public.

## C.     The Methods Employed Pursuant to the Ongoing Bid-Rigging Scheme Among the Defendants

66.     Following IHC's initial success in procuring the Intership subcontract for Compass Group/ESS, Compass Group/ESS continued as a client of IHC, paying it substantial sums of money, supposedly for "intermediary" services.  In fact, substantial portions of the fees paid by Compass Group/ESS to IHC were passed on as bribe or kick-back money to Yakovlev, the Team Leader for the Field Procurement Section of the Procurement Division, to Vladimir Kuznetsov, and/or to the John Doe Defendants, and were otherwise used to fund the criminal bid-rigging scheme.  In consideration for these payments, Yakovlev aided and abetted by Kuznetsov and/or John Doe Defendants, put IHC and its clients, especially ESS, on an "inside track" with the Procurement Division and provided IHC with, among other forms of information, critical details of officially sealed, non-public confidential technical and financial bids submitted by other bidders, including ES-KO.  IHC, in turn, shared such material non-public information with Compass Group/ESS, which, as set forth herein, enabled Compass Group/ESS, to access ES-KO's sealed bids utilizing pricing and other confidential ES-KO information and, using this information, to "underbid" ES-KO.  At all relevant times, Compass Group/ESS knew that it was improperly receiving material non-public information regarding the technical and financial bids of ES-KO, and that, in obtaining and exploiting such information to steal United Nations contracts, Compass Group/ESS was participating in a scheme of  illegal bid-rigging and commercial bribery.

67.     To avoid detection of the bribes by the United Nations or other regulatory authorities, Compass Group/ESS and IHC arranged for covert fund transfers to secret bank accounts maintained by Yakovlev.

68.     During the Relevant Period, the United Nations issued significant RFPs, including RFPs for procurement of food and related services for peacekeeping missions operating in East Timor, Sierra Leone, Congo, Kosovo, Eritrea, Cyprus, Lebanon, Syria, Liberia, Sudan, Burundi and Haiti.  ES-KO submitted technical and pricing proposals in response to each of these RFPs pursuant to the sealed bid procedures established by the United Nations. Preparation of each of these proposals drew upon ES-KO's extensive databases, institutional expertise and resources and each such proposal contained and was based upon confidential, proprietary and non-public information of ES-KO.

69.     ES-KO incurred substantial costs and committed resources in the preparation of its technical and financial proposals based on its understanding and belief in the integrity of the United Nations procurement system.  Specifically, ES-KO believed, based upon United Nations policies and procedures, that technical proposals were opened publicly in the Bid Room of the Procurement Division at United Nations Headquarters in New York (or, on occasion, at the mission headquarters as set forth herein) for the sole purpose of establishing for the record that the proposals had been submitted by the due date.  ES-KO further believed that, in accordance with United Nations procedures, the details of the technical proposal were not to be made public at any time and that no information would be shared with or communicated to any other bidder regarding the technical or financial aspects of any competing bid.

70.     Unbeknownst to ES-KO, however, during the Relevant Period, Yakovlev, directly and through intermediaries, including his son, Dmitry Yakovlev and the John Doe

Defendants, provided Compass Group/ESS with, among other information, critical details of supposedly sealed, non-public technical and financial bids submitted by other bidders, including ES-KO.

71.     Following submission of sealed bids, taking advantage of the interval between the Logistic Support Division's evaluation of technical bids and the procurement officer's review of pricing proposals, IHC, with the assistance, knowledge and/or consent of Compass Group/ESS, accessed (through Yakovlev and/or his co-conspirators) and used ES-KO's pricing proposals to assemble new or modified financial proposals by replacing the original bid pages of Compass Group/ESS's bids with pages altered to systematically underbid ES-KO and other bidders and otherwise illegally utilized ES-KO's confidentially submitted bids.

72.     Yakovlev and/or one or more John Doe Defendants in collusion with Yakovlev, routinely would then substitute the new, lower ESS bid for the old, higher bid, before the financial proposal came under formal review.

73.     Additionally, as part of the scheme, Compass Group/ESS would obtain from Yakovlev, directly and through intermediaries, such as IHC, proposals which had been successfully submitted by ES-KO in connection with the award to ES-KO of United Nations short-term interim contracts.  Compass Group/ESS would then illegally and improperly use the confidential pricing and other information contained in ES-KO's interim contract proposals to formulate Compass Group/ESS's own bids for the main contracts in an effort to underbid ES-KO's proposals for those longer-term food services contracts, which were entered into upon the expiration of the interim contracts.

