knew that confidential information was being circulated that was not supposed to be disseminated outside the United Nations.

186.    Defendant Steve Kemp is currently a Regional Operations Director with ESS. He had previously visited Burundi in an effort to rectify issues that had arisen with respect to ESS's failure to adequately perform its contract.

187.    Defendant Len Swain worked directly for Compass Group.

188.    Defendant Seiwert also sent a copy of the email to Ezio Testa, the President and Chief Executive Officer of IHC.

189.    Compass Group/ESS and IHC should not have had access to this confidential information regarding ESS's failure to perform its contract.

190.    ES-KO conservatively estimates its lost gross revenue on this contract as $93,617,167.

191.    ES-KO suffered damages because it was not awarded the long-term ONUB contract as a result of the bid-rigging scheme in an amount of not less than $14,042,575, exclusive of pre-judgment interest. ES-KO also suffered damages in the additional amount of not less than $107,846, with pre-judgment interest, as a result of being induced by the bid-rigging scheme to reduce its gross margins by not less than 5% on the interim ONUB contract.

**H.    Sudan**

192.    The United Nations Mission in the Sudan ("UNMIS") was established by the Security Council in March 2005 to support implementation of the Comprehensive Peace Agreement signed by the Government of Sudan and the Sudan People's Liberation Movement/Army in January 2005 and to perform certain functions relating to humanitarian assistance and the protection and promotion of human rights.

193.    On or about December 26, 2003, the Procurement Division issued RFPS-592 for the provision of rations to 9,800 UNMIS peacekeeping troops for estimated deployment on or about February 2004 to in or about 2008 ("Sudan Bid 1").  Yakovlev was identified in RFPS for Sudan Bid 1 as the procurement officer who was the Point of Contact.

194.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about February 26, 2004.

195.    Technical proposals were publicly opened in the Bid Room of the Procurement Division at United Nations headquarters in New York on or about February 26, 2004.

196.    After the proposals were submitted, the United Nations procurement official assigned to review the technical proposals evaluated ESS's proposal as technically incompetent and documented his evaluation on United Nations records.

197.    Thereafter, when Yakovlev learned of such negative evaluation, he repeatedly attempted to pressure such official to reverse his evaluation and approve the ESS proposal as technically competent.  The official refused to accede to these demands.

198.    To circumvent the negative evaluation, on or before November 4, 2004, Yakovlev arranged for the cancellation of Sudan Bid 1 and for the issuance of a new RFP, RFPS-724 ("Sudan Bid 2").  Once the bidding process had been repeated, Yakovlev then arranged for the new proposals to be submitted for technical evaluation at a time when the official who had previously provided the negative evaluation was not on the technical review team.

199.    Yakovlev was identified in the RFP for Sudan Bid 2 as the procurement officer who was the Point of Contact.

200.    In response to Sudan Bid 2, on or about December 17, 2004, ES-KO re-submitted its bid for the Sudan contract.

201.    Technical proposals were publicly opened in the Bid Room of the Procurement Division at United Nations headquarters in New York on or about December 17, 2004.

202.    The Procurement Division awarded this contract to ESS.

203.    Having engaged in the bid-rigging scheme at this point for several years, Compass Group/ESS, which illegally had obtained the United Nations contracts, was not competent to service such contracts, and found itself overextended and unable to perform multiple contracts to the satisfaction of various United Nations peacekeeping missions.

204.    As part of a broader investigation concerning corruption vis-à-vis the Oil-for-Food program in Iraq, the International Relations Committee issued a report on December 7, 2005.  As part of its research for that report, the International Relations Committee subpoenaed numerous documents from IHC.

205.    Those documents include an e-mail dated November 27, 2004, in which Steve Bickerstaff ("Bickerstaff"), a Compass Group employee, summarized a meeting with Terry Allen ("Allen"), the United Nations' Ration Contracts Officer for peacekeepers in Sudan, for his supervisors at Compass Group/ESS.

206.    According to Bickerstaff's November 27, 2004 e-mail, the meeting did not begin auspiciously:

> "Terry commenced with raising various points regarding our other contracts where ESS had problems, from Liberia to the current Kosovo contract, and stated that many questions were being asked in N[ew] Y[ork] as to our ability to mobilize another contract given our track record."

207.    However, Allen subsequently provided Bickerstaff with specific information about ES-KO's proposal in response to the first RFP for Sudan Bid 1:

> "Terry stated that the contract was divided into regions due to certain companies having "very good" plans for some regions. He particularly indicated [ES-KO] here for the South. Their proposal was for a supply chain out of Entebbe using a charter plane for supply to the [South of] Sudan. This is a co-location of its supply base for its Congo contract."[7]

208.    Bickerstaff knew or should have known that he was not supposed to have this confidential information, particularly when ESS was about to submit its own bid.

209.    In his e-mail to his superiors at Compass Group, Bickerstaff also reported on a separate meeting with Andrew Robertson ("Robertson"), the Country Coordinator for United Nations Office for Project Services ("UNOPS").  Specifically, Bickerstaff informed his superiors at Compass Group that:

> "[Robertson] stated that it would be received very well in the U[nited] N[ations] if we put an additional appendix to our bid stating that we wish to assist [in the] develop[ment of] the country and can assist in such ways as training of local suppliers and farmers on food production, HSE standard, transport of goods, etc."[8]

210.    Bickerstaff's superiors at Compass Group quickly forwarded this e-mail to Ezio Testa at IHC.

211.    Bickerstaff knew or should have known that it was highly inappropriate for Robertson to coach ESS as to what should be included in its bid.

---

[7]  Plaintiff does not currently have sufficient information to be able to determine whether Allen was paid to share this information with Bickerstaff.

[8]  Plaintiff does not currently have sufficient information to be able to determine whether Robertson was paid to share this information with Bickerstaff.

212.    IHC and the Yakovlevs facilitated the provision of confidential information by United Nations employees, including but not limited to Terry Allen and Andrew Robertson, to Compass Group/ESS regarding ESS's prospective bid for this contract so that Compass Group/ESS was able to underbid ES-KO, in exchange for which Compass Group/ESS paid substantial bribes and/or other illegal consideration or remuneration.

213.    Compass Group/ESS and IHC should not have had access to any information regarding either ES-KO's bid or how to improve ESS's own bid.

214.    The Procurement Division awarded this contract to ESS on or around December 31, 2004.

215.    The United Nations Office of Internal Oversight Services conducted an audit of rations management at UNMIS in November-December 2005.

216.    That audit uncovered a large number of serious issues pertaining to Compass Group/ESS's performance of this contract, including, but not limited to, the following:

(i)    The Procurement Division's presentation to the Headquarters Committee on Contracts had understated the United Nations' financial commitment to ESS by $17 million;

(ii)   In clear contravention of United Nations policy, ESS had begun supplying UNMIS troops in May 2005, even though no formal contract had ever been signed, thus needlessly exposing the United Nations to significant legal risks in the event of a dispute with ESS;

(iii)  A dispute had arisen with respect to certain warehouse operations, giving rise to a contingent liability to ESS totaling $6 million over the life of the contract;

(iv) UNMIS had paid ESS approximately $960,000 in avoidable expenditures for water;

(v) UNMIS had paid ESS approximately $830,000 for warehouse operations even though the warehouses in question were neither complete nor operational;

(vi) ESS had imported food and water with inadequate shelf life, with the result that the United Nations had paid for rations that had to be destroyed; and

(vii)ESS had not made adequate arrangements to store composite ration packs at proper temperatures, with the result that rations had needlessly spoiled. Other ration packs were missing and unaccounted for.

