UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SUPREME FOODSERVICE AG,<br><br>      Plaintiff,<br><br>      v.<br><br>COMPASS GROUP PLC, ESS (A/K/A<br>EUREST SUPPORT SERVICES), IHC<br>SERVICES, INC., PETER HARRIS,<br>ANDREW SEIWERT, ALEXANDER<br>YAKOVLEV, MOXYCO, LTD., DOUG<br>KERR, STEVE KEMP, LEN SWAIN,<br>VLADIMIR KUZNETSOV, NIKAL, LTD.,<br>EZIO TESTA, DMITRY YAKOVLEV AND<br>OLGA YAKOVLEV,<br><br>      Defendants. | **FIRST AMENDED COMPLAINT AND<br>JURY DEMAND**<br><br>Case No. 06-CV-1759 (PKC) |

Plaintiff, Supreme Foodservice AG ("Supreme"), for its complaint against Defendants,

Compass Group PLC ("Compass Group"), ESS (a/k/a Eurest Support Services), IHC Services,

Inc. ("IHC"), Peter Harris, Andrew Seiwert, Alexander Yakovlev ("Yakovlev"), Moxyco, Ltd.

("Moxyco"), Doug Kerr, Steve Kemp, Len Swain, Vladimir Kuznetsov, Nikal, Ltd. ("Nikal"),

Ezio Testa, Dmitry Yakovlev ("Dmitry") and Olga Yakovlev ("Olga") alleges on knowledge

with respect to itself and its own conduct, and upon the basis of information and belief as to all

other matters:

## I.   INTRODUCTION

1.     For approximately five years, Defendants engaged in an illegal scheme involving wire fraud and bribery to rig the award of United Nations ("U.N.") contracts for the provision of food rations to U.N. peacekeeping forces around the world. This conspiracy corrupted the United Nations and defrauded the U.N.'s member states. It contaminated a bidding process designed to be free and fair, and it cheated Plaintiff Supreme out of contracts that could be worth in excess of $350 million. The Defendants' disgraceful conduct violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act, the Sherman Act and New York State's Donnelly Act, and their conduct tortiously interfered with Plaintiff Supreme's prospective business advantage and business relations.

2.     Plaintiff Supreme, a world leader in food supply for military and multinational forces, brings this action to recover damages from Defendants' massive conspiracy. Plaintiff also seeks injunctive relief to prevent the reoccurrence of the unlawful and criminal acts of Defendants.

3.     Defendant Compass Group is the largest foodservice company in the world. ESS (a/k/a Eurest Support Services) represents a division of Compass Group that performed U.N. contracts for the provision of food rations to peacekeeping missions around the world. Compass Group, ESS and all of Compass's divisions, affiliates and subsidiaries are herein collectively referred to as "Compass."

4.     From 2000 through 2005, Defendant Compass "won" United Nations contracts that could be worth in excess of $350 million by bribing Defendant Alexander Yakovlev, a U.N. official, to manipulate the U.N.'s top-secret bidding procedures in favor of Compass.

5.     Defendant Compass, by its employees, including Defendants Peter Harris, Andrew Seiwert, Doug Kerr, Steve Kemp and Len Swain, concealed from the U.N. its illegal

2

payments to Defendant Yakovlev, amounting to at least several hundred thousand dollars, by making them through Defendant IHC.

6.      Defendant IHC gave Defendant Yakovlev cash payments to rig bids for Defendant Compass. In furtherance of the bribery and bid-rigging scheme, Defendant Ezio Testa, Defendant IHC's Chief Executive Officer ("CEO"), hired Defendant Yakovlev's son to work at Defendant IHC's headquarters in New York City.

7.      As Defendant Yakovlev amassed wealth from illegal payments, he enlisted the help of Defendant Vladimir Kuznetsov, a fellow Russian national working at the U.N. Defendant Kuznetsov received at least several hundred thousand dollars in return for his assistance, which began in approximately 2000.

8.      Defendants' scheme to corrupt the United Nations, defraud its member states and swindle Plaintiff Supreme out of profits it otherwise would have earned was first exposed on August 8, 2005, when Paul Volcker, former Chairman of the Federal Reserve and leader of the independent investigation into the U.N.'s Oil-for-Food program, announced that Defendant Yakovlev had taken at least approximately $1 million in bribes relating to U.N. procurement contracts and the Oil-for-Food program. That same day, U.N. Secretary-General Kofi Annan stripped Defendant Yakovlev of his diplomatic immunity and the United States Attorney's Office for the Southern District of New York charged Defendant Yakovlev with conspiracy to commit wire fraud, wire fraud and money laundering in connection with Defendant Yakovlev's role as a U.N. procurement officer between the years 1993 and 2005. Defendant Yakovlev pleaded guilty to all three crimes before the Honorable William H. Pauley, United States District Judge for the Southern District of New York.

3

9.     Soon after Defendant Yakovlev's plea, news of Defendant Kuznetsov's complicity became public. In early September 2005, Kofi Annan waived Defendant Kuznetsov's diplomatic immunity and the United States Attorney's Office for the Southern District of New York charged Defendant Kuznetsov with conspiracy to commit money laundering.

10.     Defendants' bid-rigging conspiracy succeeded in snatching multiple U.N. contracts, including a contract worth in excess of $62 million for the provision of food rations to U.N. peacekeeping forces stationed in Liberia (the "Liberia Rations Contract"). To secure the Liberia Rations Contract, Defendant Compass used top-secret, highly-confidential U.N. information illegally obtained from Defendant Yakovlev. When the news media reported this scandal in October 2005, the U.N. removed Defendant Compass and Defendant IHC from its approved vendor list and began an investigation into the relationship between Defendant Compass, Defendant IHC and the United Nations.

11.     Also in October 2005, Defendant Compass announced that it had launched a full-scale investigation into the circumstances surrounding Defendant Compass's procurement of U.N. contracts. It hired Freshfields Bruckhaus Deringer and Ernst & Young to lead the investigation. Less than one month later, Defendant Compass terminated the employment of Defendants Peter Harris, Andrew Seiwert and Doug Kerr because the Defendants participated in a scheme to bribe Defendant Yakovlev to obtain U.N. contracts for Defendant Compass.

12.     In November 2005, the United Kingdom's Serious Fraud Office ("SFO") launched an investigation into Defendant Compass's business practices. Currently, Defendant Compass faces investigations by the United States Congress, the United States Attorney's Office for the Southern District of New York, the SFO and the United Nations.

4

13.    Defendant Compass has failed to admit publicly the depth of corruption within its ranks. Defendant Compass neglected to disclose the involvement of at least two executives – Defendants Steve Kemp and Len Swain – in its fraudulent scheme. In April 2005, Defendant Seiwert forwarded an e-mail from Defendant Yakovlev to Defendants Kemp and Swain that included information labeled "strictly confidential, not for release outside of the United Nations." This confidential information described Defendant Compass's poor performance on a contract for the provision of food rations to peacekeepers in Burundi (the "Burundi Rations Contract"). Defendant Yakovlev sent the confidential information to Defendant Compass so that Compass could take steps to prevent the cancellation of Defendant Compass as a supplier for the Burundi Rations Contract. The Burundi Rations Contract was worth as much as $111 million, including optional add-ons. Supreme had bid on the Burundi Rations Contract and lost it to Compass.

14.    Defendants' bribery and bid-rigging scheme violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act, the Sherman Act, New York State's Donnelly Act, the Robinson-Patman Act and the common law.

15.    Defendants, by their illegal conduct, not only corrupted the United Nations and defrauded the U.N.'s member states, including the United States, but Defendants also swindled Plaintiff Supreme out of profits it would have earned from U.N. food rations contracts that could be worth in excess of $350 million.

## II.    JURISDICTION

16.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under 18 U.S.C. § 1964(c) of the RICO Act, which provides federal jurisdiction for injuries resulting from RICO violations.