74.     Employing the foregoing described means, as alleged in further detail in paragraphs 78 to 234 infra, IHC secured for Compass Group/ESS contracts for provision of

services to missions in East Timor, Kosovo, Cyprus, Lebanon, Syria, Liberia, Eritrea, Burundi, and Sudan which would have otherwise been awarded to ES-KO.

75.     In response to Compass Group/ESS's apparent success in underbidding ES-KO proposals (evident as a result of the award of contracts to ESS), ES-KO was forced to significantly reduce its profit margins when calculating its pricing proposals relative to prior successful proposals.  ES-KO adopted this reduced pricing in the good faith belief that it was responding to authentic and legitimate pricing competition from Compass Group, the self-proclaimed largest food services company in the world, rather than, as is now known, the pervasive and egregious violation by Compass Group/ESS of the integrity of the bidding procedures established by the United Nations.  As a result of being induced to change its pricing structure based upon the bid-rigging scheme, as alleged in further detail in paragraphs 78 to 264 infra, ES-KO was forced to lower its bids in its proposals for other contracts awarded to it for the provision of services to missions in Sierra Leone, Kosovo, Cyprus, Congo, Eritrea, Liberia, Burundi and Haiti.

76.     In addition to the foregoing described conduct, Yakovlev and/or one or more John Doe Defendants in conspiracy with Compass Group/ESS and IHC, took other steps in furtherance of the conspiracy to ensure that ESS was awarded such contracts, and that the illegal bid-rigging scheme would not be detected.   For example, Yakovlev suppressed formal complaints made by Field Headquarters regarding the performance of Compass Group/ESS and immediately alerted Compass Group/ESS to enable them to attempt to remedy problems prior to audit of Compass Group/ESS by the United Nations.  Yakovlev even took steps to improperly relieve ESS of some of its financial contractual obligations.  On at least one occasion, Yakovlev

returned or caused to be returned a $3.7 million performance bond to ESS eight months early, in contravention of United Nations regulations.

      77.    In furtherance of its sudden appearance and meteoric rise as a United Nations contractor, Compass Group/ESS trumpeted its association with IHC which propelled it from a neophyte in the field to a major United Nations contractor which was awarded eight out of the eleven United Nations food supply contracts from 2002 to 2005. On or about September 13, 2004, ESS issued a press release in which it established a "New Best in Class" business partnership with New York-based IHC. That partnership was hailed in the same press release by Peter Harris. The ESS-IHC partnership was to be managed by Andrew Seiwert. In reality, the so-called "new" ESS-IHC business partnership was one vehicle by which Compass Group/ESS sought to disguise the illegal bribes and other illegal payments made by Compass Group/ESS and IHC in connection with this so-called business partnership. Compass Group terminated the employment of Peter Harris and Andrew Seiwert when their involvement in the bid-rigging scheme was publicly disclosed.

**IV.    Contracts Which But for the Bid-Rigging Scheme Would Have Been Awarded to ES-KO**

    **A.    Liberia**

      78.    The United Nations Mission in Liberia ("UNMIL") was established by the Security Council in September 2003 to support the implementation of a ceasefire agreement following a civil war between the Liberian government and the National Patriotic Front of Liberia, protect United Nations staff, facilities and civilians, and support humanitarian and human rights activities.

79.     On or about September 12, 2003 the Procurement Division issued RFPS-550 for the provision of rations to UNMIL peacekeeping troops for the period of January 2004 to December 2006 (the "Liberia Main Contract").

80.     On or about October 8, 2003, while ES-KO was preparing its bid for the Liberia Main Contract, the Procurement Division in New York issued RFPS-564 for the interim provision of rations to 4,386 UNMIL peacekeeping troops for the period of November 1, 2003 to December 31, 2003 (the "Liberia Interim Contract").

81.     On or about October 15, 2003, ES-KO submitted a technically proficient and financially competitive proposal in response to RFPS-564 and, on or about October 22, 2003, was awarded the Liberia Interim Contract.

82.     The following day, on October 23, 2003, ES-KO submitted its technically proficient and financially competitive proposals for the Liberia Main Contract in separate, sealed envelopes.

83.     The technical proposals of bidders for the Liberia Main Contract were publicly opened in the Bid Room of the Procurement Division at United Nations Headquarters in New York at 11:00 a.m. on or about October 23, 2003.