217.   ES-KO would have been awarded this contract but for the illegally obtained, proprietary and confidential non-public material bidding information that was improperly provided by United Nations employees to Compass Group/ESS and Defendants' other, related illegal conduct.

218.   ES-KO estimates its lost gross revenue on this contract as not less than $201,000,000.

219.   ES-KO suffered damages in connection with this contract as a result of the bid-rigging scheme in an amount of not less than $30,150,000, exclusive of pre-judgment interest.

I.   **Kosovo**

220.   The United Nations Mission in Kosovo ("UNMIK") was established in June 1999 when the Security Council authorized an interim civilian administration led by the United Nations under which the Kosovars could progressively enjoy substantial autonomy from Serbia.

221.    On or about September 6, 2000, the Procurement Division issued RFP-UNMIK007/00/JC for the provision of catering services to 1,150 UNMIK special police units in Kosovo for the period of December 1, 2000 to November 30, 2002, with options for two one-year renewal periods.

222.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about September 25, 2000.

223.    This contract was subsequently awarded to ES-KO.

224.    ES-KO successfully performed this contract and consequently secured a two year-renewal.  In total, this contract generated $10,378,850 in revenue.

225.    As a direct result of the bid-rigging scheme, however, ES-KO was forced to reduce its gross profit margin on this contract by not less than 5%.

226.    ES-KO suffered damages in connection with this contract as a result of the bid-rigging scheme in an amount of not less than $518,943, exclusive of  pre-judgment interest.

227.    On or about April 2, 2004, the Procurement Division issued RFP-0103/04/NM to solicit proposals for the continuing provision of rations to special police units in Kosovo for the period, from December 1, 2004 to December 1, 2006, following the conclusion of the existing contract.

228.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about May 10, 2004.

229.    During the four-year period preceding the submission of its proposal for this RFP, EK-KO had been satisfactorily performing its obligations under the existing UNMIK

contract and had current, relevant experience in Kosovo on which to rely in preparing its technical and financial proposals.

230.    IHC and/or the Yakovlevs provided Compass Group/ESS with confidential information regarding ES-KO's technical and/or financial proposals for this contract so that Compass Group/ESS was able to underbid ES-KO, in exchange for which Compass Group/ESS paid bribes and/or other illegal consideration or remuneration to IHC and/or the Yakovlevs.

231.    This contract was subsequently awarded to ESS.

232.    ES-KO would have been awarded this contract but for the illegally obtained, proprietary and confidential non-public bidding information that was improperly provided by IHC and/or the Yakovlevs to Compass Group/ESS and Defendants' other related illegal conduct.

233.    ES-KO conservatively estimates its lost gross revenue on this second contract as not less than $14,608,000.

234.    ES-KO suffered damages in connection with this contract as a result of the bid-rigging scheme in an amount of not less than $2,191,200, exclusive of pre-judgment interest.

## V.    Additional Contracts From Which ES-KO Sustained Damages Based on the Forced Reduction of its Gross Margins

### A.    Sierra Leone

235.    In 1999, the Security Council established the United Nations Mission in Sierra Leone ("UNAMSIL") to cooperate with the government of Sierra Leone and the other parties in a prolonged civil war in implementing the Lomé Peace Agreement and to assist in the implementation of a plan for disarmament, demobilization and reintegration.

236.    On or about November 19, 1999, the Procurement Division issued an RFP for the provision of rations to approximately 11,000 UNAMSIL peacekeeping troops for the period from April 1, 2000 to March 31, 2003 (the "UNAMSIL Contract").

237.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about January 5, 2000.

238.    Initial technical proposals were publicly opened in the Bid Room of the Procurement Division at United Nations headquarters in New York on or about January 6, 2000.

239.    Prior to the time of the submission of its proposal, ES-KO learned that Compass Group/ESS would be submitting bids for Sierra Leone and for East Timor (for which, as alleged in paragraph 124 above, an RFP had been issued on November 18, 1999). ES-KO was unaware that Compass Group/ESS was involved in a scheme to secure contracts through bribery, misappropriated confidential information and other illicit means but believed that it would face authentic and legitimate bidding from Compass Group/ESS for the UNAMSIL Contract. Based on what ES-KO believed would be legitimate and authentic price competition from Compass Group/ESS, ES-KO reduced its margins by not less than 5% in formulating its proposal for the UNAMSIL Contract.

240.    The Procurement Division awarded the UNAMSIL Contract to ES-KO on or about March 10, 2000.

241.    ES-KO performed the UNAMSIL Contract satisfactorily and it generated $118,216,947 in revenue.

242.    Based on its forced reduction in its gross margin, ES-KO has been damaged in connection with the UNAMSIL Contract as a result of the bid-rigging scheme in an amount not less than $5,910,847, exclusive of pre-judgment interest.

**B.     Congo**

243.    The Security Council established the United Nations Organization Mission in the Democratic Republic of the Congo ("MONUC") in November 1999, to maintain liaison with The Democratic Republic of the Congo and five regional States in observing the Lusaka Ceasefire Agreement and to carry out other tasks incorporating United Nations personnel authorized in earlier Security Council resolutions.

244.    On or about March 13, 2000, the Procurement Division issued RFPS-28 for the provision of rations to 5,037 MONUC peacekeeping troops for the period of March 12, 2001 to March 12, 2004 (the "MONUC I Contract").

245.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about May 18, 2000.

246.    Initial technical proposals were publicly opened in the Bid Room of the Procurement Division at United Nations headquarters in New York on or about May 18, 2000.

247.    On or about August 4, 2000, the United Nations issued an amendment to the RFP for the MONUC I Contract, adding two additional delivery locations, and at the same time, requested the bidders to provide a "Best and Final Offer." ES-KO submitted its amended and Best and Final Offer on or about August 14, 2000.  Typically, in response to a request for a Best and Final Offer, ES-KO lowers its original price by approximately 1-2%.  However, as a direct result of Defendants' bid-rigging scheme, ES-KO was forced to reduce the selling price for the items provided under this contract by approximately 12% in total.  At the time of submitting this drastically reduced bid, ES-KO was unaware of the bid-rigging scheme and mistakenly believed  that it was responding to authentic and legitimate pricing competition from Compass Group/ESS.

248.    The Procurement Division awarded the MONUC I Contract to ES-KO on or about October 18, 2000.

249.    ES-KO performed the MONUC I Contract satisfactorily and this contract generated $49,660,805 in revenue.

250.    Based on its forced reduction in its gross margin, ES-KO has been damaged in connection with this contract as a result of the bid-rigging scheme in an amount of not less than $5,959,297, exclusive of pre-judgment interest.

251.    On or about September 23, 2003, the Procurement Division issued RFPS-558 for the provision of rations to 10,040 peacekeeping troops in Congo from March 13, 2004 to March 12, 2007, with an option to extend for an additional two years (the "MONUC II Contract"). The MONUC II Contract was for the continuation of services following the conclusion of the MONUC I Contract.

252.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about October 31, 2003. At the time of the submission of its proposal, Compass Group/ESS had just been awarded a series of contracts by the United Nations. ES-KO was unaware that these contracts had been secured by ESS through illegal means and believed that these awards had been obtained through authentic and legitimate pricing competition. Based on this mistaken belief, ES-KO reduced its margins by not less than 12% in formulating its proposal for the MONUC II Contract.

253.    Technical proposals were publicly opened in the Bid Room of the Procurement Division at United Nations headquarters in New York on or about October 31, 2003. Yakovlev was the Point of Contact for the MONUC II Contract.

254.    ES-KO was notified by the Procurement Division of its receipt of the award on or about December 11, 2003.

255.    This contract generated $164,028,235 in revenue.

256.    ES-KO has been damaged in connection with this contract as a result of the bid-rigging scheme in an amount estimated to be not less than $19,683,388, exclusive of pre-judgment interest.