17.    This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, because Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 2(c) of the Robinson-Patman

Act, 15 U.S.C. § 13(c) and Section 4 of the Clayton Act, 15 U.S.C. § 15, provide federal jurisdiction for claims arising under the antitrust laws. The Sherman Act applies because the Foreign Trade Antitrust Improvement Act of 1982, 15 U.S.C. § 6a, makes the Sherman Act applicable to foreign trade or commerce having a direct, substantial and reasonably foreseeable effect on domestic trade or commerce.

18.     This Court also has jurisdiction pursuant to Article III, Section 7 of the Agreement between the United Nations and the United States of America Regarding the Headquarters of the United Nations, 61 Stat. 758, which provides that federal courts of the United States shall have jurisdiction over acts done and transactions taking place in the headquarters district, as provided in applicable federal, state and local laws.

19.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), in that the RICO, Sherman Act and Robinson-Patman claims arise under the laws of the United States and the state-law claims are so related to the RICO, Sherman Act and Robinson-Patman claims that they form part of the same case or controversy.

### III.     TRADE AND COMMERCE

20.     The United Nations has established a Procurement Service at United Nations Headquarters in New York City, located at 304 East 45th Street, New York, New York. The Procurement Service handles procurement for U.N. peacekeeping missions worldwide, the various departments and offices of the U.N. Secretariat in New York and other U.N. offices, organizations, regional commissions and departments worldwide.

21.     In 2003, the U.N. purchased more than 822 different categories of goods and services representing a total value in excess of $891 million. Of this total, more than $41 million was spent on food rations and catering services in 2003.

22.     Vendors from around the world, including vendors located in the United States, apply to become U.N.-approved vendors. These applications are sent to and evaluated by the Procurement Service at U.N. Headquarters in New York.

23.     The Procurement Service also solicits bids for U.N. contracts, including food rations contracts. Requests for proposals and invitations to bid are issued from the Procurement Service at U.N. Headquarters in New York.

24.     Vendors bidding on U.N. contracts submit sealed bids to the Procurement Service at U.N. Headquarters in New York. The Procurement Service opens these bids at the U.N. Headquarters in New York.

25.     Defendant Compass retained Defendant IHC, whose headquarters is in New York City, as its so-called "vendor intermediary" so that Defendant IHC could assist it with Defendant Compass's bid submissions to the Procurement Service at U.N. Headquarters in New York.

26.     The U.N. releases payments to vendors providing goods and services, including vendors providing food rations, from an account in New York.

27.     The submission, evaluation and award of bids and the management of procurement contracts by the United Nations at its Headquarters in New York represent substantial and significant commerce in New York City. Defendants' anti-competitive and unlawful conduct, described more fully below, had a direct, substantial and reasonably foreseeable effect on trade and commerce occurring in this District, and such effect gives rise to Plaintiff Supreme's Sherman Act claim set forth below. Plaintiff's injuries are not independent of the effects of Defendants' anti-competitive and unlawful conduct on United States commerce.

7

## IV.    RELEVANT MARKET

28.    Vendors interested in supplying food to U.N. peacekeeping missions must take part in a competitive bidding process administered by the Procurement Service at U.N. Headquarters in New York. The U.N. sets specific requirements for its contracts, and it seeks bids to supply food rations to peacekeeping missions only from qualified vendors.

29.    No reasonable substitute exists for the supply of food rations to U.N. peacekeeping missions. Before a food vendor may be invited to bid on a food rations contract, it must become a U.N.-approved vendor. Before it may be awarded a U.N. food rations contract, a food vendor must be invited to bid and it must submit a response to a formal request for a proposal (an "RFP") for a food rations contract. An entity wishing to became a U.N.-approved vendor must submit an application to the U.N. and establish that it meets the U.N.'s technical requirements.

30.    The relevant product market for antitrust purposes is the market for the supply of food rations to U.N. peacekeeping missions. The relevant geographic market is global.

## V.    THE PARTIES

### A.    Plaintiff Supreme

31.    Plaintiff Supreme, headquartered in Switzerland, is a U.N.-registered, global foodservice company specializing in the provision of foodservice to organizations in regions of crisis. It is a world leader in food supply for military and multinational forces, and has more than 45 years of experience in the food supply business. Plaintiff Supreme has provided foodservice to numerous multinational military and governmental organizations, including the United Nations, and has also provided foodservice to numerous national military forces, including the United States military. Plaintiff Supreme currently has a five-year, $1 billion contract with the United States to provide food rations to military forces in Afghanistan. Plaintiff Supreme is a

8

signatory to the U.N. Global Compact. It regularly conducts business in New York by submitting bids for food rations contracts to the U.N. Headquarters in New York City.

32.     Plaintiff Supreme is the parent and successor-in-interest of Supreme Sales GmbH, a wholly-controlled subsidiary that succeeded Alfred Orenstein Gbr, an entity that began providing deliveries of food rations to U.S. military forces stationed in Germany in the late 1950s. (Supreme, Supreme Sales GmbH and Alfred Orenstein Gbr are collectively referred to herein as "Supreme".)

## B.     Defendant Compass Group

33.     Defendant Compass Group is the twelfth largest employer in the world. It has 400,000 employees and annual revenues in excess of $21 billion. It is headquartered in the town of Chertsey in Surrey, United Kingdom.

34.     Defendant Compass Group has foodservice contracts with the United States government – including at least one contract to provide foodservice to a federal courthouse – and it owns several restaurants in New York City, including The Brasserie, Sea Grille, Tropica, Naples 45, Macy's Cellar Bar & Grill and Cucina & Co. Defendant Compass provides catering services to some of New York City's most popular attractions, including the American Museum of Natural History, Carnegie Hall, the Central Park Zoo, the Intrepid Sea, Air and Space Museum, Lincoln Center, The Metropolitan Museum of Art and the Guggenheim Museum.

## C.     Defendants ESS

35.     Defendant ESS, also known as Eurest Support Services, is a division of Defendant Compass Group that specializes in providing services to remote sites, defense locations and off-shore locations, including areas patrolled by U.N. peacekeeping forces. It is managed and operated by Defendant Compass Group at its offices in the United Kingdom. Defendant ESS regularly conducts business in New York by submitting bids for food rations

9

contracts to the U.N. Headquarters in New York City.  ESS Support Services Worldwide and Eurest Support Services (Cyprus) International Limited are divisions of Defendant Compass Group or Defendant ESS through which these Defendants conduct business operations.

### D.    Defendant IHC

36.    Defendant IHC is a corporation doing business in New York with its base of operations at 192 Lexington Avenue.  While IHC has sold some goods directly to the U.N., it mainly operates as a so-called "vendor intermediary."  In such capacity, IHC has helped other companies obtain lucrative U.N. contracts.

### E.    Defendant Peter Harris

37.    Prior to the termination of his employment from Defendant Compass in November 2005, Defendant Peter Harris was a member of Defendant Compass Group PLC's senior management team and sat on the Board of Compass as a Director.  He was the CEO of Defendant Compass's United Kingdom and Ireland, Middle East and Africa divisions, and he was also the Chief Executive Officer of Defendant ESS.  Defendant Harris held these positions when Defendant Compass obtained the Liberia Rations Contract, the Burundi Rations Contract and other U.N. contracts for which Plaintiff Supreme submitted competing bids.

### F.    Defendant Andrew Seiwert

38.    Prior to the termination of his employment in November 2005, Defendant Andrew Seiwert was a senior executive for business development at Defendant ESS.  Defendant Seiwert may also be known as Markus or Marcus Andreas Seiwert.  He was Defendant Compass's main liaison with the U.N. Procurement Service, regularly meeting with Defendant Yakovlev to discuss business issues.  Defendant Seiwert performed this function when Defendant Compass obtained the Liberia Rations Contract, the Burundi Rations Contract and other U.N. contracts for which Plaintiff Supreme submitted competing bids.