84.     Yakovlev was the sole point of contact within the Procurement Division for all queries that bidders might have in relation to the proposals for the Liberia Interim and Main Contracts and was the custodian of both the technical and financial proposals during the evaluation periods.

85.     ES-KO's pricing for the Main Liberia Contract was exceptionally competitive for at least two reasons. First, at the time of preparing and submitting the Liberia Main Contract proposals, ES-KO had heard an alarming rumor from a Northern European

shipping agent that Compass Group/ESS was boasting that its intention was to "wipe ES-KO out of Africa," a region where ES-KO was established as the primary vendor supplying food to the United Nations peacekeeping forces. Therefore, in order to counteract what ES-KO believed at the time to be aggressive, but legitimate, commercially competitive behavior by Compass Group/ESS, ES-KO reduced its margins in the financial proposal for the Liberia Main Contract in an attempt not to be underbid and to defend its market in Africa.

86.     Second, as alleged supra, at the time ES-KO submitted its technical and financial proposals for the Liberia Main Contract it had been officially informed that it had been awarded the Liberia Interim Contract.  Based on such information and recognizing that the Liberia Main Contract called for the continuation of services it would be providing pursuant to the Liberia Interim Contract, ES-KO was able to formulate its proposal for the Liberia Main Contract without including the substantial costs of mobilization.

87.     On or about November 14, 2003, the Procurement Division awarded ESS the Liberia Main Contract. In a departure from usual practice, other bidders for the contract were not immediately notified of the award.

88.     On or about November 18, 2003, it came to ES-KO's attention that an ESS manager was making public statements regarding a pending United Nations contract award. Specifically, the same Northern European shipping agent who had heard of the earlier-stated intention of Compass Group/ESS to "wipe ES-KO out of Africa," now reported that an ESS manager had stated that ESS had been awarded the Liberia Main Contract.

89.     Upon hearing this rumor, on or about November 18, 2003, ES-KO immediately tried to contact Yakovlev by telephone to clarify the matter.  When Yakovlev did not respond, ES-KO e-mailed him at his United Nations e-mail address, with copies of the e-mail

sent to Dmitri Dovgopoly, Chief of the Field Procurement Section, and Christian Saunders, Chief of the Procurement Division, asking the same question.  Later on November 18, 2003, Dmitri Dovgopoly responded, with copies of his e-mail sent to Yakovlev and Christian Saunders, declining to answer the question and informing ES-KO that "you will be informed of the results as appropriate."

90.     On the following day, November 19, 2003, ES-KO received formal notice from the United Nations that the Liberia Main Contract had been awarded to ESS, which was purportedly the "lowest bidder."

91.     The award to ESS of the Liberia Main Contract came as a great shock to ES-KO for a number of reasons.  First, at the time of the award to ESS, ES-KO had been performing the interim contract for approximately three weeks and had already established an excellent level of service to the mission there.  Furthermore, when the award for the Liberia Interim and Main Contracts was being decided, ES-KO was faithfully fulfilling all of its obligations under an ongoing food supply contract for the United Nations in neighboring Sierra Leone.  As a vendor which had successfully performed numerous other United Nations contracts in the region and as the only vendor, due to its ongoing operations in the same region, capable of submitting a competitive proposal for commencing additional operations at short notice, ES-KO considered itself uniquely positioned to submit the most competitive proposal.  Furthermore, unlike ES-KO, ESS had no comparable experience.

92.     Finally, ES-KO was shocked that ESS could somehow have underbid ES-KO's proposal for the Main Liberia Contract. ES-KO assumed that ESS's financial proposal for this contract would have had to include significant mobilization costs since ESS, unlike ES-KO, had no concurrent operations in the region.  This factor, combined with ES-KO's highly

competitive pricing on the proposal, led ES-KO to conclude that it would have been virtually impossible for ESS's financial proposal to match its own.

93.     On November 20, 2003, ES-KO e-mailed Dmitri Dovgopoly, with copies of the e-mail again sent to Yakovlev and Christian Saunders, asking that ES-KO be provided with an analysis of its technical compliance.

94.     Thereafter, on November 24, 2003, ES-KO sent another e-mail to Dmitri Dovgopoly, with copies of the e-mail again sent to Yakovlev and Christian Saunders, asking for a de-briefing with respect to the Liberia Main Contract.

95.     Despite ES-KO's request, ES-KO was never invited to participate in a de-briefing session, and was never provided with an evaluation of its technical proposal or pricing.