### C.    Haiti

257.    The United Nations Stabilization Mission in Haiti ("MINUSTAH")    was established in April 2004 when the Security Council found that Haiti's internal instability continued to constitute a threat to international peace and security in the region.    The Mission requested that authority over Haiti's peacekeeping force be transferred from the Multinational Interim Force ("MIF") to MINUSTAH on June 1, 2004.

258.    On or about March 24, 2004, the Procurement Division issued RFPS-626 for the provision of rations to 1,500 peacekeeping troops in Haiti from July 4, 2004 to July 3, 2006.  Yakovlev was the procurement officer who was the Point of Contact for this contract.

259.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about April 30, 2004.

260.    Technical proposals were publicly opened in the Bid Room of the Procurement Division at United Nations headquarters in New York on or about April 30, 2004.

261.    The Procurement Division thereafter awarded this contract to ES-KO.

262.    It is estimated that revenue generated during the term of this contract will be approximately $55,358,466.

263.   In formulating its financial proposal for the MINUSTAH RFP, ES-KO reduced its margins by not less than 5% in an attempt not to be underbid. Such reduced margins were adopted by ES-KO, unaware of the ongoing bid-rigging scheme, in the mistaken belief that it was responding to authentic and legitimate pricing competition from Compass Group/ESS.

264.   ES-KO suffered damages in connection with this contract as a result of the bid-rigging scheme in an amount of not less than $2,767,923, exclusive of pre-judgment interest.

## VI.   The Bid-Rigging Scheme Is Exposed

265.   After ESS and IHC had publicly announced their "New Best in Class" business partnership on or about September 13, 2004, Harris approached other members of Compass Group's senior management to inquire whether Harris could acquire, on behalf of Compass Group/ESS, IHC.  Prior to and as a result of such communications, the nature of the business relationship of ESS and IHC was widely known by the highest level of Compass Group's executive management.  Moreover, as a result of Compass Group's internal evaluation of the possibility of acquiring IHC and its relationship with IHC, it was or should have been widely known among Compass Group's senior executive management, inter alia, that the nature of the use of IHC by Compass Group/ESS as a so-called "vendor intermediary" was improper and that Compass Group/ESS, through Harris, Seiwert and other Compass Group officers and employees had been engaged in a long-running bid-rigging scheme.  Reportedly, Compass Group ultimately declined to pursue such acquisition directly.

266.   On or about June 3, 2005, after Peter Harris had explored with Compass Group/ESS its potential acquisition of IHC, IHC was purchased by Strategic International Alliance Limited, a company registered in the British Virgin Islands, now known as Alliance

Investment Development Ltd. Peter Harris and Andrew Seiwert represented the buyers of IHC in that transaction, and Harris, who had been touted as a leading candidate to shortly succeed the then-Chief Executive Officer of Compass Group, was identified as the sole director of Strategic International Alliance Limited. Peter Harris also acted on behalf of the buyers of IHC to re-hire Ezio Testa as President and/or Chief Executive Officer of IHC. Also present at the closing to finalize the transaction, which was conducted in Milan, were representatives of a British Virgin Islands ("BVI") entity named Oak Directors Limited which maintains a registered office at the same location in Road Town, Tortola, BVI as Alliance Investment Development Ltd. Two 100% owned Compass Group subsidiaries, both of which were incorporated in BVI in 2001, also maintained offices at a nearby location in Road Town, Tortola, BVI. Dario Fischer represented IHC's majority shareholder, Torno S.A.H., at the closing.

267.    In June 2005, following the publication of numerous articles in the press regarding the bid-rigging scheme, the United Nations suspended IHC's status as a registered vendor.

268.    Peter Harris, exercising certain share options, subsequently sold all of his shares in Compass Group in July 2005, for a net return of approximately $425,000.

269.    On August 8, 2005, after the United Nations waived Yakovlev's diplomatic immunity, David N. Kelley, the United States Attorney for this District, announced the acceptance of Yakovlev's guilty plea with respect to charges of conspiracy, wire fraud and money laundering arising from his receipt of at least several hundred thousand dollars in connection with the performance of his duties as a procurement officer at the United Nations between 1993 and 2005. Defendant Yakovlev pleaded guilty to such crimes before United States District Judge William H. Pauley of this District.

270.   In early September 2005, after the United Nations waived Vladimir Kuznetsov's diplomatic immunity, Kuznetsov was charged with conspiracy to commit money laundering.

271.   On October 21, 2005, the United Nations announced that it was suspending ESS's status as a registered vendor.

272.   On December 7, 2005, the International Relations Committee issued its investigative report on corruption in the Oil-for-Food Program in Iraq.

273.   That report noted that Yakovlev had funneled almost $1 million in bribe money into a secret bank account at Antigua Overseas Bank in the Caribbean, and that those bribes had been paid in return for information and assistance pertaining to both the Oil-for-Food program and non-Oil-for-Food contracts.

274.   On or about January 16, 2006, the United Nations suspended eight officials pending the results of its own internal investigation, including Andrew Toh, the Assistant Secretary-General in charge of Central Support Services and Christian Saunders, the Chief of the Procurement Division.

## VII.   Compass Group's "House-Cleaning" Is Really a Cover-Up

275.   After the bid-rigging scheme and the role of Compass Group/ESS in such criminal scheme first publicly came to light, Compass Group (a public company) experienced a significant drop in its market capitalization.

276.   Compass Group issued its first public response to this negative publicity in the form of a press release dated October 10, 2005.  In that press release, Compass Group stated that it "takes any questions about business operations seriously." While Compass Group also stated in that press release the "[t]he Group is a signatory to the UN Global Compact and its

business practices are governed by a strict, zero-tolerance based Code of Ethics that applies to all employees without exception," Compass Group failed to disclose that its conduct at issue was in blatant violation of such Global Compact and its own internal policies and procedures.

277.    On October 21, 2005, Compass Group issued a second press release, in which it informed its shareholders and those following the scandal regarding its and ESS's illegal actions that it had "instructed [the law firm of] Freshfields Bruckhaus Deringer to conduct an investigation into the relationships between Eurest Support Services (ESS), IHC and the United Nations.  Pending progress in that investigation, [Compass Group] has decided that Peter Harris, the CEO of the Group's UK, & Ireland, Middle East and Africa division should be suspended." No reference was made in this press release to the fact that Freshfields Bruckhaus Deringer ("Freshfields") serves as Compass Group's regular general counsel.  In addition, this press release self-servingly and disingenuously attempted to limit any potential liability to ESS.

278.    In a third press release, dated November 3, 2005, Compass Group announced that Freshfields's "investigation" had revealed "serious concerns as to whether, within ESS, there has been, in connection with IHC and the UN, improper conduct.... As a result, Peter Harris, whose suspension was announced on 21 October, is being dismissed, along with Andrew Seiwert and a further mid-ranking executive who was associated with UN contracting." The "further mid-ranking executive" was Doug Kerr, who was also involved in United Nations contracts, but whose identity and precise role in the bid-rigging scheme was not disclosed by Compass Group.  This third press release was carefully worded to focus attention on three high level executives within ESS rather than Compass Group.  However, the facts clearly indicate that a number of other Compass Group employees were directly involved in the bid-rigging scheme, including, but not limited to, Len Swain and Peter Bickerstaff and that the

criminal scheme had permeated the highest executive levels of Compass Group. Moreover, those Compass Group employees' involvement in the bid-rigging scheme was public knowledge at the time of Compass Group's third press release on this subject. Sir Francis Mackay, the outgoing Chairman of Compass Group, admitted at the company's annual shareholders' meeting on February 10, 2006 that its internal investigation had found irregularities in "most" of the seven United Nations contracts it currently has, including those for Liberia, Sudan and Eritrea. In fact, Compass Group/ESS paid or otherwise improperly compensated IHC and/or Yakovlev and/or engaged in other related misconduct in winning all of the contracts which it had been awarded.