10

### G.    Defendant Alexander Yakovlev

39.    Defendant Yakovlev is a Russian citizen living in Yonkers, New York who was employed at the U.N. from 1985 to 2005. Beginning in at least 1998 through June 22, 2005, Defendant Yakovlev played a major role within the U.N. as a senior procurement officer in the U.N.'s Procurement Service and possessed substantial authority to affect the U.N.'s selection of a winning bidder, the U.N.'s response to allegations of service problems by a vendor and the U.N.'s decision whether to grant advantageous price adjustments to a vendor during the performance of a contract.

40.    Defendant Yakovlev was responsible for the U.N.'s award of the Liberia Rations Contract, the Burundi Rations Contract and other, if not all, food supply contracts Defendant Compass won.

### H.    Defendant Moxyco

41.    Defendant Yakovlev established Defendant Moxyco, an off-shore company, in or about 2000. Soon thereafter, Defendant Yakovlev opened an account for Defendant Moxyco at Antigua Overseas Bank Limited ("Antigua Overseas") to facilitate the transfer and concealment of illicit payments.

### I.    Defendant Doug Kerr

42.    Defendant Kerr, an executive of Defendant Compass who worked directly with Defendant Seiwert to prepare Defendant Compass's bids for the U.N., was terminated from Defendant Compass in November 2005. At the time of Defendant Kerr's termination, Defendant Compass did not disclose Defendant Kerr's involvement in the bribery and bid-rigging conspiracy. Defendant Kerr's involvement became publicly known only after U.S. congressional investigators disclosed his identity.

11

### J.      Defendant Steve Kemp

43.      Defendant Kemp is the Regional Operations Director for Defendant ESS. He is responsible for Defendant Compass's performance of U.N. food rations contracts.

### K.      Defendant Len Swain

44.      Until recently, Defendant Swain had been responsible for Defendant Compass's purchases in connection with Defendant Compass's performance on its rations contracts with the U.N. He is slated to leave Defendant Compass's employment soon. Defendant Compass has not offered details of Defendant Swain's anticipated departure other than to say that it is "part of the ongoing restructuring of ESS."

### L.      Defendant Vladimir Kuznetsov

45.      Defendant Vladimir Kuznetsov is a former United Nations official. Beginning no later than 2000, Defendant Kuznetsov served on the U.N.'s Advisory Committee on Administrative and Budgetary Questions. Beginning on or about January 1, 2004, he served as Chairman of this Committee.

### M.      Defendant Nikal

46.      Defendant Kuznetsov established Defendant Nikal, an off-shore company, in or about 2000. Soon thereafter, Kuznetsov opened a bank account for Defendant Nikal at Antigua Overseas, the same bank where Defendant Yakovlev opened an account for Defendant Moxyco.

### N.      Defendant Ezio Testa

47.      Defendant Ezio Testa was President and CEO of IHC from approximately 2003 through approximately 2005. Defendant Testa is currently an IHC board member.

### O.    Defendant Dmitry Yakovlev

48.    Defendant Dmitry is Defendant Yakovlev's son.  Defendant Dmitry lives in

Yonkers, New York.  On or about May 2000, Defendant IHC hired Defendant Dmitry, pursuant

to Defendant Yakovlev's request, to work in IHC's New York City headquarters.  Defendant

Dmitry was employed by IHC from approximately May to August 2000 and 2001 and from

approximately December 2002 to December 2003.  During his employment with IHC, Defendant

Dmitry served as a conduit through which confidential United Nation information was

transferred between and among Defendants Yakovlev, Testa and IHC.

### P.    Defendant Olga Yakovlev

49.    Defendant Olga is the wife of Defendant Yakovlev.  Defendant Olga received

transfers of cash to her Swiss bank account from Moxyco's offshore account, which is the

account Defendant Yakovlev used as the storehouse for cash he obtained through the bribery and

bid-rigging scheme described herein.

### VI.    UNITED NATIONS RATIONS CONTRACTS

50.    The market for U.N. rations contracts is a difficult market for vendors to enter.

The U.N.'s standards are very high and, since the performance of procurement services are

critical to peacekeeping missions, the U.N. does not welcome unproven entrants.  Hence,

relationships with the United Nations take many years to build.

51.    Plaintiff Supreme has been providing service to the United Nations since the

1970s, when it delivered supplies to U.N. missions in the Middle East.  In 1993, Plaintiff

Supreme won a U.N. contract for the provision of food rations to 2,500 U.N. peacekeeping

forces stationed in Mozambique.  Also in that year, Plaintiff Supreme won a rations contract for

13

peacekeeping forces stationed in Croatia and Bosnia-Herzegovina ranging in size from 6,500 to

10,000 troops. From 1998 to 1999, Plaintiff Supreme provided food rations to a U.N. facility in

Lebanon, and from 1999 to 2000, Plaintiff Supreme provided catering and food supply service to

a U.N. facility in East Timor. Currently, Plaintiff Supreme provides foodservice and catering to

U.N. peacekeepers in the Ivory Coast and catering and retail services to U.N. staff in

Afghanistan.

52.     Defendant Compass entered the market for the provision of food rations to U.N.

peacekeeping forces when it became a U.N-registered vendor in approximately 2000. Shortly

thereafter, Defendant Compass won a contract for the first bid it submitted to the U.N. – a

contract for the provision of food rations to peacekeeping forces in East Timor. Despite the

U.N.'s longstanding practice of requiring bidders to prove themselves over time, Defendant

Compass's business with the U.N. grew at a torrid pace from the moment Defendant Compass

entered the market for food rations contracts.

53.     Defendant Compass hired Defendant IHC to be its so-called "vendor

intermediary" for most, if not all, of its bid submissions.

54.     The legitimacy of vendor intermediaries is highly suspect. The U.N. has issued

the following statement concerning the use of such intermediaries:

> There are indications that certain parties have approached prospective vendors
> offering to act as intermediaries in dealings with the United Nations. Some of
> these intermediaries purport to have various arrangements with the United
> Nations, or to possess support facilities within UN missions or projects which can
> place a vendor in a more advantageous position in a competitive bidding exercise.
>
> Vendors are advised that the UN prefers to deal directly with principals to the
> extent possible. Vendors are therefore urged to consult with the Procurement
> Service before deciding to submit offers or negotiate contracts through any
> intermediary.

14

55.    Defendant Compass, through its employees, paid Defendant IHC millions of dollars to be its so-called "vendor intermediary" for its U.N. contracts.

56.    Since 2000, with the help of Defendant IHC, Defendant Compass won U.N. contracts for the provision of food rations to peacekeeping forces in Sudan, East Timor, Liberia, Burundi, Eritrea, Lebanon, Cyprus and Syria. As of October 2005, Defendant Compass serviced approximately 50% of the market for peacekeeping rations contracts. Defendant Compass's foodservice contracts could be worth in excess of $350 million.

57.    Of the rations contracts won by Defendant ESS, Plaintiff Supreme submitted bids for Sudan, East Timor, Liberia, Burundi and Eritrea.

58.    The U.N. removed Defendant IHC and Defendant Compass from its approved vendor list in late 2005, when the U.N. began to investigate how Defendant IHC and Defendant Compass obtained top-secret information about the Liberia Rations Contract.

## VII.    RACKETEERING AND OTHER UNLAWFUL ACTIVITY

### A.    The Criminal Enterprise

59.    From 2000 to 2005, Defendant Yakovlev rigged the bidding process for U.N. food rations contracts so that Defendant Compass would win several U.N. contracts that could be worth in excess of $350 million.

60.    Defendant Yakovlev received approximately nearly $1 million, if not more, from Defendant Compass as compensation for his illicit activities. Additionally, in an effort to bribe Defendant Yakovlev through patronage, Defendant IHC's CEO, Defendant Ezio Testa, hired Defendant Yakovlev's son, Defendant Dmitry, to work at Defendant IHC. This occurred at a time when Defendant IHC was supplying the U.N. with nearly $2 million worth of portable generators pursuant to a contract that Defendant Yakovlev had negotiated with Defendant IHC.