96.     Unbeknownst to ES-KO, on November 6, 2003, prior to the formal review by HCC and the award of this Liberia Main Contract to Compass Group/ESS, Ezio Testa, the President and Chief Executive Officer of IHC, sent an e-mail to Defendant Andrew Seiwert of Compass Group/ESS which reveals the egregious breach by Yakovlev, IHC and ESS of the confidentiality requirements applicable to the bidding process and exposes the nature of the conspiracy.  The e-mail was brief and direct.  "Dear Andy," it said, "This will go to the Committee next Tuesday.  All the best." The Committee referred to was the United Nations Headquarters Committee on Contracts, which approves all major purchases by the Procurement Division.

97.     Three documents were attached to Ezio Testa's November 6, 2003 e-mail.

98.     The first document ("Attachment 1") was a draft of the official recommendation by the United Nations' Procurement Division that a $62 million, three-year

contract for supplying food and water for up to 15,000 peacekeepers in Liberia be awarded to ESS. The contract also included two renewable one-year options.

99.    The second document ("Attachment 2") was a detailed United Nations evaluation of the technical abilities of twelve different firms, including ES-KO and ESS, to meet United Nations requirements for feeding separate peacekeeping missions in Liberia, Ethiopia, Eritrea and the Congo in response to an EOI.

100.    The third document ("Attachment 3") was a detailed summary of the sealed bids that three bidders, including ESS and ES-KO, had submitted in response to RFPS-550. This summary included the Compass Group/ESS modified bid pricing which Yakovlev and/or a John Doe Defendant acting at Yakovlev's direction, had substituted in ESS's original financial bid.

101.    The proposal that Compass Group/ESS submitted with the benefit of this illegally-obtained information contained numerous line items which were just pennies below ES-KO's proposal, and could not have been made without access to ES-KO's bid details. ESS's total proposal was less than 1.5% below the proposal submitted by ES-KO.

102.    Compass Group/ESS altered its original financial proposal, after which Yakovlev and/or Ezio Testa, the President and Chief Executive Officer of IHC, with the assistance of one or more of the other Defendants, sometime between October 23, 2003 and November 6, 2003, substituted the altered bid so as to ensure that ESS's bid would win the contract. ESS's modified proposal was and could only have been created as a result of ESS's having illegally obtained ES-KO's confidential, non-public proprietary bidding information. For example, the figures shown in the "Price Chart for Changes in Troop Strength" in the Cost Summary of ES-KO's financial proposal for the Liberia Main Contract had been calculated by

ES-KO based solely upon proprietary, empirical data uniquely available to it, based upon its own prior experience and could not be replicated by any arithmetical formula. It was therefore impossible for ESS to arrive at virtually identical figures without improper and illegal access to and reliance on ES-KO's proprietary and confidential work product.

103.    Compass Group/ESS should not have had access to any of ES-KO's confidential and proprietary non-public material information, and Compass Group/ESS knew that the conduct it was engaging in was illegal and criminal.

104.    ES-KO would have been awarded the main UNMIL contract but for the illegally obtained, proprietary and confidential non-public bidding information that was improperly provided by IHC and the Yakovlevs to Compass Group/ESS and Defendants' other, related illegal conduct.

105.    The Liberia Interim Contract was initially only for a period of two months.  However, due to ESS's failure to mobilize on time for the contract start date of January 1, 2004 in accordance with a four to six weeks mobilization period that ESS had represented to the United Nations that it required, the United Nations asked ES-KO to extend and continue its services to UNMIL for an additional month.  ES-KO agreed to the extension and performed the requested services for an additional month.

106.    ESS's performance of its contractual obligations in Liberia was abysmal and United Nations officials monitoring such performance complained of systemic failures by ESS.  For example, on or about June 4, 2004, after four months of ESS's performance under the Liberia Main Contract, a "Notice of Unsatisfactory Performance and Material Breach of

Contractual Obligations" was sent to ESS by the Chief Administrative Officer, the highest civilian official of UNMIL.[6]

107.   ES-KO estimates its lost gross revenue on the Liberia Main Contract as not less than $120,411,000. ES-KO suffered damages because it was not awarded the Liberia Main Contract as a result of the bid-rigging scheme in an amount of not less than $18,061,650, exclusive of prejudgment interest. The Liberia Interim Contract generated $1,589,259 in revenue.  ES-KO also suffered damages in the additional amount of not less than $79,463, exclusive of pre-judgment interest, as a result of being induced by the bid-rigging scheme to reduce its gross margins on the Liberia Interim Contract by not less than 5%.