279.    On or around February 14, 2006, Compass Group admitted that a total of eight employees implicated in the bid-rigging scheme had been dismissed, disciplined or lost their jobs as a result of "restructuring."

280.    Compass Group's efforts to "manage" this crisis by appointing its own counsel, rather than a truly disinterested law firm, to "investigate" the bid-rigging scheme were part of Compass Group's efforts to whitewash its own involvement in the scheme by firing or disciplining a few high level Compass Group/ESS executives and employees.

281.    However, as Compass Group itself acknowledged in its February 1, 2005 press release, the relationship between IHC, ESS and the United Nations remains the subject of investigations conducted by the Office of the United States Attorney for the Southern District of New York, the United States Congress and the United Nations itself. In addition, Compass Group/ESS has been under investigation by Britain's Serious Fraud Office since late November 2005, and Compass Group was subpoenaed by the United States Attorney for the Southern District of New York sometime in late November or early December 2005.

282.     Moreover, the United States House of Representatives Internal Relations Committee has declared that it is not satisfied with Compass Group's internal investigation.  In particular, the International Relations Committee has expressed an interest in learning more about Compass Group's knowledge of ESS's role in the bid-rigging scheme as well as Compass Group's and ESS's possible involvement in the sale of IHC.

283.     In addition, the United Nations has undertaken an internal investigation. This internal investigation has looked at twenty-seven contracts, worth a total of $1.0 billion, to date, and has preliminarily concluded that the United Nations may have lost as much as $298 million as a result of the bid-rigging scheme.  Eight senior United Nations officials have been suspended with pay pending the release of the final report.

## CLAIMS FOR RELIEF

## COUNT I

### (CIVIL RICO BASED ON THE DEFENDANTS' PARTICIPATION IN THE AFFAIRS OF THE PROCUREMENT DIVISION)

### (AS AGAINST ALL DEFENDANTS)

284.     ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 283 above.

285.     During the relevant period, the Procurement Division of the United Nations has been an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which was engaged in, or the activities of which affected, interstate or foreign commerce.

286.     The Procurement Division was established and is maintained and operated by the United Nations to procure goods and services for, among others, all United Nations peacekeeping missions worldwide.  At all relevant times, the Procurement Division had established procedures designed to protect the integrity of the United Nations procurement

process and to cause providers and other contractors to be selected on the basis of a fair and impartial evaluation of relevant factors. These procedures include the requirement that companies seeking the award of a procurement contract provide the United Nations with proposals that include information sufficient in scope and detail to allow the United Nations to evaluate whether the company has the necessary capability, experience, knowledge, expertise and financial strength to perform the contract satisfactorily.

287.    At all relevant times, Yakovlev and John Doe Defendants who were or are employees of the Procurement Division (the "Employee Defendants") were employed by the Procurement Division.

288.    At all relevant times, Defendants IHC, Ezio Testa, Dmitry Yakovlev, Compass Group/ESS, Andrew Seiwert, Steve Kemp, Len Swain, Steve Bickerstaff, Doug Kerr, Vladimir Kuznetsov and other John Doe Defendants were associated with the Procurement Division through their participation in and their direct and/or indirect control over the affairs of the Procurement Division, including, without limitation, the award of United Nations procurement contracts.

289.    The means by which Defendants exercised influence and control over, and participated in, the affairs of the Procurement Division included, but were not limited to, (i) the payment of bribes to Employee Defendants to secure their assistance throughout the procurement process; (ii) the procurement by the Defendants of ES-KO's proprietary information through the use of bribes paid to the Employee Defendants; (iii) the unauthorized use by the Defendants of such proprietary information in the preparation of contract proposals to be submitted by or on behalf of the Defendants under the false pretense that such proposals were prepared based upon the capability, experience, knowledge and expertise of the Defendants; (iv)

the improper modification of contract proposals which had already been submitted for the purpose of having such modified proposals presented for evaluation and/or approval by United Nations officials under false pretense that such proposals had been submitted concurrently with ES-KO's proposals; and (v) the concealment of the foregoing activities from ES-KO and from other officials of the United Nations having authority over the procurement process.

290.     Defendants influenced, participated and controlled the affairs of the Procurement Division through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962 (c).  The conduct and acts of the Defendants are related to each other as parts of a common or shared purpose, intent and economic motive, namely, to violate and circumvent the legitimate, authorized bidding procedures of the United Nations in order to control the award of procurement contracts for the respective financial benefit of the Defendants.

291.     The racketeering activity of the Defendants consisted of numerous acts which are chargeable under New York law and punishable by imprisonment under such law for more than one year and which fall within the scope of 18 U.S.C. § 1961 (1)(A) and (5), including commercial bribery as proscribed by New York Penal Law §§ 180.03 and 180.08 in that, during the Relevant Period, Defendants Compass Group/ESS and IHC, acting through their respective agents and employees, on multiple occasions, conferred, offered and agreed to make illicit payments of money in amounts in excess of $1,000 to the Employee Defendants, including Yakovlev, with the intent to cause the Employee Defendants to breach their duties to their employer and to violate the procurement contract award procedures of the United Nations by obtaining and providing to Compass Group/ESS and IHC, for such Defendants' illicit and illegal use, confidential and proprietary information belonging to ES-KO and otherwise improperly

administering United Nations procurement procedures in order to secure valuable procurement contracts for Compass Group/ESS.

292.   The racketeering activity of the Defendants also included numerous acts perpetrated during the Relevant Period which are indictable under 18 U.S.C. § 1341 (relating to mail fraud) and which are within the scope of 18 U.S.C. § 1961(1)(B) and (5), including the use by Defendants of United States mails to (i) cause or direct the exchange among the Defendants of misappropriated confidential and/or proprietary information pertaining to proposals for the award of multiple United Nations contracts; (ii)  pay bribes and/or other illegal consideration to the Employee Defendants as remuneration for the aforementioned information; (iii) submit, under false pretenses, recommendations and proposals to the United Nations Headquarters Committee on Contracts incorporating pricing and other confidential information misappropriated from ES-KO; and (iv) engage in money laundering with respect to bribe money.

293.   Each of the acts referred to in paragraph 292 hereof constituted the placement in a post office or authorized depository for mail of a matter or thing to be sent or delivered by the post office department for the purpose of executing a scheme to defraud which had been devised by the Defendants, and Defendants caused to be made each of such mailings with the specific intent of furthering the said scheme.

294.   The racketeering activity of the Defendants also included numerous acts perpetrated during the Relevant Period which are indictable under 18 U.S.C. § 1343 (relating to wire fraud) and which fall within the scope of 18 U.S.C. § 1961(1)(B), including the use by Defendants of interstate wires to (i) make dozens, if not hundreds, of phone calls among Defendants in connection with the furtherance and/or concealment of the Defendants' scheme to interfere with the legitimate procedures of the Procurement Division for the award of contracts

and to conceal such interference; (ii) cause or direct the exchange of confidential and/or proprietary documents and information pertaining to proposals for United Nations contracts; (iii) pay or arrange for the payment of bribes and/or other illegal consideration as remuneration for the aforementioned information; (iv) submit, under the false pretense of constituting the work product of Compass Group/ESS, proposals to the United Nations Headquarters Committee on Contracts incorporating pricing and other confidential information that had been misappropriated from ES-KO; and (v) engage in money laundering with respect to bribe money.