15

61.     By obtaining a job for his son, Defendant Yakovlev violated at least two U.N.
conflict-of-interest rules. One such rule stated, "Staff members shall not use their office or
knowledge gained from their official functions for private gain, financial or otherwise, or for the
private gain of any third party, including family, friends and those they favour." The other rule
required U.N. officials to certify that they did not have a "conflict of interest with regard to the
economic activities of spouses and children." Defendant Dmitry lived with Defendant Yakovlev
while employed by Defendant IHC.

62.     Through his father, Defendant Dmitry had access to confidential U.N. information
concerning, among other things, vendor bids for food rations contracts and the U.N.'s
evaluations of such bids. Defendant Dmitry's cell phone records indicate that during his
employment with IHC, Defendant Dmitry placed numerous phone calls to IHC that were
immediately preceded or followed by phone calls to Defendant Yakovlev. By making these
calls, Defendant Dmitry acted as a conduit through which confidential U.N. information was
transferred between and among Defendants Yakovlev, IHC and Testa. Even after his
employment relationship with IHC ceased in December 2003, Defendant Dmitry continued to
speak to IHC officials using his cellular phone and regularly telephoned Defendant Yakovlev
immediately before and after such phone calls.

63.     Defendants Harris, Seiwert, Kerr, Kemp and Swain were instrumental in
Defendants' bribery and bid-rigging scheme.

64.     In addition to violating various laws, the bribery and bid-rigging scheme violated
Defendant Compass's Statement of Business Principles and the United Nations Global Compact.
Defendant Compass's Statement of Business Principles includes the directive that "[n]o
employee may offer or receive – or influence others to offer or receive – any money, gift or

16

hospitality that could be construed as being intended as a bribe or influence." The anti-corruption provision of the U.N. Global Compact mandates that "Business should work against all forms of corruption, including extortion and bribery." Defendant Compass is a signatory to the Global Compact.

65.    Defendant Yakovlev paid Defendant Kuznetsov a portion of his illicit proceeds, amounting to several hundred thousand dollars, in exchange for Defendant Kuznetsov's assistance.

66.    Collectively, the Defendants perpetrated a scheme whereby Defendant Compass was awarded U.N. contracts in exchange for illicit payments and patronage to Defendant Yakovlev. As part of this scheme, Defendant Yakovlev disclosed confidential information to Defendant Compass concerning Defendant Compass's performance on at least one U.N. contract. The purpose of disclosing information relating to Defendant Compass's performance failures was to enable Defendant Compass to correct its service problems before the U.N. cancelled its contract with Defendant Compass and tendered the contract to the marketplace for re-bid. Without such support, Defendant Compass not only would have lost the Burundi Rations Contract, but its other U.N. contracts would have been put in jeopardy.

**B.    A Pattern of Racketeering Activity**

**i)    Defendant Yakovlev's Money Laundering Scheme**

67.    Defendant Yakovlev instructed Defendant IHC to make payments to the account he set up for Defendant Moxyco at Antigua Overseas and to a secret bank account in Switzerland in exchange for confidential information and illegal assistance that Defendant Compass utilized to obtain and retain U.N. contracts.

17

**ii)      Defendant Kuznetsov Joins Defendant Yakovlev's Criminal Scheme**

68.      In early 2000, Defendant Yakovlev informed Defendant Kuznetsov of his criminal scheme to obtain money from companies seeking to secure U.N. contracts.

69.      Sometime thereafter, Defendant Kuznetsov established Defendant Nikal and opened a bank account in the name of Defendant Nikal at Antigua Overseas, the same bank where Defendant Yakovlev opened an account for Defendant Moxyco.

70.      Defendant Kuznetsov did not report Defendant Yakovlev to the U.N. or any law enforcement authority. In exchange for Defendant Kuznetsov's silence, Defendant Yakovlev agreed to transfer, and did transfer, a share of his illegally-obtained proceeds to Defendant Kuznetsov.

71.      Defendant Kuznetsov used the off-shore account for Defendant Nikal at Antigua Overseas to facilitate and hide Defendant Yakovlev's payments of hush money.

72.      From approximately 2000 through June 2005, Defendant Kuznetsov received at least several hundred thousand dollars in criminal proceeds from Defendant Yakovlev.

**iii)     Authorities Discover the Criminal Conspiracy - Defendant Yakovlev Pleads Guilty**

73.      Defendant Yakovlev resigned from the U.N. in June 2005 after the news media reported that Defendant Yakovlev had obtained a job for his son at Defendant IHC's headquarters in New York City at a time when Defendant Yakovlev had been overseeing Defendant IHC's performance on a U.N. contract.

74.      On August 8, 2005, Paul Volcker, former Chairman of the Federal Reserve and leader of the independent investigation into the U.N.'s Oil-for-Food program, announced that Defendant Yakovlev had taken bribes in connection with U.N. procurement contracts and the Oil-for-Food program.

18

75.     Following Volcker's announcement, authorities arrested Defendant Yakovlev on August 8, 2005. That same day, Defendant Yakovlev pleaded guilty before the Honorable William H. Pauley, United States District Judge for the Southern District of New York, to charges of conspiracy to commit wire fraud, wire fraud and money laundering stemming from his receipt of several hundred thousand dollars, if not more, from foreign companies seeking to obtain contracts from the U.N. between the years 1993 and 2005.

76.     Prior to his guilty plea, Defendant Yakovlev was able to effect several transfers of cash from Moxyco's offshore account to Olga's Swiss bank account.

77.     Following Defendant Yakovlev's plea, the FBI arrested Defendant Kuznetsov on September 1, 2005. The United States Attorney's Office for the Southern District of New York charged Defendant Kuznetsov with one count of conspiracy to commit money laundering in connection with his receipt of hush money from Defendant Yakovlev. This case is pending before the Honorable Debra A. Batts, United States District Judge for the Southern District of New York.

### iv)    Defendant IHC Leaks U.N.'s Top Secret Information on Liberia Rations Contract to Defendant Compass

78.     Under U.N. rules, sealed bids for procurement contracts are submitted to the U.N. in a top-secret bidding process pursuant an RFP. Responses to an RFP must include a technical and a financial proposal, which are submitted in separate sealed envelopes. Pursuant to United Nations procedures, technical proposals submitted to the Procurement Division are opened publicly for the sole purpose of recording that the proposals were submitted by the due date and time. No price is to be extrapolated or announced at the time of the public opening. The financial proposals are not revealed at the public opening.

19

79.     As of November 6, 2003, the U.N. had not yet decided who would be awarded the Liberia Rations Contract.  Yet, on that date, Defendant Testa (Defendant IHC's CEO), and Defendant Seiwert received three highly confidential U.N. documents concerning the Liberia Rations Contract.

80.     One of those documents was a draft of the U.N. Procurement Service's official recommendation to the U.N. Headquarters Committee on Contracts to award the $62 million Liberia Rations Contract to Defendant Compass.

81.     Another of those documents was an evaluation of the technical abilities of twelve food supply firms bidding for the Liberia Rations Contract (the "Technical Evaluation"). According to the Technical Evaluation, Supreme met the U.N.'s technical requirements.

82.     The third document showed that Plaintiff Supreme was a finalist in the competition for the Liberia Rations Contract.  This document provided a cost description of the finalists' bids, including bids by Plaintiff Supreme and Defendant Compass.

83.     On or about November 12, 2003, the U.N. Headquarters Committee on Contracts approved the award of the $62 million Liberia Rations Contract to Defendant Compass, as per the Procurement Service's recommendation.