**B.     Cyprus**

108.   The United Nations Peacekeeping Force in Cyprus ("UNFICYP") was set up in 1964 to prevent inter-communal fighting between the Greek Cypriot and Turkish Cypriot communities. UNFICYP's responsibilities expanded following the hostilities of 1974. UNFICYP remains on the island to supervise ceasefire lines, maintain a buffer zone and undertake humanitarian activities.

109.   On or about September 10, 2001, UNFICYP issued RFP-01/15 for the provision of food supplies on an interim basis to 1,250 UNFICYP peacekeeping troops for the period of March 1, 2002 to March 1, 2004, with an option to extend for a further twelve months ("UNFICYP I").

110.   ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about October 1, 2001.

---

[6] Notwithstanding such poor performance, ESS continued to be awarded food supply contracts, since Yakovlev was the point of contact for procurement contracts processed at United Nations Headquarters.

111.    Unlike the procedures employed for other contracts, technical proposals were publicly opened on or about October 4, 2001 in the Chief Administration Conference Room at the UNFICYP Headquarters at the old Nicosia Airport.  UNFICYP thereafter awarded this contract to ES-KO.

112.    ES-KO achieved a satisfactory level of performance and consequently the option to extend the contract for a further year was exercised. This contract generated $5,265,740 in revenue.

113.    Following the completion of UNFICYP I, on or about September 6, 2004, UNFICYP issued RFP-18/04 for the provision of rations to 1,230 troops for the period of March 1, 2005 to March 1, 2007 with an option to extend for a further twelve months ("UNFICYP II").

114.    ES-KO relied on its immediate prior experience successfully provisioning UNFICYP in preparing its technical and financial proposals.

115.    However, ES-KO was told that the proposals it had submitted to Nicosia, which included prices, were subsequently forwarded to New York for final scrutiny by the Procurement Division.  The UNFICYP II proposals were not subject to approval by the HCC.

116.    ES-KO submitted technical and financial proposals in separate, sealed envelopes on or about October 11, 2004 with subsequent proposals submitted on or about November 11, 2004 to reflect a decrease in force level from 1,230 to 860 troops.

117.    Technical proposals in response to the UNFICYP II were subsequently publicly opened in the Chief Administration Conference Room at the UNFICYP Headquarters at the old Nicosia Airport.

118.    IHC and/or the Yakovlevs provided Compass Group/ESS with confidential non-public material information regarding ES-KO's financial and/or technical

33

proposals for the UNFICYP II so that Compass Group/ESS was able to formulate and improve its proposals and underbid ES-KO and engaged in other related misconduct, in exchange for which Compass Group/ESS paid bribes and/or other illegal consideration or remuneration to IHC and/or the Yakovlevs.

119.   Based upon an ESS proposal prepared with the illicit use of ES-KO's confidential, proprietary information and other related misconduct by Defendants, the Procurement Division awarded UNFICYP II to ESS.

120.   ES-KO would have been awarded this contract but for the illegally obtained, proprietary and confidential non-public material bidding information that was improperly provided by IHC and/or the Yakovlevs to Compass Group/ESS and Defendants' other related illegal conduct.

121.   ES-KO conservatively estimates its lost gross revenue on the UNFICYP contract as not less than $5,838,540.

122.   ES-KO suffered damages because it was not awarded the UNFICYP II contract as a result of the bid-rigging scheme in an amount of not less than $875,781, exclusive of prejudgment interest.  ES-KO also suffered damages in the additional amount of not less than $263,287, exclusive of pre-judgment interest, as a result of being induced by the bid-rigging scheme to reduce its gross margins by not less than 5% on the UNFICYP I contract.

**C.   East Timor**

123.   The United Nations Transitional Administration in East Timor ("UNTAET") was established in October 1999 to administer East Timor, exercise legislative and executive authority during the transition period to independence from Malaysia, and support capacity-building for self-government.

124.    On or about November 18, 1999, the Procurement Division issued an RFP for the provision of rations to 8,284 UNTAET peacekeeping troops from June 2000 to June 2005.

125.    Andrew Toh, who has been suspended by the United Nations pending a full investigation of the bid-rigging scheme, signed this RFP on behalf of the United Nations. All inquiries and proposals in response to this RFP were to be directed to Yakovlev in New York.