295.    Each of the acts referred to in paragraph 294 hereof constituted the transmittal by means of wire communication in interstate commerce of signals, sounds or writings for the purpose of executing the scheme to defraud which had been devised by Defendants, and Defendants caused to be made each of such transmittals with the specific intent of furthering and concealing the said scheme.

296.    The conduct of the scheme to rig the bidding of United Nations procurement contracts through a pattern of racketeering activity (the "Bid-Rigging Scheme") was continuous.  It extended over a substantial amount of time, involved multiple acts of bribery, hundreds of acts of mail and wire fraud, was directed at numerous United Nations procurement contracts, caused numerous separate and distinct injuries.  But for the exposure of the scheme and the intervention of law enforcement authorities, the Bid-Rigging Scheme would have continued indefinitely.

297.    By means of the foregoing violations of RICO, Plaintiff was injured in its business and property in an amount in excess of $123 million.

## COUNT II

## (CIVIL RICO CONSPIRACY)

## (AS AGAINST ALL DEFENDANTS)

298.    ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 297 above.

299.    Defendants conspired to commit the violations of 18 U.S.C. § 1962(c) alleged in paragraphs 284 through 297 above.

300.    At all relevant times, each Defendant agreed and conspired to participate, directly and indirectly, in the conduct of the Procurement Division through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

301.    The Defendants committed and/or caused to be committed a series of overt acts in furtherance of the conspiracy alleged herein and to effect the objectives of the Bid-Rigging Scheme.

302.    By means of the foregoing violations of RICO, Plaintiff was injured in its business and property in an amount in excess of $123 million.

## COUNT III

## (CIVIL RICO BASED ON CERTAIN DEFENDANTS' ASSOCIATION–IN–FACT AS A CRIMINAL ENTERPRISE)

## (AS AGAINST THE CORE ENTERPRISE DEFENDANTS)

303.    ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 302 above.

304.    At all relevant times, Yakovlev, IHC, Ezio Testa, Vladimir Kuznetsov, Dmitry Yakovlev and John Doe Defendants, who were or are employees of the Procurement Division and/or IHC (the "Core Enterprise Defendants"), associated with each other to form an

association-in-fact which was an "enterprise" (referred to herein as the "<u>Bid-Rigging Enterprise</u> <u>I</u>") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and which was engaged in, or the activities of which affected, interstate or foreign commerce.

305.   Bid-Rigging Enterprise I continued as a unit with a core of the same membership as an on-going combination from late 1999 until intercepted by law enforcement in 2005.

306.   At all relevant times, the Core Enterprise Defendants participated in the conduct of Bid-Rigging Enterprise I through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962 (c).

307.   The conduct and acts of the Core Enterprise Defendants are related to each other as parts of a common or shared purpose, intent and economic motive, namely, to violate and circumvent the legitimate, authorized bidding procedures of the United Nations in order to control the award of procurement contracts for the respective financial benefit of the Core Enterprise Defendants.  The financial interests of Bid-Rigging Enterprise I were served by diverting awards of United Nations contracts from lowest-bidding qualified vendors to other vendors (the "<u>Vendor Participants</u>"), including Compass Group/ESS, who had agreed to pay bribes to Yakovlev and other Core Enterprise Defendants and to remunerate IHC, for their illicit assistance in circumventing United Nations award procedures.

308.   The illicit assistance provided by the Core Enterprise Defendants included, without limitation, (i) obtaining for the benefit of the Vendor Participants, confidential, proprietary information supplied to the United Nations by other participants in the United Nations bidding process, (ii) modifying contract proposals submitted by Vendor Participants after their official submission for the purpose of underbidding other legitimate competitive

proposals, and (iii) submitting for approval, under false pretenses, such modified Vendor Participant proposals to officials of the United Nations.

309.   The racketeering activity of the Core Enterprise Defendants consisted of numerous acts which are chargeable under New York law and punishable by imprisonment under such law for more than one year and which fall within the scope of 18 U.S.C. § 1961 (1)(A) and (5), including commercial bribery as proscribed by New York Penal Law §§ 180.03 and 180.08 in that, during the Relevant Period, Defendants Compass Group/ESS and IHC, acting through their respective agents and employees, on multiple occasions, conferred, offered and agreed to make illicit payments of money in amounts in excess of $1,000, to employees of the United Nations, including Yakovlev and the foregoing John Doe Defendants, with the intent to influence such employees to breach their duties to their employer and to violate the procurement contract award procedures of the United Nations by obtaining and providing to Compass Group/ESS and IHC, for such Defendants' illicit and illegal use, confidential and proprietary information belonging to ES-KO and otherwise improperly administering United Nations procurement procedures in order to secure valuable procurement contracts for Compass Group/ESS.

310.   The racketeering activity of the Core Enterprise Defendants also included numerous acts perpetrated during the Relevant Period which are indictable under 18 U.S.C. § 1341 (relating to mail fraud) and which are within the scope of 18 U.S.C. § 1961(1)(B) and (5), including the use by Core Enterprise Defendants of United States mails to (i) cause or direct the exchange among the Core Enterprise Defendants of misappropriated confidential and/or proprietary information pertaining to proposal for the award of multiple United Nations contracts; (ii)   pay bribes and/or other illegal consideration or remuneration for the

aforementioned misappropriated information; (iii) submit, under the false pretense of constituting the work product of Compass Group/ESS, proposals to the United Nations Headquarters Committee on Contracts incorporating pricing and other confidential information that had been misappropriated from ES-KO; and (iv) engage in money laundering with respect to bribe money.

311. Each of the acts referred to in paragraph 310 hereof constituted the placement in a post office or authorized depository for mail of a matter or thing to be sent or delivered by the post office department for the purpose of executing a scheme to defraud which had been devised by the Core Enterprise Defendants, and the Core Enterprise Defendants caused to be made each of such mailings with the specific intent of furthering such scheme.

312. The racketeering activity of the Core Enterprise Defendants also included numerous acts perpetrated during the Relevant Period which are indictable under 18 U.S.C. § 1343 (relating to wire fraud) and which fall within the scope of 18 U.S.C. § 1961 (1)(B), including the use by the Core Enterprise Defendants of interstate wires to (i) make dozens, if not hundreds, of phone calls among the Core Enterprise Defendants in connection with the furtherance and/or concealment of the Core Enterprise Defendants' scheme to interfere with the legitimate procedures of the Procurement Enterprise for the award of contracts and to conceal such interference; (ii) cause or direct the exchange of confidential and/or proprietary documents and information  pertaining to bids on multiple United Nations contracts; (iii) pay bribes and/or other illegal consideration or remuneration for the aforementioned information; (iv) submit, under the false pretense of constituting the work product of Compass Group/ESS, proposals to the United Nations Headquarters Committee on Contracts incorporating the misappropriated

pricing and other proprietary information of ES-KO; and (v) engage in money laundering with respect to bribe money.

313.    Each of the acts referred to in paragraph 312 hereof constituted the transmittal by means of wire communication in interstate commerce of signals, sounds or writings for the purpose of executing Bid-Rigging Enterprise I, which had been devised by the Core Enterprise Defendants, and the Core Enterprise Defendants caused to be made each of such transmittals in furtherance of the Bid-Rigging Scheme with the specific intent to rig bids and to conceal such bid-rigging.

314.    The conduct of Bid-Rigging Enterprise I was continuous.  It extended over a substantial amount of time, involved multiple acts of bribery, hundreds of acts of mail and wire fraud, was directed at numerous contracts, caused numerous separate and distinct injuries, and constituted Bid-Rigging Enterprise I's regular way of conducting business. But for the exposure of the scheme and then intervention of law enforcement authorities, Bid-Rigging Enterprise I would have continued indefinitely.