84.     In October 2005, after learning of Defendant Testa's e-mail to Defendant Seiwert, the U.N. launched an investigation to determine how Defendant Testa obtained the information and why Defendant Compass did not inform the U.N. of the leak.  Defendant Compass was de-listed from the United Nations registry of vendors soon thereafter.

   v)      **Defendant Yakovlev Leaks Top-Secret Information on Burundi Rations Contract to Defendant Compass**

85.     On April 27, 2005, Defendant Yakovlev leaked confidential information to Defendant Seiwert concerning Defendant Compass's performance failings with respect to the

20

Burundi Rations Contract. Defendant Seiwert forwarded the e-mail to Defendants Kemp and Swain, seeking their urgent attention, and to Defendant Testa.

### vi)    Current Investigations

86.    Defendant Compass, which announced the completion of its internal investigation on February 1, 2006, is currently subject to investigations by the United States Congress, the United States Attorney's Office for the Southern District of New York, the Serious Fraud Office of the United Kingdom and the United Nations. So far, Defendant Compass has fired Defendants Harris, Seiwert and Kerr. Defendant Compass has not terminated the employment of Defendants Kemp and Swain, though Defendant Swain is purportedly scheduled to leave the company soon. Defendant Compass has also disciplined at least three other employees as a result of the involvement of those employees in the big-rigging and bribery conspiracy.

## VIII.   UNLAWFUL RESTRAINT OF TRADE AND COMMON LAW VIOLATIONS

87.    Defendants attempted to rig, and did rig, the bidding process associated with the award of food rations contracts to U.N. peacekeeping forces. As a result, the U.N. and its member states were defrauded and Plaintiff Supreme was swindled out of the profits it would have earned from contracts it would have won but for Defendants' illegal conduct.

88.    Defendants knowingly and intentionally corrupted the U.N.'s bidding process so that Defendant Compass would "win" contracts that it otherwise would not have won and keep contracts that it otherwise would not have kept. Defendants knew that by engaging in such conduct, they interfered with Plaintiff Supreme's ability to win those contracts. In the case of the Liberia Rations Contract and other contracts for which Plaintiff Supreme submitted bids, Defendant Compass knew that by bribing Defendant Yakovlev, its bids would prevail over Plaintiff Supreme's bids and Defendant Compass would win the contracts. In the case of the Burundi Rations Contract, Defendant Compass knew that by bribing Defendant Yakovlev, it

21

would obtain confidential information that would enable it to correct performance failures before the U.N. acted to cancel Defendant Compass's contract.

89.    By their illegal scheme, Defendants sought to reduce and eliminate competition in the market for the supply of food rations to U.N. peacekeeping missions, thereby, and to achieve a monopoly position in that market for Defendant Compass.

90.    There are significant barriers to entry into the market for the supply of food rations to U.N. peacekeeping missions, including the registration requirements to become a U.N. vendor and, more importantly, the very high standards imposed on vendors before such vendors' bids will be considered by the U.N. Thus, the market for U.N. food rations contracts was particularly vulnerable to Defendants' illegal scheme to reduce and eliminate competition and to gain monopoly power for Defendant Compass.

91.    Defendants used their illegal tactics described above, including bid-rigging and bribery, in an effort to reduce and eliminate competition and to gain monopoly power for Defendant Compass

92.    As a result of Defendants' illegal scheme, competition was restrained and eliminated in the market for the supply of food rations to U.N. peacekeeping missions, causing antitrust injury to both the U.N. and Compass's competitors, including Plaintiff Supreme. The U.N. was been deprived of the benefits of free and fair competition in its bidding process. Plaintiff Supreme was deprived of the opportunity to compete in a free and fair bidding process, causing it to lose contracts and market share to Defendant Compass.

93.    As a result of Defendants' illegal scheme, there was a dangerous probability that Defendants would succeed in their goal of achieving a monopoly for Defendant Compass. Due to Defendants' illegal scheme, the market share of Defendant Compass grew substantially after it

22

entered the market in approximately 2000, reaching approximately 50% of the market for
peacekeeping rations contracts by October 2005.

## IX.    COUNT ONE – RICO VIOLATION

94.    Plaintiff Supreme is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and
1964(c).

95.    Each of the Defendants is a "person" within the meaning of 18 U.S.C. §§ 1961(3)
and 1962(c).

96.    Defendants (including officers, agents and employees not named in this
Complaint) other than Olga Yakovlev (the "RICO Defendants") composed a group of persons
associated together for the common purpose of carrying out the fraudulent scheme described in
this Complaint; namely, making secret payments and providing other non-cash benefits to
Defendant Yakovlev and facilitating the transfer of cash payments to Defendant Yakovlev's off-
shore bank accounts in exchange for confidential information and favorable treatment which
enabled Defendant Compass to circumvent an otherwise aboveboard bidding and procurement
process. As a result, the RICO Defendants constitute an association-in-fact enterprise (the "U.N.
Bid-Rigging Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c); additionally,
Defendants Yakovlev, Moxyco, Kuznetsov, Nikal, IHC, Testa and Dmitry constitute an
association-in-fact enterprise (the "U.N. Crony Enterprise") within the meaning of 18 U.S.C.
§§ 1961(4) and 1962(c); additionally, the U.N. Procurement Service constitutes an enterprise
(the "U.N. Procurement Fraud Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and
1962(c). (The U.N. Bid-Rigging Enterprise, the U.N. Crony Enterprise and the U.N.
Procurement Fraud Enterprise are collectively referred to herein as the "U.N. Corruption
Enterprises.")

23

97.     During all relevant times, each of the Bid-Rigging and Bribery Enterprises was engaged in, and its activities affected by, interstate and foreign commerce, within the meaning of 18 U.S.C. § 1962(c).

98.     During all relevant times, each of the RICO Defendants conducted and/or participated in the conduct of each of the Bid-Rigging and Bribery Enterprises, directly or indirectly, through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

99.     During all relevant times, the RICO Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth above. The acts set forth above constitute a violation of one or more of the following statutes: 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1952 (racketeering) and 18 U.S.C. § 1956 (money laundering). Under New York law, the acts set forth above also constitute commercial bribing in the first degree under Penal Law §180.03, commercial bribe receiving in the first degree under Penal Law §180.05 and commercial bribe receiving in the second degree under Penal Law § 180.08, each of which constitutes racketeering activity within the meaning of 18 U.S.C. § 1961(1).

100.    Each of the RICO Defendants committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

101.    The acts of racketeering activity referred to in the previous paragraph constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5). The acts alleged were related to each other by virtue of common participants, a common victim (Plaintiff Supreme), a common method of commission and the common purpose and common result of a scheme designed to obtain through bribery U.N. contracts and confidential competitor information for the benefit of Defendant Compass by bribing Defendant Yakovlev and

24

facilitating the transfer of Defendant Yakovlev's fraudulently-obtained proceeds. The fraudulent scheme described herein began in or about 2000 and would have continued perpetually but for its discovery in or about June 2005 by the United States Attorney's Office for the Southern District of New York.

102.    As a result of the RICO Defendants' violation of 18 U.S.C. § 1962(c), Plaintiff Supreme lost U.N. foodservice contracts that could be worth in excess of $350 million, a significant portion of which represents Supreme's anticipated profits from performing these contracts, plus additional substantial costs incurred in preparing bid submissions for contracts that were fraudulently obtained by Defendant Compass.

103.    As a result of the RICO Defendants' misconduct, each RICO Defendant is liable for Plaintiff Supreme's losses in an amount to be determined at trial.

104.    Pursuant to the RICO Act, 18 U.S.C. § 1964(c), Plaintiff Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from each of the RICO Defendants.

### X.    COUNT TWO – RICO CONSPIRACY

105.    Each of the Defendants is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

106.    The RICO Defendants conspired to commit the violation of 18 U.S.C. § 1962(c) described in Section IX of this Complaint.

107.    During all relevant times, the RICO Defendants were associated with the Bid-Rigging and Bribery Enterprises as set forth in paragraph 97 above.