126.    ES-KO submitted its technical and financial proposals for award of the UNTAET contract in separate, sealed envelopes on or about January 15, 2000.

127.    Technical proposals were publicly opened in the Bid Room of the Procurement Division at United Nations headquarters in New York on or about January 17, 2000.

128.    IHC and/or the Yakovlevs provided Compass Group/ESS with confidential non-public material information regarding ES-KO's financial and/or technical proposals on this contract so that Compass Group/ESS was able to underbid ES-KO and engaged in other related misconduct, in exchange for which Compass Group/ESS paid bribes and/or other illegal consideration or remuneration to IHC and/or Yakovlev.

129.    Based upon an ESS proposal prepared with the illicit use of ES-KO's confidential, proprietary information and other related misconduct by Defendants, the Procurement Division awarded this contract to ESS. ES-KO was advised by Yakovlev on or about March 7, 2000 that it had not been awarded the contract.

130.    ES-KO would have been awarded this contract but for the illegally obtained, proprietary and confidential non-public bidding information that was improperly

provided by IHC and/or the Yakovlevs to Compass Group/ESS and Defendants' other related illegal conduct.

131.   ES-KO conservatively estimates its lost gross revenue on this contract as not less than $83,690,501.

132.   ES-KO has suffered damages in connection with this contract as a result of the bid-rigging scheme in an amount of not less than $12,553,575, exclusive of pre-judgment interest.

**D.     Eritrea**

133.   The Security Council established the United Nations Mission in Ethiopia and Eritrea ("UNMEE") in June 2000 to maintain liaison with Ethiopia and Eritrea and establish a mechanism for verifying the ceasefire between them.   In September 2000, the Council authorized deployment within UNMEE of up to 4,200 military personnel to monitor the cessation of hostilities and to help ensure the observance of security commitments.

134.   On or about October 6, 2001, the Procurement Division issued RFPS-124 for the provision of rations to 4,000 UNMEE peacekeeping troops for the period February 1, 2001 to January 31, 2002, plus two option years of renewal (the "UNMEE I Contract").   The Procurement Officer and Point of Contact for the UNMEE I Contract was a United Nations official other than Yakovlev.

135.   ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about November 14, 2000.  In formulating its financial proposal for the UNMEE I Contract, ES-KO reduced its margins by not less than 5% in an attempt not to be underbid. Such reduced margins were adopted by ES-KO, unaware of the ongoing bid-rigging scheme, in

the belief that it was responding to authentic and legitimate pricing competition from Compass Group/ESS.

136.    The Procurement Division awarded the UNMEE I Contract to ES-KO on or about December 21, 2001.

137.    ES-KO successfully performed the UNMEE I Contract and consequently the two one-year renewal options were exercised. The UNMEE I Contract generated $23,270,190 in revenue.

138.    On or about September 16, 2003, the Procurement Division issued RFPS-552 for the provision of rations to UNMEE troops for the period from January 2004 to December 2006 (the "UNMEE II Contract"). The UNMEE II Contract was a two-year contract with an additional one-year renewal option.

139.    Yakovlev was the Procurement Officer and Point of Contact for the UNMEE II Contract.

140.    Having successfully discharged its duties with regard to the UNMEE I Contract, ES-KO had its immediate prior experience in Eritrea to rely on in preparing its technical and financial proposals for the UNMEE II Contract.

141.    ES-KO submitted its technical and financial proposals for the UNMEE II Contract in separate, sealed envelopes on or about October 27, 2003.

142.    Technical proposals were publicly opened in the Bid Room of the Procurement Division at United Nations headquarters in New York on or about October 27, 2003.  As Procurement Officer for the UNMEE II Contract, Yakovlev was the custodian of the bidders' proposals.

143.    IHC and the Yakovlevs provided Compass Group/ESS with confidential non-public material information regarding ES-KO's technical and/or financial proposals for this contract so that Compass Group/ESS illegally was able to underbid ES-KO and engaged in other related misconduct, in exchange for which Compass Group/ESS paid IHC and/or the Yakovlevs bribes and/or other illegal consideration or remuneration.

144.    The proposal that Compass Group/ESS submitted contains numerous line items priced at just pennies below the prices quoted in ES-KO's proposal.  ESS's pricing could only have resulted from its illegal access to ES-KO's confidential, non-public proprietary bidding information.  ES-KO's pricing was based entirely upon proprietary, empirical cost data uniquely available to ES-KO, derived from its unique experience in the region, and could not have been replicated without access to ES-KO's proposal.