315.    By means of the foregoing violations of RICO, Plaintiff was injured in its business and property in an amount in excess of $123 million.

## COUNT IV

### (CIVIL RICO CONSPIRACY)

### (AGAINST THE COMPASS GROUP/ESS DEFENDANTS)

316.    ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 315 above.

317.    Defendants Compass Group/ESS, Harris, Seiwert, Kemp, Swain, Bickerstaff and Kerr (the "Compass Group/ESS Defendants") conspired to commit the violations of 18 U.S.C. § 1962(c) alleged in paragraphs 303 through 315 above.

318.    At all relevant times, the Compass Group/ESS Defendants agreed and conspired to participate, directly and indirectly, in the conduct of Bid-Rigging Enterprise I through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

319.    The Compass Group/ESS Defendants committed and/or caused to be committed a series of overt acts in furtherance of the conspiracy alleged herein and to effect the objectives of  Bid-Rigging Enterprise I including, without limitation, the payment of bribes in exchange for  the illicit assistance of the Core Enterprise Defendants in obtaining the award of United Nations procurement contracts.

320.    By means of the foregoing violations of RICO, Plaintiff was injured in its business and property in an amount in excess of $123 million.

## COUNT V

### (CIVIL RICO BASED ON THE ASSOCIATION–IN–FACT
### OF ALL DEFENDANTS AS A CRIMINAL ENTERPRISE)

### (AS AGAINST ALL DEFENDANTS)

321.    ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 320 above.

322.    During the Relevant Period, Defendants associated with each other to form an association-in-fact which was an "enterprise" (referred to herein as "Bid-Rigging Enterprise II") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and which was engaged in, or the activities of which affected, interstate or foreign commerce.

323.  This Bid-Rigging Enterprise II continued as a unit with a core of the same membership for a substantial amount of time as an on-going combination.

324.  At all relevant times, Defendants participated in the conduct of Bid-Rigging Enterprise II through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962 (c).

325.  The conduct and acts of the Defendants are related to each other as parts of a common or shared purpose, intent and economic motive, namely, to violate and circumvent the legitimate, authorized bidding procedures of the United Nations in order to control the award of procurement contracts for the respective financial benefit of the Defendants. The interests of the participants in Bid-Rigging Enterprise II were served by diverting contract awards which would have been made to ES-KO to Compass Group/ESS by illicit means including, without limitation, the use and exploitation of misappropriated confidential, proprietary information supplied to the United Nations by other participants in the United Nations bidding process, including ES-KO, and by the payment of bribes to employees of the United Nations having responsibility for contract awards, including Yakovlev and the John Doe Defendants, in exchange for obtaining and providing to IHC and Compass Group/ESS the misappropriated information and for other improper assistance in securing contracts.

326.  The racketeering activity of the Defendants consisted of numerous acts which are chargeable under New York law and punishable by imprisonment under such law for more than one year and which fall within the scope of 18 U.S.C. § 1961 (1)(A) and (5), including commercial bribery as proscribed by New York Penal Law §§ 180.03 and 180.08 in that, during the Relevant Period, Defendants Compass Group/ESS and IHC, acting through their respective agents and employees, on multiple occasions, conferred, offered and agreed to make illicit

payments of money in amounts in excess of $1,000, to employees of the United Nations, including Yakovlev and the John Doe Defendants, with the intent to influence such employees to breach their duties to their employer and to violate the procurement contract award procedures of the United Nations by obtaining and providing to Compass Group/ESS and IHC, for such Defendants' illicit and illegal use, confidential and proprietary information belonging to ES-KO and otherwise improperly administering United Nations procurement procedures in order to secure valuable procurement contracts for Compass Group/ESS.

327.   The racketeering activity of the Defendants also included numerous acts perpetrated during the Relevant Period which are indictable under 18 U.S.C. § 1341 (relating to mail fraud) and which are within the scope of 18 U.S.C. § 1961(1)(B) and (5), including the use by Defendants of United States mails to (i) cause or direct the exchange among the Defendants of misappropriated confidential and/or proprietary information pertaining to proposal for the award of multiple United Nations contracts; (ii)  pay bribes and/or other illegal consideration or remuneration for the aforementioned misappropriated information; (iii) submit, under the false pretense of constituting the work product of Compass Group/ESS, proposals to the United Nations Headquarters Committee on Contracts incorporating pricing and other confidential information that had been misappropriated from ES-KO; and (iv) engage in money laundering with respect to bribe money.

328.   Each of the acts referred to in paragraph 327 hereof constituted the placement in a post office or authorized depository for mail of a matter or thing to be sent or delivered by the post office department for the purpose of executing a scheme to defraud which had been devised by the Defendants, and Defendants caused to be made each of such mailings with the specific intent of furthering such scheme.

329.   The racketeering activity of the Defendants also included numerous acts perpetrated during the Relevant Period which are indictable under 18 U.S.C. § 1343 (relating to wire fraud) and which fall within the scope of 18 U.S.C. § 1961 (1)(B), including the use by Defendants of interstate wires to (i) make dozens, if not hundreds, of phone calls among Defendants in connection with the furtherance and/or concealment of the Defendants' scheme to interfere with the legitimate procedures of the Procurement Enterprise for the award of contracts and to conceal such interference; (ii) cause or direct the exchange of confidential and/or proprietary documents and information  pertaining to bids on multiple United Nations contracts; (iii) pay bribes and/or other illegal consideration or remuneration for the aforementioned information; (iv) submit, under the false pretense of constituting the work product of Compass Group/ESS, proposals to the United Nations Headquarters Committee on Contracts incorporating the misappropriated pricing and other proprietary information of ES-KO; and (v) engage in money laundering with respect to bribe money.

330.   Each of the acts referred to in paragraph 329 hereof constituted the transmittal by means of wire communication in interstate commerce of signals, sounds or writings for the purpose of executing Bid-Rigging Enterprise II, which had been devised by Defendants, and Defendants caused to be made each of such transmittals in furtherance of the Bid-Rigging Scheme with the specific intent to rig bids and to conceal such bid-rigging.

331.   The conduct of Bid-Rigging Enterprise II was continuous.  It extended over a substantial amount of time, involved multiple acts of bribery, hundreds of acts of mail and wire fraud, was directed at numerous contracts, caused numerous separate and distinct injuries, and constituted Bid-Rigging Enterprise II's regular way of conducting business. But for the

exposure of the scheme and then intervention of law enforcement authorities, Bid-Rigging Enterprise II would have continued indefinitely.

332.    By means of the foregoing violations of RICO, Plaintiff was injured in its business and property in an amount in excess of $123 million.

## COUNT VI

## (CIVIL RICO CONSPIRACY)

## (AS AGAINST ALL DEFENDANTS)

333.    ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 332 above.

334.    Defendants conspired to commit the violations of 18 U.S.C. § 1962(c) alleged in paragraphs 321 through 332 above.

335.    At all relevant times, each Defendant agreed and conspired to participate, directly and indirectly, in the conduct of Bid-Rigging Enterprise II through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

336.    The Defendants committed and/or caused to be committed a series of overt acts in furtherance of the conspiracy alleged herein and to effect the objectives of the Bid-Rigging Scheme.

337.    By means of the foregoing violations of RICO, Plaintiff was injured in its business and property in an amount in excess of $123 million.

## COUNT VII

## ROBINSON-PATMAN ACT

## (AS AGAINST DEFENDANTS COMPASS GROUP/ESS AND IHC)

338.    ES-KO repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 337 above.

339.    ES-KO is a "person" within the meaning of 15 U.S.C. § 7.

340.    Defendants Compass Group/ESS and IHC are "persons" within the meaning of 15 U.S.C. § 7.

341.    ES-KO and Defendant Compass Group/ESS are competitors in the global market for the supply of food rations to United Nations peacekeeping missions.