108.    During all relevant times, each RICO Defendant agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of each of the Bid-Rigging and Bribery Enterprises through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

109.    The RICO Defendants (including officers, agents and employees not named in this Complaint) committed and caused to be committed a series of overt acts in furtherance of the conspiracy alleged herein and to effect the object thereof.

110.    As a result of the RICO Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff Supreme lost U.N. foodservice contracts that could be worth in excess of $350 million, a significant portion of which represents Supreme's anticipated profits from performing these contracts, plus additional substantial costs incurred in preparing bid submissions for contracts that were fraudulently obtained by Defendant Compass.

111.    As a result of the RICO Defendants' conspiracy, each RICO Defendant is liable for losses to Plaintiff Supreme in an amount to be determined at trial.

112.    Pursuant to the RICO Act, 18 U.S.C. § 1964(c), Plaintiff Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from each of the RICO Defendants.

## XI.    COUNT THREE – SHERMAN ACT § 1

113.    Plaintiff Supreme is a "person" within the meaning of 15 U.S.C. § 7.

114.    Each of the Defendants is a "person" within the meaning of 15 U.S.C. § 7.

115.    Beginning in or about 2000, if not earlier, through June 2005, Defendants engaged in a contract, agreement, arrangement, combination and conspiracy to commit unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

116.    This contract, agreement, arrangement, combination and conspiracy consisted of, among other things, an agreement by Defendants to rig the award of U.N. contracts for the provision of food rations to peacekeeping forces so that Defendant Compass would be awarded these contracts and would continue to retain these contracts. This bid-rigging took place in New

26

York at U.N. Headquarters, with the assistance of Defendants Yakovlev and Kuznetsov, and facilitated by Defendant IHC as the so-called "vendor intermediary."

117.    Defendants' bid-rigging activities are a *per se* violation of the Sherman Act.

118.    As a result of Defendants' *per se* violation of the Sherman Act, Defendants restrained competition in the marketplace, thereby preventing Plaintiff Supreme from competing freely and obstructing the free and fair determination of contract prices.

119.    By corrupting the Procurement Service in the U.N.'s Headquarters in New York, Defendants' violations of the Sherman Act have injured competition in the market for contracts to supply food rations to U.N. peacekeeping missions.

120.    As a result of Defendants' conduct, Plaintiff Supreme lost U.N. food rations contracts that could be worth in excess of $350 million plus additional significant amounts resulting from costs incurred in the preparation of bid submissions for contracts that were fraudulently obtained and fraudulently retained by Defendant Compass.

121.    Plaintiff Supreme's injuries were not independent of Defendants' big-rigging activities in New York. Plaintiff's Sherman Act claim results from the direct, substantial and reasonably foreseeable effect of Defendants' anti-competitive and unlawful conduct on United States commerce.

122.    As a result of Defendants' conduct, each Defendant is liable for Plaintiff Supreme's losses in an amount to be determined at trial.

123.    Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiff Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from each Defendant and injunctive relief.

27

## XII.   COUNT FOUR – ATTEMPTED MONOPOLIZATION – SHERMAN ACT § 2

124.   Beginning in or about 2000, if not earlier, through June 2005, Defendants have
knowingly, intentionally and with specific intent to do so, attempted to monopolize the market
for U.N. contracts to supply food rations to peacekeeping missions, in violation of Section 2 of
the Sherman Act, 15 U.S.C. § 2.

125.   The attempt to monopolize this market has been effectuated by the means and the
overt acts set forth above, among others.

126.   Defendants have attempted to:

    (i)    control the award of contracts to supply food rations to U.N. peacekeeping missions;

    (ii)    corrupt the U.N. bidding process for contracts to supply food rations to U.N. peacekeeping missions;

    (iii)    deprive the U.N. of the benefits of a free and fair competitive bidding process for contracts to supply food rations to U.N. peacekeeping missions;

    (iv)    deprive the competitors of Defendant Compass, including Supreme, of the opportunity to compete in a free and fair competitive bidding process for contracts to supply food rations to U.N. peacekeeping missions;

    (v)    eliminate, reduce, limit and foreclose competition in the market for contracts to supply food rations to U.N. peacekeeping missions; and

    (vi)    injure, restrain and eliminate competition in the market.

127.   As a result of the conduct alleged herein, Defendant Compass gained control of
such a substantial share of the market for contracts to supply food rations to U.N. peacekeeping
missions that a dangerous probability existed that Defendant Compass would succeed in
monopolizing that market.

28

128. Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiff Supreme is entitled to recover threefold its damages, plus costs and attorneys' fees from each Defendant and injunctive relief.

### XIII. COUNT FIVE – CONSPIRACY TO MONOPOLIZE – SHERMAN ACT § 2

129. Beginning in or about 2000, if not earlier, through June 2005, Defendants have willfully, knowingly, intentionally and with specific intent to do so, combined and conspired to monopolize the market for U.N. contracts to supply food rations to peacekeeping missions, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

130. This combination and conspiracy to monopolize the market for contracts to supply food rations to U.N. peacekeeping missions has been effectuated by the means and overt acts set forth above, among others.

131. Defendants intended by their actions to restrain trade in the market for contracts to supply food rations to U.N. peacekeeping missions in the manner set forth above.

132. The combination and conspiracy to monopolize has had, among other things, the effects detailed above.

### XIV. COUNT SIX – RESTRAINT OF TRADE – DONNELLY ACT

133. Beginning in or about 2000, if not earlier, through June 2005, Defendants engaged in a contract, agreement, arrangement and combination in unreasonable restraint of trade and commerce in violation of the Donnelly Act, §§ 340 *et seq.* of New York General Business Law.

134. This contract, combination, agreement and arrangement consisted of, among other things, an agreement by Defendants to rig the award of U.N. contracts for the provision of food rations to peacekeeping forces so that Defendant Compass would be awarded those contracts and would continue to retain those contracts.

29

135.    As a result of this conspiracy, Defendants restrained competition in the marketplace, thereby preventing Plaintiff Supreme from competing freely and obstructing the free and fair determination of contract prices.

136.    Defendants' bid-rigging activities are a *per se* violation of the Donnelly Act.

137.    As a result of Defendants' conspiratorial conduct, Plaintiff Supreme lost U.N. food rations contracts that could be worth in excess of $350 million, a significant portion of which represents Supreme's anticipated profits from performing these contracts, plus additional substantial costs incurred in preparing bid submissions for contracts that were fraudulently obtained by Defendant Compass.

138.    Defendants' violations of the Donnelly Act took place in New York, at U.N. Headquarters, and Plaintiff sustained injury to its business and property as a result of Defendants' anti-competitive and wrongful conduct perpetrated in New York.

139.    As a result of Defendants' conspiracy, each Defendant is liable for Plaintiff Supreme's losses in an amount to be determined at trial.

140.    Pursuant to § 340(5) of New York General Business Law, Plaintiff Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from each of the Defendants and injunctive relief.

## XV.    COUNT SEVEN – ATTEMPTED MONOPOLIZATION – DONNELLY ACT

141.    Beginning in or about 2000, if not earlier, through June 2005, Defendants have knowingly, intentionally and with specific intent to do so, attempted to monopolize the market for U.N. contracts to supply of food rations to peacekeeping missions, in violation of the Donnelly Act.

142.    The attempt to monopolize this market has been effectuated by the means and the overt acts set forth above, among others.

143.  Defendants have attempted to:

(i)  control the award of contracts to supply food rations to U.N. peacekeeping missions;

(ii)  corrupt the U.N. bidding process for contracts to supply food rations to U.N. peacekeeping missions;

(iii)  deprive the U.N. of the benefits of a free and fair competitive bidding process for contracts to supply food rations to U.N. peacekeeping missions;

(iv)  deprive the competitors of Defendant Compass, including Supreme, of the opportunity to compete in a free and fair competitive bidding process for contracts to supply food rations to U.N. peacekeeping missions;

(v)  eliminate, reduce, limit and foreclose competition in the market for contracts to supply food rations to U.N. peacekeeping missions; and

(vi)  injure, restrain and eliminate competition in the market.