145.    The Procurement Division thereafter awarded the UNMEE II Contract to ESS.  ES-KO would have been awarded the UNMEE II Contract but for the illegally obtained, proprietary and confidential non-public bidding information that was improperly provided by IHC and/or the Yakovlevs to Compass Group/ESS and Defendants' other, related illegal conduct.

146.    The UNMEE II Contract was awarded to ESS on November 14, 2003 for activation on December 15, 2003.  Within weeks of activation, it was apparent that ESS was unable to mobilize in accordance with its contractual undertaking. On January 26, 2004 Yakovlev requested ES-KO's assistance in the form of an extension of the lease of reefer containers deployed for contingent level storage. Yakovlev also improperly assisted ESS in obtaining a price adjustment for items that ESS had already committed to providing at a set cost.

147.    ES-KO estimates its lost gross revenue on the UNMEE II Contract as not less than $36,614,351.

148.    ES-KO suffered damages because it was not awarded the UNMEE II Contract as a result of the bid-rigging scheme in an amount of not less than $5,492,153, with pre-judgment interest. ES-KO further estimates that it sustained damages in the additional amount of not less than $1,163,510, with pre-judgment interest, as a result of being induced by the bid-rigging scheme to reduce its gross margin on the UNMEE I Contract by not less than 5%. ES-KO sustained additional damages, as a result of the bid-rigging scheme, in the approximate amount of $900,000 in connection with the failure by Yakovlev, as part of the conspiracy, to authorize appropriate adjustments to the UNMEE I Contract price, in accordance with United Nations policies after the three-year renewal option was exercised, based on movements of foreign currency exchange rates during the contractual period.

**E.    Syria**

149.    The United Nations Disengagement Observer Force ("UNDOF") was established in 1974 following the agreed disengagement of Israeli and Syrian forces in the Golan Heights. UNDOF continues to supervise the implementation of the agreement and maintain the ceasefire.

150.    On or about October 22, 2002, the Procurement Division issued RFPS-415 for the provision of food supplies to 1,000 UNDOF peacekeeping troops for the period of January 2003 to December 2005.  A United Nations officer other than Yakovlev was initially the Procurement Officer and Point of Contact for RFPS-415. Thereafter, Yakovlev assumed these roles and became the custodian of proposals.

151.   ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about November 14, 2002.

152.   Technical proposals were publicly opened in the Bid Room of the Procurement Division at United Nations headquarters in New York on or about November 15, 2002.

153.   IHC and/or the Yakovlevs provided Compass Group/ESS with confidential information regarding ES-KO's technical and/or financial proposals on this contract so that Compass Group/ESS illegally was able to underbid ES-KO and engaged in other related misconduct, in exchange for which Compass Group/ESS paid substantial bribes and/or other illegal consideration or remuneration.

154.   The Procurement Division thereafter awarded this contract to ESS.

155.   ES-KO would have been awarded this contract but for the illegally obtained, proprietary and confidential non-public bidding information that was improperly provided by IHC and/or the Yakovlevs to Compass Group/ESS and Defendants' other, related illegal conduct.

156.   ES-KO conservatively estimates its lost gross revenue on this contract as not less than $7,053,771.

157.   ES-KO suffered damages in connection with this contract as a result of the bid-rigging scheme in an amount of not less than $1,058,066, exclusive of pre-judgment interest.

F.     **Lebanon**

158.    The United Nations Interim Force in Lebanon ("UNIFIL") was created to confirm Israel's withdrawal from Southern Lebanon in 1978, and help the Lebanese Government restore its effective authority in the area.

159.    On or about October 22, 2002, the Procurement Division issued RFPS-414 for the provision of food supplies to 2,000 UNIFIL peacekeeping troops for the period of January 2003 to December 2005.

160.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about November 14, 2002.

161.    Technical proposals were publicly opened in the Bid Room of the Procurement Division at United Nations headquarters in New York on or about November 15, 2002.

162.    An United Nations official other than Alexander Yaklovlev was initially the Procurement Officer and Point of Contact for RFS-414 and was subsequently replaced in these roles by Yakovlev, who became the custodian of the submitted proposals.

163.    IHC and/or the Yakovlevs provided Compass Group/ESS with confidential non-public material information regarding ES-KO's technical and/or financial proposals on this contract so that Compass Group/ESS illegally was able to underbid ES-KO and engaged in other related misconduct, in exchange for which Compass Group/ESS paid substantial bribes and/or other illegal consideration or remuneration.