342.     Defendants Compass Group/ESS and IHC were engaged in commerce during the Relevant Period.

343.    In the course of such commerce, Defendants Compass Group/ESS and IHC, and or an agent, representative or other intermediary acting for or in their behalf, paid or granted a commission, brokerage or other compensation of significant value to Yakovlev, and or an agent, representative or other intermediary acting for or on his behalf.

344.    This commission, brokerage or other compensation consisted of bribes paid directly by Compass Group/ESS or indirectly through IHC to Yakovlev, and retained by Yakovlev for his personal benefit.  The commission, brokerage or other compensation was not paid in exchange for services rendered in connection with the sale or purchase of goods.

345.    At all times during the Relevant Period, Yakovlev was an agent of the United Nations, and owed fiduciary duties to the United Nations in such capacity.  Accepting the bribes of Compass Group/ESS constituted a breach of fiduciary duty.

346.    Yakovlev at all times concealed from the United Nations his acceptance of the bribes of Compass Group/ESS.

347.    Payment of the bribes constituted a per se violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

348.    Through their Robinson-Patman Act violations, Defendants Compass Group/ESS and IHC injured, destroyed or prevented competition in the market for the supply of food rations to United Nations peacekeeping missions.  As a result of these violations, ES-KO lost United Nations food rations contracts worth approximately $574 million plus additional significant amounts resulting from costs incurred in the preparation of bid submissions for contracts that were fraudulently obtained and fraudulently retained by Defendant Compass Group/ESS.  In addition, ES-KO was forced to reduce its bids on other contracts with a total value of approximately $430 million, causing ES-KO additional losses.

349.    ES-KO's injuries resulted from the direct, substantial and reasonably foreseeable effect of the anti-competitive and unlawful conduct of Defendants Compass Group/ESS and IHC on United States and/or foreign commerce.

350.    As a result of their conduct, Defendants Compass Group/ESS and IHC are liable for ES-KO's losses in an amount to be determined at trial.

351.    Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, ES-KO is entitled to recover threefold its damages plus costs and attorneys' fees from Defendants Compass Group/ESS and IHC, as well as injunctive relief.

## COUNT VIII

## ROBINSON-PATMAN ACT

## (AS AGAINST DEFENDANT ALEXANDER YAKOVLEV)

352.    ES-KO repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 351 above.

353.    ES-KO is a "person" within the meaning of 15 U.S.C. § 7.

354.    Yakovlev is a "person" within the meaning of 15 U.S.C. § 7.

355.    ES-KO and Defendant Compass Group/ESS are competitors in the global market for the supply of food rations to United Nations peacekeeping missions.

356.    Yakovlev was engaged in commerce during the Relevant Period.

357.    In the course of such commerce, Yakovlev, and or an agent, representative or other intermediary acting for or in his behalf, received or accepted a commission, brokerage or other compensation of significant value from Defendants Compass Group/ESS and IHC, and or an agent, representative or other intermediary acting for or in their behalf.

358.    This commission, brokerage or other compensation consisted of bribes paid directly by Compass Group/ESS or indirectly through IHC to Yakovlev, and retained by Yakovlev for his personal benefit.  The commission, brokerage or other compensation was not paid in exchange for services rendered in connection with the sale or purchase of goods.

359.    At all times during the Relevant Period, Yakovlev was an agent of the United Nations, and owed fiduciary duties to the United Nations in such capacity.  Accepting the bribes of Compass Group/ESS constituted a breach of fiduciary duty.

360.    Yakovlev at all times concealed from the United Nations his acceptance of the bribes of Compass Group/ESS.

361.    Receipt of the bribes constituted a per se violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

362.    Through his Robinson-Patman Act violation, Yakovlev injured, destroyed or prevented competition in the market for the supply of food rations to United Nations peacekeeping missions. As a result of this violation, ES-KO lost United Nations food rations contracts worth approximately $574 million plus additional significant amounts resulting from costs incurred in the preparation of bid submissions for contracts that were fraudulently obtained and fraudulently retained by Defendant Compass Group/ESS. In addition, ES-KO was forced to reduce its bids on other contracts with a total value of approximately $430 million, causing ES-KO additional losses.

363.    ES-KO's injuries resulted from the direct, substantial and reasonably foreseeable effect of the anti-competitive and unlawful conduct of Yakovlev on United States and/or foreign commerce.

364.    As a result of his conduct, Yakovlev is liable for ES-KO's losses in an amount to be determined at trial.

365.    Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, ES-KO is entitled to recover threefold its damages plus costs and attorneys' fees from Yakovlev, as well as injunctive relief.

## COUNT IX

### (TORTIOUS INTERFERENCE WITH
### PROSPECTIVE BUSINESS ADVANTAGE)

### (AS AGAINST DEFENDANTS COMPASS GROUP/ESS, PETER HARRIS,
### ANDREW SEIWERT, STEVE KEMP, LEN SWAIN, STEVE BICKERSTAFF,
### DOUG KERR, IHC SERVICES, AND EZIO TESTA)

366.    ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 365 above.

367.    ES-KO had a lengthy business relationship with the United Nations as the primary supplier of food, water and related services to peacekeeping troops around the world.

368.    Defendants Compass Group/ESS, Peter Harris, Andrew Seiwert, Steve Kemp, Len Swain, Steve Bickerstaff, Doug Kerr, IHC Services, and Ezio Testa interfered with that business relationship through their bid-rigging scheme.

369.    Specifically, the bid-rigging scheme enabled Compass Group/ESS, along with their named employees, inter alia, to obtain and misuse ES-KO's confidential pricing and other information from IHC and Yakovlev, in exchange for substantial bribes and/or other illegal consideration or remuneration.

370.    Defendants acted knowingly, dishonestly, unfairly and improperly.

371.    As a result of Defendants' dishonest, unfair and improper acts, ES-KO was damaged by the loss of multiple contracts that otherwise would have been awarded to it and was forced to reduce its profit margins on other contracts that ES-KO was awarded. ES-KO is entitled to recover its damages caused by the tortious acts of Compass Group/ESS and the other named Defendants in this Count in an amount of not less than $123 million, with prejudgment interest in the current amount of not less than $32.8 million. The conduct of Compass Group/ESS and their named employees, IHC and Testa was outrageous, wanton and willful,

constituted morally culpable conduct to an extreme degree and, consequently, ES-KO also should be awarded punitive damages in an amount of not less than $500 million to be determined at trial.

## COUNT X

## (UNFAIR COMPETITION)

### (AS AGAINST DEFENDANTS COMPASS GROUP/ESS, PETER HARRIS, ANDREW SEIWERT, STEVE KEMP, LEN SWAIN, STEVE BICKERSTAFF, DOUG KERR, IHC SERVICES, EZIO TESTA AND JOHN DOES 1 TO 100)

372.    ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 371 above.

373.    ES-KO has been providing food and water, as well as related services, to United Nations peacekeeping troops for almost twenty years.

374.    As a result of its extensive experience, know-how and superior resources, ES-KO had a commercial advantage over Compass Group/ESS in bidding on contracts to provide food, water and related services to United Nations peacekeeping troops.

375.    Frustrated by their inability to compete successfully with ES-KO, Compass Group/ESS, their named employees and other employees unknown, decided to engage in bribery and the misappropriation of trade secrets, in order to overcome ES-KO's competitive advantages.