144.  As a result of the conduct alleged herein, Defendant Compass gained control of such a substantial share of the market for contracts to supply food rations to U.N. peacekeeping missions that a dangerous probability existed that Defendant Compass would succeed in monopolizing that market.

145.  As a result of Defendants' conduct, each Defendant is liable for Plaintiff Supreme's losses in an amount to be determined at trial.

146.  Pursuant to § 340(5) of New York General Business Law, Plaintiff Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from each of the Defendants and injunctive relief.

31

## XVI.  COUNT EIGHT – CONSPIRACY TO MONOPOLIZE – DONNELLY ACT

147.    Beginning in or about 2000, if not earlier, through June 2005, Defendants have willfully, knowingly, intentionally and with specific intent to do so, combined and conspired to monopolize the market for contracts to supply food rations to U.N. peacekeeping missions, in violation of the Donnelly Act.

148.    This combination and conspiracy to monopolize the market for contracts to supply food rations to U.N. peacekeeping missions was effectuated by the means and overt acts set forth above, among others.

149.    Defendants intended by their actions to restrain trade in the market for contracts to supply food rations to U.N. peacekeeping missions in the manner set forth above.

150.    The combination and conspiracy to monopolize had, among other things, the effects detailed above.

151.    As a result of Defendants' conduct, each Defendant is liable for Plaintiff Supreme's losses in an amount to be determined at trial.

152.    Pursuant to § 340(5) of New York General Business Law, Plaintiff Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from each of the Defendants and injunctive relief.

## XVII.  COUNT NINE – INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE AND BUSINESS RELATIONS

153.    Defendants knew that Plaintiff Supreme was a competitor of Defendant Compass's in the market for U.N. food rations contracts.

154.    With respect to the Liberia Rations Contract, Defendants knew that Defendant Compass and Plaintiff Supreme were the finalists in the U.N.'s bidding process.  With respect to the Burundi Rations Contract, Defendant Compass received early indication that its performance

was unacceptable to the United Nations only because Defendant Yakovlev disclosed confidential information to Defendant Compass. This breach by Defendant Yakovlev enabled Defendant Compass to correct its performance failures before the U.N. cancelled the Burundi Rations Contract and, perhaps, other contracts performed by Defendant Compass.

155.    The Defendants intentionally interfered with Plaintiff Supreme's prospective business relations by paying bribes to obtain confidential information and favorable treatment from Defendant Yakovlev and using such information and treatment to fraudulently obtain and fraudulently retain U.N. foodservice contracts, including the Liberia Rations Contract, the Burundi rations Contract and others.

156.    As a result of Defendants' intentional interference, Plaintiff Supreme lost U.N. foodservice contracts that could be worth in excess of $350 million, a significant portion of which represents Supreme's anticipated profits from performing these contracts, plus additional substantial costs incurred in preparing bid submissions for contracts that were fraudulently obtained by Defendant Compass.

157.    As a result of Defendants' conspiracy, each Defendant is liable for Plaintiff Supreme's losses in an amount to be determined at trial.

### XVIII. COUNT TEN – ROBINSON-PATMAN ACT– AGAINST DEFENDANTS COMPASS, IHC, HARRIS, SEIWERT AND TESTA

158.    Plaintiff Supreme is a "person" within the meaning of 15 U.S.C. § 7.

159.    Defendants Compass, IHC, Harris, Seiwert and Testa are "persons" within the meaning of 15 U.S.C. § 7.

160.    Plaintiff Supreme and Defendant Compass are competitors in the global market for contracts to supply food rations to U.N. peacekeeping missions.

33

161.    Defendant Harris was formerly employed by Defendant Compass Group and was the CEO of Defendant ESS. Defendant Seiwert was formerly employed by Defendant ESS as an executive. Defendants Harris and Seiwert acted as agents for Defendant Compass in bidding for and performing various U.N. contracts.

162.    Defendants IHC and Testa were agents of Defendant Compass and acted as Compass's "vendor intermediary" for U.N. contracts.

163.    Defendants Compass, Harris and Seiwert, as vendors to the U.N., and Defendants IHC and Testa, as "vendor intermediary" for Defendant Compass, were engaged in commerce at all times relevant to this Complaint, as active participants in the preparation and submission of bids for U.N. food rations contracts, in competition with other U.N. vendors, including Plaintiff Supreme.

164.    In the course of such domestic and foreign commerce, Defendants Compass, IHC, Harris, Seiwert or Testa or an agent, representative or other intermediary acting for or on their behalf, paid or granted a commission, brokerage or other compensation of significant value to Defendant Yakovlev, or an agent, representative or other intermediary acting for or on his behalf.

165.    Defendants Compass, Harris and Seiwert paid this commission, brokerage or other compensation directly or indirectly, through Defendant IHC or Defendant Testa, to Yakovlev, who retained this payment for his personal benefit. The commission, brokerage or other compensation was not paid in exchange for services rendered in connection with the sale or purchase of goods.

166.    At all times relevant to this Complaint, Yakovlev was an agent of the U.N., and owed fiduciary duties to the U.N. in such capacity. Accepting the bribes of Defendants Compass, IHC, Harris, Seiwert and Testa constituted a breach of fiduciary duty.

167.    Yakovlev at all times concealed from the U.N. his acceptance of the bribes of Defendants Compass, IHC, Harris, Seiwert and Testa.

168.    Receipt of the bribes constituted a *per se* violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

169.    Through their Robinson-Patman Act violation, Defendants Compass, IHC, Harris, Seiwert and Testa injured, destroyed or prevented competition in the market for contracts to supply food rations to U.N. peacekeeping missions.  As a result of this violation, Supreme lost U.N. food rations contracts worth approximately $350 million, a significant portion of which represents Supreme's anticipated profits from performing these contracts, plus additional substantial costs incurred in preparing bid submissions for contracts that were fraudulently obtained by Defendant Compass.

170.    Supreme's injuries resulted from the direct, substantial and reasonably foreseeable effect of the anti-competitive and unlawful conduct of Defendants Compass, IHC, Harris, Seiwert and Testa on domestic and foreign commerce.

171.    As a result of their conduct, Defendants Compass, IHC, Harris, Seiwert and Testa are liable for Supreme's losses in an amount to be determined at trial.

172.    Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from Defendants Compass, IHC, Harris, Seiwert and Testa, as well as injunctive relief.

## XIX.   COUNT ELEVEN – ROBINSON-PATMAN ACT – AGAINST DEFENDANT ALEXANDER YAKOVLEV

173.    Plaintiff Supreme is a "person" within the meaning of 15 U.S.C. § 7.

174.    Defendant Alexander Yakovlev is a "person" within the meaning of 15 U.S.C. § 7.

35

175.    Plaintiff Supreme and Defendant Compass are competitors in the global market
for contracts to supply food rations to U.N. peacekeeping missions.

176.    As senior procurement officer of the U.N. in the Procurement Service, Yakovlev
was engaged in commerce at all times relevant to this Complaint, making decisions regarding the
award of U.N. contracts to various vendors that participated in bids for the award of U.N.
contracts, including Plaintiff Supreme and Defendant Compass.

177.    In the course of such domestic and foreign commerce, Yakovlev, and or an agent,
representative or other intermediary acting for or on his behalf, received or accepted a
commission, brokerage or other compensation of significant value from Defendants Compass,
IHC, Harris, Seiwert or Testa, or an agent, representative or other intermediary acting for or on
their behalf.

178.    Defendants Compass, Harris and Seiwert paid this commission, brokerage or
other compensation directly or indirectly, through Defendant IHC or Defendant Testa to
Yakovlev, who retained this payment for his personal benefit. The commission, brokerage or
other compensation was not paid in exchange for services rendered in connection with the sale or
purchase of goods.