164.    The Procurement Division awarded this contract to ESS.

165.    ES-KO would have been awarded this contract but for the illegally obtained, proprietary and confidential non-public bidding information that was improperly

provided by IHC and/or the Yakovlevs to Compass Group/ESS and Defendants' other, related illegal conduct.

166.    ES-KO estimates its lost gross revenue on this contract as not less than $10,950,000.

167.    ES-KO suffered damages in connection with this contract as a result of the bid-rigging scheme in an amount of not less than $1,642,500, exclusive of pre-judgment interest.

**G.    Burundi**

168.    The Rwandan civil war between the Tutsi-dominated army and armed Hutu rebel groups spilled over into Burundi. The Security Council established the United Nations Operation in Burundi ("ONUB") in May 2004 in order to support and help to implement the efforts undertaken by Burundians to restore lasting peace and bring about national reconciliation following the Rwandan genocide.

169.    On or about March 23, 2004, the Procurement Division issued RFPS-624 for the provision of rations on an interim basis to 4,500 ONUB peacekeeping troops in Burundi for the period May 10, 2004 to July 9, 2004 (the "Burundi Interim Contract"). Christian Saunders, then Chief of the Procurement Division, who has since been suspended by the United Nations pending a full investigation of the bid-rigging scheme, signed the RFP for the Burundi Interim Contract. The RFP designated Yakovlev as the procurement officer who was the Point of Contact.

170.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about April 2, 2004.

171.   Technical proposals were publicly opened in the Bid Room of the Procurement Division at United Nations headquarters in New York on or about April 2, 2004.

172.   The Procurement Division awarded this contract to ES-KO on or about April 29, 2004.

173.   ES-KO satisfactorily performed the Burundi Interim Contract which generated $2,156,925 in revenue.

174.   On or about February 18, 2004, prior to issuance of RFPS-624 for the Burundi Interim Contract, the Procurement Division issued RFPS-610 for the provision of rations to 9,900 ONUB peacekeeping troops for the period of July 2004 to July 2007 (the "Burundi Main Contract").  The RFP designated Yakovlev as the Point of Contact.

175.   ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about April 15, 2004.

176.   Technical proposals were publicly opened in the Bid Room of the Procurement Division at United Nations headquarters in New York at 10:00 a.m. on or about April 15, 2004. Yakovlev was the custodian of the contract proposals.

177.   Yakovlev and IHC provided Compass Group/ESS with confidential information regarding ES-KO's technical and/or financial proposals for this contract so that Compass Group/ESS was able to underbid ES-KO, in exchange for which Compass Group/ESS paid substantial bribes and/or other illegal consideration or remuneration.

178.   At the time the Burundi Main Contract was awarded, ES-KO was successfully performing the Burundi Interim Contract.

179.   On or about June 4, 2004, Yakovlev notified ES-KO that the Burundi Main Contract had been awarded to ESS.

180.    ES-KO would have been awarded the Burundi Main Contract but for the illegally obtained, proprietary and confidential non-public bidding information that was improperly provided by IHC and/or the Yakovlevs to Compass Group/ESS and Defendants' other, related illegal conduct.

181.    After the Procurement Division had awarded the Burundi Main Contract to ESS and ESS had commenced operations under the contract, Yakovlev provided information directly to senior Compass Group/ESS executives, alerting them to problems with ESS's performance.

182.    Specifically, at 11:23 p.m. on the evening of April 27, 2005, Yakovlev sent Andrew Seiwert an e-mail which simply read "Dear Andy, for your urgent comments, pls."

183.    An extensive United Nations "Contractor Performance Report" and related documents were attached to the April 27, 2005 e-mail.  These materials detailed ESS's multiple failures to perform as promised on the contract.  The checklist and related documents were labeled "strictly confidential, not for release outside of the United Nations."

184.    By the next morning, there were indications of alarm at the offices of ESS.

185.    Defendant Seiwert immediately passed this e-mail on to Defendants Steve Kemp and Len Swain, noting that "[t]he recommendation of the local team is to not use ESS as a food-rations contractor again.  Your urgent attention to this would be appreciated – please formulate an official reply to the UN (sent via myself to Alex Yakovlev) and comment by this weekend in detail on all the items with agreed actions and deadlines and assigned responsibilities on items which may not have been solved to date."   Defendants Seiwert, Kemp and Swain all