376.    Compass Group/ESS, their named employees and other employees unknown thus procured, with the active assistance and collusion of IHC, Testa and the John Doe Defendants who were or are employed by Compass Group/ESS and IHC, through bribery the confidential proprietary information of ES-KO, including, but not limited to, pricing information which constituted trade secrets, in order to eliminate ES-KO's competitive advantage.

377.    Defendants' actions were taken in bad faith.

378.    ES-KO is entitled to recover its damages caused by Defendants' unfair competition in an amount of not less than $123 million, with pre-judgment interest in the current amount of not less than $32.8 million.

## COUNT XI

## (MISAPPROPRIATION OF TRADE SECRETS)

### (AS AGAINST DEFENDANTS COMPASS GROUP/ESS, PETER HARRIS, ANDREW SEIWERT, STEVE KEMP, LEN SWAIN, STEVE BICKERSTAFF, DOUG KERR, IHC SERVICES, EZIO TESTA AND JOHN DOES 1 TO 100)

379.    ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 378 above.

380.    As a result of its prior extensive experience in providing food, water and related services to United Nations peacekeeping forces for almost twenty years, ES-KO possesses a compilation of information regarding the provision of such services in specific geographic regions and the design of technical and pricing proposals for the provision of such services. Such compilation of information is unique to ES-KO, is not known generally, and has been retained and handled by ES-KO to guard its confidentiality.

381.    ES-KO's possession of this information gives it the opportunity to obtain an advantage over competitors who do not have it.  ES-KO's pricing and related information is of great value, was developed by ES-KO at substantial cost and could not have been easily duplicated or acquired by others through proper means. ES-KO's pricing and related information constitutes a trade secret.

382.    Defendants used improper means, including bribery, to procure the pricing and cost information contained in ES-KO's confidential proposal on contracts to provide

food, water and related services to United Nations peacekeeping troops so that they could compete with ES-KO, by, among other means, underbidding ES-KO on those contracts.

383.    ES-KO is entitled to recover damages in an amount of not less than $123 million, with pre-judgment interest in the current amount of not less than $32.8 million, and punitive damages in an amount of not less than $500 million to be determined at trial, or, alternatively, the actual profits of Compass Group/ESS on each of the contracts at issue which were awarded to Compass Group/ESS.

384.    ES-KO is also entitled to injunctive relief.

## COUNT XII

## (UNJUST ENRICHMENT)

## (AS AGAINST DEFENDANTS COMPASS GROUP/ESS AND IHC)

385.    ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 384 above.

386.    The preparation by ES-KO of each proposal for the award of a United Nations procurement contract required the commitment by ES-KO of substantial personnel and other resources and the incurrence of significant out-of-pocket costs.    The resulting ES-KO contract proposals constitute the valuable property of ES-KO.

387.    Defendants Compass Group/ESS and IHC wrongfully obtained ES-KO proposals through the means of bribing Yakovlev and the John Doe Defendants.

388.    After having obtained ES-KO contract proposals through such wrongful means, Defendants Compass Group/ESS and IHC used such proposals and the information they contained to prepare Compass Group/ESS's proposals for submission to the Procurement

Division. Through such improper means, Compass Group/ESS was able to undercut ES-KO's bids and secure the award of valuable procurement contracts.

389.    Compass Group/ESS and IHC were unjustly enriched by obtaining ES-KO's confidential proposals by the means described.

390.    Under these circumstances, equity and good conscience require that Compass Group/ESS and IHC make restitution for their unjust enrichment.

391.    ES-KO is entitled to damages for the amount, to be determined at trial, by which Compass Group/ESS and IHC were unjustly enriched by Defendants misappropriation of ES-KO's contract proposals.

## COUNT XIII

## (COMMERCIAL BRIBERY)

## (AS AGAINST DEFENDANTS COMPASS GROUP/ESS AND IHC)

392.    ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 391 above.

393.    Yakovlev, during the Relevant Period, was an agent, employee and fiduciary of the United Nations.

394.    Defendants Compass Group/ESS and IHC engaged in commercial bribery in violation of Section 180.03 of the New York Penal Code by conferring benefits upon Yakovlev without the United Nations' consent, with the intent to influence Yakovlev in connection with his official duties as an employee of the United Nations Procurement Division, and to induce Yakovlev to conspire with Compass Group/ESS and IHC in the perpetration of the Bid-Rigging Scheme.

395.   The benefits conferred consisted of the payment of money to Yakovlev, either directly by Compass Group/ESS or indirectly through IHC, which money was retained by Yakovlev for his personal benefit in violation of Section 180.03 of the New York Penal Code.

396.   The bribes caused economic harm to the United Nations, including, inter alia, payment by the United Nations of hundreds of millions of dollars to Compass Group/ESS as compensation under contracts which should not, in accordance with United Nations rules and procedures, have been awarded to Compass Group/ESS and which Compass Group/ESS was unable to perform satisfactorily.

397.   As a direct consequence of the acts of commercial bribery engaged in by Compass Group/ESS and IHC, contracts which would have been awarded to ES-KO were instead awarded to Compass Group/ESS.

398.   ES-KO is entitled to recover damages in an amount of not less than $123 million, with pre-judgment interest in the current amount of not less than $32.8 million, or alternatively, the actual profits of Compass Group/ESS on each of the contracts at issue which were awarded to Compass Group/ESS.

**WHEREFORE,** ES-KO requests that the Court issue judgment, jointly and severally against the Defendants, as follows:

(i)   On ES-KO's RICO, Robinson-Patman and Clayton Act claims, awarding ES-KO treble damages in an amount to be determined at trial not less than $369 million, and reasonable attorneys' fees, and injunctive relief in the form of an order barring Compass Group/ESS from future Robinson-Patman Act violations;

(ii)     On ES-KO's tortious interference claim, awarding ES-KO damages in an amount not less than $123 million, with pre-judgment interest in an amount not less than $32.8 million, and punitive damages in an amount not less than $500 million to be determined at trial;

(iii)    On ES-KO's unfair competition claim, awarding ES-KO damages in an amount not less than $123 million and pre-judgment interest in an amount not less than $32.8 million to be determined at trial;

(iv)     On ES-KO's claim for misappropriation of trade secrets, awarding ES-KO damages in an amount not less than $123 million, with pre-judgment interest in an amount not less than $32.8 million, and punitive damages in an amount not less than $500 million to be determined at trial, or alternatively, the actual profits of Compass Group/ESS on each of the contracts at issue which were awarded to Compass Group/ESS;

(v)      On ES-KO's claim for misappropriation of trade secrets, granting ES-KO injunctive relief in the form of an order barring Compass Group/ESS from submitting proposals on any United Nations contracts in which Compass Group/ESS might make use of the confidential, proprietary and non-public information illegally obtained from ES-KO;

(vi)     On ES-KO's claim for unjust enrichment, damages in an amount to be determined at trial by which Compass Group/ESS and IHC have been unjustly enriched and the imposition of a constructive trust on such assets and profits of Compass Group/ESS and IHC as are traceable to such unjust enrichment;

(vii)    On ES-KO's claim for commercial bribery, damages in an amount not less than $123 million, with pre-judgment interest in an amount not less than $32.8 million to be determined at trial, or, alternatively, the actual profits of Compass Group/ESS on each of the contracts at issue which were awarded to Compass Group/ESS; and

(viii)    Awarding ES-KO such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: March 28, 2006
       New York, New York

                    **BROWN RUDNICK BERLACK ISRAELS LLP**

                    By: _____
                         Sigmund S. Wissner-Gross (SW-0001)
                         May Orenstein (MO-2948)
                         Peter Adelman (PA-1562)
                         David E. Miller (DM-7179)
                    7 Times Square
                    New York, New York  10036
                    (212) 209-4800
                    Attorneys for Plaintiff