179.    At all times relevant to this Complaint, Yakovlev was an agent of the U.N., and
owed fiduciary duties to the U.N. in such capacity. Accepting the bribes of Defendants
Compass, IHC, Harris, Seiwert and Testa, constituted a breach of fiduciary duty.

180.    Yakovlev at all times concealed from the U.N. his acceptance of the bribes of
Defendants Compass IHC, Harris, Seiwert and Testa.

181.    Receipt of the bribes constituted a *per se* violation of Section 2(c) of the
Robinson-Patman Act, 15 U.S.C. § 13(c).

182.    Through his Robinson-Patman Act violation, Yakovlev injured, destroyed or prevented competition in the market for the supply of food rations to U.N. peacekeeping missions. As a result of this violation, Supreme lost U.N. food rations contracts worth approximately $350 million, a significant portion of which represents Supreme's anticipated profits from performing these contracts, plus additional substantial costs incurred in preparing bid submissions for contracts that were fraudulently obtained by Defendant Compass.

183.    Supreme's injuries resulted from the direct, substantial and reasonably foreseeable effect of the anti-competitive and unlawful conduct of Yakovlev on domestic and foreign commerce.

184.    As a result of his conduct, Yakovlev is liable for Supreme's losses in an amount to be determined at trial.

185.    Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Supreme is entitled to recover threefold its damages plus costs and attorneys' fees from Yakovlev, as well as injunctive relief.

## XX.    COUNT THIRTEEN -- UNJUST ENRICHMENT -- AGAINST DEFENDANTS YAKOVLEV AND KUZNETSOV

186.    Supreme submitted each of its bids to the Procurement Service in response to a formal RFP with the understanding that the confidential information contained therein would be held in strict confidence, pursuant to U.N. procedures.

187.    Defendants Yakovlev and Kuznetsov each had a duty to maintain Supreme's proposals in confidence, pursuant to U.N. procedures.

188.    However, Defendant Yakovlev, assisted by Defendant Kuznetsov, failed to retain the confidentiality of Supreme's proposals. Instead, Defendants Yakovlev and Kuznetsov shared

37

Supreme's confidential information with Defendants Compass and IHC for the purpose of

carrying out the fraudulent scheme described in this Complaint.

189.    Defendants Yakovlev and Kuznetsov were unjustly enriched by receiving bribery

payments in furtherance of this fraudulent scheme.

190.    Equity, good conscience and the demands of justice require the imposition of a

constructive trust upon all bribery proceeds received by Defendants Yakovlev and Kuznetsov.

191.    Plaintiff Supreme is also entitled to damages for all amounts, to be determined at

trial, by which Defendants Yakovlev and Kuznetsov were unjustly enriched by their

misappropriation of the confidential information contained in Supreme's bids.

## XXI.  COUNT FOURTEEN – UNJUST ENRICHMENT – AGAINST DEFENDANTS COMPASS AND IHC

192.    Supreme submitted each of its bids to the Procurement Service in response to a

formal RFP with the understanding that the confidential information contained therein would be

held in strict confidence pursuant to U.N. procedures.

193.    Defendants Compass and IHC knew or should have known that the U.N.

procedures required that the information contained in Supreme's bids must be held in strict

confidence.

194.    Defendants Compass and IHC wrongfully sought to circumvent the

confidentiality requirements of U.N. procedures to obtain confidential information contained in

Supreme's bids through the means of the fraudulent scheme described herein for the purpose of

"winning" valuable procurement contracts by undercutting Supreme's bids.

195.    Defendants Compass and IHC used Supreme's bids and the information they

contained to prepare Compass's bid submissions to the Procurement Service.  Through such

38

improper means, Compass was able to undercut Supreme's bids, thus enabling Compass to prevent Supreme from winning the contracts.

196.     Defendants Compass and IHC were unjustly enriched by obtaining and using the confidential information contained in Supreme's bids as a result of the fraudulent scheme described in this Complaint.

197.     Equity, good conscience and the demands of justice require the imposition of a constructive trust upon all bribery proceeds received by Defendants Compass and IHC through their bribery.

198.     Plaintiff Supreme is also entitled to damages for all amounts, to be determined at trial, by which Defendants Compass and IHC were unjustly enriched by their misappropriation of the confidential information contained in Supreme's bids.

### XXII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

(1)     awarding Plaintiff damages, including compensatory, treble and punitive damages, in an amount exceeding $125,000,000, as well as prejudgment and postjudgement interest, the precise amount of said damages to be determined at trial;

(2)     entering appropriate injunctive relief including, but not limited to, an order directing Defendant Compass Group PLC and the individual Defendants to divest themselves of any interest each may have in Defendants ESS and IHC;

(3)     awarding Plaintiff the costs, expenses and attorneys' fees incurred in prosecuting this action; and

(4)     such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues and claims so triable.

Dated: New York, New York
      June 1, 2006

Respectfully submitted,

CONSTANTINE CANNON, P.C.

By: _____
      Robert L. Begleiter (RB-7052)
      Gary J. Malone (GM-3119)
      Yang Chen (YC-3782)
      Michael C. Rakower (MR-2914)

      450 Lexington Avenue
      New York, New York 10017

      *Attorneys for Plaintiff*
      *Supreme Foodservice AG*

40

Robert L. Begleiter, Esq. (RB-7052)
Yang Chen, Esq. (YC-3782)
Gary J. Malone, Esq. (GM-3119)
Michael C. Rakower (MR-2914)
CONSTANTINE CANNON
450 Lexington Avenue, 17th Floor
New York, NY 10017
(212) 350-2700

*Attorneys for Plaintiff*
*Supreme Foodservice AG*


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUPREME FOODSERVICE AG, | Case No. 06 CV 1759 (PKC) |
| Plaintiff, | |
| -v- | |
| COMPASS GROUP PLC, ESS (A/K/A EUREST SUPPORT SERVICES), IHC SERVICES, INC., PETER HARRIS, ANDREW SEIWERT, ALEXANDER YAKOVLEV, MOXYCO, LTD., DOUG KERR, STEVE KEMP, LEN SWAIN, VLADIMIR KUZNETSOV, NIKAL, LTD., EZIO TESTA, DMITRY YAKOVLEV AND OLGA YAKOVLEV, | |
| Defendants. | |


## CERTIFICATE OF SERVICE

**SARA KRIENDLER** declares, under penalty of perjury and pursuant to 28

U.S.C. § 1746, that the following is true and correct.

(1)     I am over the age of eighteen and I am not a party to this action.

(2)    A true and correct copy of Plaintiff's First Amended Complaint and Jury

Demand, along with a copy of this Certificate of Service, was sent on June 1, 2006 via

Federal Express overnight delivery to the following individuals, who serve as counsel for

each Defendant who has thus far appeared in this case:

Brian E. Mass, Esq.
Frankfurt Kurnit Klein & Selz, PC
488 Madison Avenue
9th Floor
New York, New York 10022
*Attorneys for Defendant Peter Harris*

David Lazer, Esq.
Lazer, Aptheker, Rosella & Yedid, P.C.
Melville Law Center
225 Old Country Road
Melville, New York 11747-2712
*Attorneys for Defendants IHC Services, Inc. and Ezio Testa*

Richard Rosen, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
*Attorneys for Defendants Compass Group PLC, ESS (A/K/A Eurest Support Services), Steve Kemp and Len Swain*

Nicholas Wooldridge, Esq.
Law Offices of Bukh & Associates
1123 Avenue Z
Brooklyn, NY 11235
*Attorneys for Defendants Alexander Yakovlev and Moxyco, Ltd.*

Dated: New York, New York
       June 1, 2006

By: _____
    Sara Kriendler
    *Paralegal*
    CONSTANTINE CANNON
    450 Lexington Avenue, 17th Floor
    New York, NY 10017
    (212) 350-2700

2