SIGMUND S. WISSNER-GROSS (SW-0001)
MAY ORENSTEIN (MO-2948)
DAVID E. MILLER (DM-7179)
BROWN RUDNICK BERLACK ISRAELS LLP
SEVEN TIMES SQUARE
NEW YORK, NEW YORK 10036
(212) 209-4800
ATTORNEYS FOR PLAINTIFF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

ES-KO INTERNATIONAL INC.,

                            Plaintiff,                          Case No. CV-06-2422

        -against-

IHC SERVICES, INC., IHC SERVICES S.R.L., EZIO
TESTA, ANGELITA QUINTEROS, WILLIAM J.            **AMENDED COMPLAINT**
ETHERSON, GIANDOMENICO PICCO, TORNO                      **AND**
INTERNAZIONALE S.P.A., TORNO S.A.H.,               **JURY DEMAND**
DARIO FISCHER, ENGELBERT SCHREIBER, JR.,
ALLIANCE INVESTMENT DEVELOPMENT LTD.,
COGIM S.P.A., CORIMEC ITALIANA S.P.A.,
ALEXANDER YAKOVLEV, DMITRY
YAKOVLEV, and JOHN DOES 1 TO 100.

                            Defendants.

----------------------------------------------------------------X



        Plaintiff, ES-KO International Inc. ("ES-KO"), by its attorneys, Brown Rudnick

Berlack Israels LLP, for its Amended Complaint, alleges on knowledge with respect to itself and

its own conduct, and based on its investigation and on information and belief as to all other

matters:[1]

---

[1] The Amended Complaint does not include any information obtained by ES-KO from any defendant named in the initial Complaint in this action. ES-KO reserves the right to further amend its Complaint in the event it is determined as discovery proceeds that certain of such information may be included in a pleading not filed under seal.

## INTRODUCTION

I. **The Scheme to Corrupt and Control the Award of U.N. Contracts**

1.      The Procurement Division of the United Nations (the "U.N") is responsible for procuring goods and services valued at over a billion dollars annually for thousands of U.N. troops serving on peacekeeping missions worldwide and to a variety of other U.N.-related end-users. This action arises out of a criminal scheme and conspiracy engaged in by the Defendants primarily during the period from 1998 through 2005 (except as indicated below, the "Relevant Period") to corrupt, manipulate and control the award by the U.N. Procurement Division, inter alia, of contracts worth hundreds of millions of dollars for goods and services to be supplied to U.N. peacekeeping missions and other operations around the world for their own financial gain that otherwise would have been awarded to ES-KO.

2.      At the nucleus of the scheme were (i) Alexander Yakovlev ("Yakovlev"), a corrupt U.N. employee, now a convicted felon, who abused his official position with the U.N. throughout his long career there by accepting bribes in exchange for influencing the outcome of the contract award process in favor of competitors of ES-KO, and (ii) IHC Services, Inc., a New York based corporation ("IHC"), which, through its officers, shareholders, directors and employees, functioned both as the intermediary between Yakovlev and prospective vendors and as a conduit for the illicit payments and illicitly procured confidential internal U.N. information to be passed between them.  In the process, IHC and its owners, acting through IHC's President and Chief Executive Officer, Defendant Ezio Testa ("Testa"), and other IHC employees and agents, pocketed millions of dollars of so-called "brokerage" and "success" fees from deals Yakovlev illegally was able to procure for IHC's "clients," which in reality were payoffs to IHC, its owners, and its employees and agents for their illicit role in the criminal scheme.

3.     Radiating from the Yakovlev-IHC nucleus were IHC's "clients": prospective vendors to the U.N. willing to commit criminal bribery and engage in related misconduct in order to obtain improper advantages in their efforts to win potentially lucrative U.N. contracts.  Such IHC "clients" included ESS Support Services Worldwide ("ESS"), a division of Compass Group PLC ("Compass Group"), one of the world's largest foodservice providers, and Cogim S.p.A. ("Cogim") and Corimec Italiana, S.p.A. ("Corimec"), both of which are Italian manufacturers of prefabricated housing, a mainstay of peacekeeping mission operations.  ESS, Cogim and Corimec were direct competitors of ES-KO during the Relevant Period.  Yakovlev recently has admitted publicly to accepting bribes from both Cogim and Corimec in consideration for providing them with illicit preferential treatment in connection with contract proposals submitted to the U.N.[2]

4.     Due to ES-KO's well-earned prominence in the highly specialized market for food service supply to U.N. peacekeeping missions, during the Relevant Period, undermining ES-KO's superior bids was a principal objective of Defendants' ongoing scheme.  More than simply an able competitor, ES-KO is a unique company with unparalleled expertise in supplying a comprehensive range of products and services to remote and difficult regions around the world in support of U.N., NATO and commercial operations.  As a result of over fifty years of extensive experience in this difficult and highly-specialized area of endeavor, ES-KO had developed exceptional proficiency in, among other matters, the complex logistics involved in successfully delivering food and other materials to the harsh environments where the U.N. peacekeeping missions operate and the construction and delivery of prefabricated housing for

---

[2] As alleged infra, ES-KO lost significant U.N. contracts that were awarded to Cogim and Corimec as a result of payment of bribes to IHC and Yakovlev.  Due to IHC's illicit role on behalf of Cogim and Corimec, ES-KO has lost at least four major contracts that were awarded by the U.N. during the Relevant Period to Cogim and/or Corimec as a result of bribes paid to Yakovlev, in which IHC played a key role.  The total revenue lost by ES-KO from such contracts exceeded $95 million.

such missions. Additionally, ES-KO had developed extensive, confidential, proprietary databases on the consumption habits and preferences of U.N. peacekeeping troops from various countries and the most efficient and cost-effective supply and storage points for deliveries of food to U.N. missions around the world. This information, which ES-KO maintained as strictly confidential, enabled ES-KO to submit uniquely well-designed proposals for the award of U.N. contracts for food and other goods and services to be supplied to peacekeeping missions.

5.     To manipulate and control the outcome of the bidding process, Yakovlev, in gross violation of the U.N.'s "closed bidding" procedures and U.N ethical rules, abused his office in a variety of ways. For example, with respect to contracts for rations and food service, Yakovlev routinely provided IHC with confidential, proprietary information regarding ES-KO's pricing and logistical plans for contract performance so that the "know-how" reflected in ES-KO's proposals could be improperly exploited by certain of IHC's "clients" to prepare apparently comparable proposals to be submitted on behalf of those "clients."  Yakovlev, working with IHC, also allowed those "clients" to "amend" their bids, after ES-KO's bids had been submitted and bidding was closed, in order to improperly enable those "clients" to undercut ES-KO's pricing.  IHC and its clients, among other misconduct, routinely used the confidential pricing information provided by Yakovlev to amend its "clients'" bids, sufficient to undercut the prices of competitor bids.  IHC then routinely provided Yakovlev with amended pricing pages of its "clients'" bids, which Yakovlev substituted for their original pages before the "qualified" technical bids were forwarded for final bid award by the Headquarters Committee on Contracts ("HCC") as detailed below.

6.     Yakovlev also manipulated the outcome of awards by selectively providing IHC (and thereby ESS and other IHC "clients," such as Cogim and Corimec) with supplemental confidential information as to the U.N.'s preferences regarding logistical issues or

proposal presentation. Providing such an edge to preferred IHC "clients" enabled Yakovlev, who was paid both in cash and through other forms of remuneration by IHC (or by IHC's "clients" directly), to manipulate the bidding process and give an IHC "client's" proposal a higher score for technical merit and thus support a recommendation for its approval as superior to a proposal by its competitor who had not been provided with the key information. Yakovlev also "disqualified" competing proposals for purported technical deficiencies while providing IHC's "clients" with the opportunity to correct any technical deficiencies in their own proposals. Additionally, Yakovlev abused his office by simply providing, without objective basis, more favorable assessments of the approaches adopted by IHC's "clients."

7.     By these means and by means of other abuses of his office, Yakovlev was able to manipulate and control the outcome of the internal evaluative processes of the U.N. so that food rations contracts, which, had the process not been corrupted, would have been awarded to ES-KO, were instead awarded to ESS, and so that other U.N. contracts, such as those involving prefabricated construction, which also would have been awarded to ES-KO, were improperly awarded to other "clients" of IHC such as Cogim and Corimec.

8.     In all of these manipulations, Yakovlev and IHC (through its officers, shareholders, directors and employees named as defendants herein) worked hand-in-hand to achieve their mutual goals of procuring contract awards for IHC's "clients." Since IHC had no special expertise in providing food and related services to remote locations, the value it imparted to the arrangement with Yakovlev was solely to serve as an illegal conduit for the improper dissemination to ESS, Cogim, Corimec and other IHC "clients" of a steady stream of confidential U.N. information to which they were not entitled and to otherwise assist such "clients" in improperly securing U.N. contracts, for which Yakovlev, through IHC and its

subsidiary or division, IHC Services S.r.l. (and/or by IHC's "clients" directly), was illegally compensated.

9.     As alleged herein, during the Relevant Period, at least nine contracts were awarded to ESS and at least four contracts were awarded to Cogim and Corimec which, had Defendants' scheme not been in operation, would have been awarded to ES-KO based on ES-KO's superior bids, technical capabilities and pricing.

## II.     ES-KO's Damages

10.     The total value of the contracts awarded to ESS alone which were denied to ES-KO as a result of the scheme was approximately $574 million. As a result of having been wrongfully denied the award of these contracts, ES-KO suffered damages of approximately $86 million (excluding pre-judgment interest) representing the lost profits that, consistent with ES-KO's historical performance or similar contractual commitments, it would have achieved had the lost contracts been awarded to it.

11.     In addition to damages resulting from denied contract awards, ES-KO also sustained damages as a result of being forced to reduce its profit margins on certain food contracts for the U.N. which were awarded to it.  Such reduced margins were adopted by ES-KO, unaware that the scheme had been implemented by IHC and Yakovlev, in the belief that it was responding to authentic and legitimate pricing competition from ESS.

12.     The total value of contracts awarded to ES-KO and adversely impacted by the scheme involving ESS was approximately $473 million.  ES-KO sustained approximately $39 million (excluding pre-judgment interest) in further damages, as a result of the reduced profit margins it was forced to establish in connection with such contracts and related damages suffered by ES-KO.

13.     ES-KO sustained further damages as a result of contracts awarded to other IHC "clients," including Cogim and Corimec, as a result of the scheme.   The total value of such contracts was approximately $95 million.   ES-KO sustained further damages totaling approximately $19 million (excluding pre-judgment interest), which represents the lost profits that, consistent with ES-KO's historical performance or similar contractual commitments, it would have achieved had the U.N. awarded these contracts to it.

14.     IHC, Testa, and other IHC officers, directors, shareholders and employees named as defendants herein all conducted substantial activities and played a critical role in New York with respect to the scheme as it affected the award of contracts to ESS, the award of contracts on which ES-KO reduced its profit margins in the belief that it was responding to authentic and legitimate pricing competition from ESS, and the award of contracts to Cogim and Corimec.

## III.     The Scheme Is Exposed and Unravels

15.     In June 2005, the press first reported on offshore bank accounts held by Yakovlev and disclosed that Yakovlev's son Dmitry had been employed by IHC while IHC was actively engaged by "clients" whose proposals were being evaluated by Yakovlev. In response to these revelations of impropriety and corruption, Yakovlev, who had been employed by the U.N. for approximately 20 years, hurriedly submitted his resignation.  Publicly unknown at the time, IHC and Yakovlev had been engaged in a long-term covert relationship which involved Yakovlev providing his illicit assistance to IHC's "clients" who paid bribes to obtain, inter alia, peacekeeping missions contract awards and U.N. Office of Iraq Program (OIP) contract awards.

16.     The criminal scheme involving Defendants gained further public notoriety when, on August 8, 2005, an independent committee headed by Paul Volker, former Chairman of the Federal Reserve, released its Third Interim Report of the results of its investigation in the

U.N. Oil-for-Food Programme.  The Report included several pages describing Yakovlev's efforts to improperly influence the award of contracts relating to the Oil-for-Food Programme for his own financial benefit (and that of a vendor who had bribed him), his attempt at a cover-up and his unrelenting lies and denials as his activities came under investigation.  Additionally, with respect to Yakovlev, the Report found that he had been engaged in a "continuous course of conduct of accepting payment from U.N. contractors in other [non-Oil-for-Food] U.N. programs." The report stated that more than $950,000 of these payments had been wired into an overseas account maintained by Yakovlev from companies that collectively had won more than $79 million in U.N. contracts and purchase orders.

17.     Immediately following his arrest, Yakovlev pled guilty in the Southern District of New York to charges of conspiracy, wire fraud and money laundering arising from his receipt of bribes as payment for the exploitation and abuse of his official capacity as an officer of the U.N.  In a subsequent investigation of the scandal, the Committee on International Relations of the United States House of Representatives identified IHC, ESS and Compass Group as entities that "must be investigated for the roles they played with respect to their work with the U.N., particularly the U.N. Procurement Department."

18.     The scheme resulted in a second indictment in the Southern District of New York of a U.N. employee, Vladimir Kuznetsov ("Kuznetsov"), formerly head of the U.N.'s Advisory Committee on Administrative and Budgetary Questions. Kuznetsov was charged with laundering money representing proceeds of the scheme obtained by him from Yakovlev. Kuznetsov was convicted on these charges on March 7, 2007.

19.     Yakovlev testified at Kuznetsov's criminal trial.  As part of his testimony, Yakovlev confirmed that he had accepted bribes from Cogim and Corimec in exchange for his illicit assistance in obtaining contracts from the U.N. for the provision of prefabricated buildings.

20.     In June 2005, following the publication of numerous articles in the press regarding the scheme, the U.N. suspended IHC's status as a registered vendor.

21.     In October 2005, the U.N. announced that it was suspending ESS's status as a registered vendor.

22.     On October 21, 2005, Compass Group announced that it had engaged the law firm Freshfields Bruckhaus Deringer to conduct an investigation into the relationships between ESS, IHC and the U.N.  A subsequent Compass Group press release dated November 3, 2005 disclosed that the investigation had revealed "serious concerns as to whether, within ESS, there has been, in connection with IHC and the U.N., improper conduct…."

23.     On or about January 16, 2006, the U.N. suspended eight senior officials pending the results of its own internal investigation, including Andrew Toh, the Assistant Secretary-General in charge of Central Support Services, and Christian Saunders, the Chief of the Procurement Division. After reviewing contracts worth a total of $1 billion, the U.N. preliminarily concluded that it may have lost as much as $298 million as a result of corruption and irregularities in the contract award process.

24.     On or about February 14, 2006, Compass Group admitted that a total of eight employees, including high-ranking executives, had been dismissed, disciplined or lost their jobs as a result of "restructuring" based upon their conduct relating to IHC, Yakovlev and the U.N. contracts procured by them on behalf of ESS.

## PROCEDURAL BACKGROUND

25.     This action was commenced by the filing by ES-KO of an initial complaint (the "Initial Complaint") on March 28, 2006 against Compass Group, ESS, Eurest Support Services (Cyprus) International Limited ("Eurest"), Peter Harris, Andrew Seiwert, Steve Kemp, Len Swain, Steve Bickerstaff, Doug Kerr, IHC Services, Inc., Ezio Testa, Alexander

Yakovlev, Dmitry Yakovlev, Vladimir Kuznetsov and John Does 1 to 100, believed to be participants in the criminal scheme, after discovery by ES-KO of the fraudulent scheme.

26.    On or about October 17, 2006, ES-KO agreed to dismiss, with prejudice, all claims asserted in the Initial Complaint against Compass Group, ESS, Eurest, Harris, Seiwert, Kemp, Bickerstaff, and Kerr (the "Dismissed Parties") in connection with a confidential settlement of the claims against such parties asserted by ES-KO.

27.    ES-KO hereby amends the Initial Complaint in order to reflect the dismissal of the Dismissed Parties and to name as additional defendants (i) certain additional IHC-related persons and entities who participated in and/or knowingly benefited from the scheme or are otherwise culpable and/or liable for ES-KO's resulting damages, and (ii) Cogim and Corimec.[3]

28.    Pursuant to this Amended Complaint, ES-KO asserts claims against the Defendants herein pursuant to (i) the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), (d) and 1964(c), (ii) Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c) and Section 4 of the Clayton Act, 15 U.S.C. § 15, and (iii) the common law of the State of New York.

## JURISDICTION AND VENUE

29.    The jurisdiction of this Court is founded on, inter alia, 28 U.S.C. § 1331 and 28 U.S.C. § 1337.  This Court has jurisdiction under 28 U.S.C. § 1331 since this action arises under, inter alia, Sections 1962(c)(d) and 1964(c) of RICO, Section 2(c) of the Robinson-Patman Act and Section 4 of the Clayton Act.  Supplemental jurisdiction is founded on 28 U.S.C. § 1367.

---

[3] ES-KO also is dismissing without prejudice Kuznetsov as a defendant in this action.  In the event discovery in this action demonstrates that Kuznetsov played a role in the bid-rigging scheme beyond laundering some of the proceeds of such scheme from Yakovlev, ES-KO reserves the right to reinstate Kuznetsov as a defendant.

30.     Venue is proper in this district, <u>inter</u> <u>alia</u>, because many of the acts and much of the conduct charged herein occurred in this District. Moreover, several of the Defendants maintain offices and/or reside in this District.

31.     This Court has personal jurisdiction over Defendants, <u>inter</u> <u>alia</u>, because Defendants either reside, maintain offices, or conduct substantial business in New York and/or conspired to and engaged in substantial conduct in connection with the scheme and in furtherance of their conspiracy in this District.

## PARTIES

32.     Plaintiff ES-KO International Inc. is a foreign corporation headquartered in Monaco. ES-KO maintains places of business at 1 Rue des Genêts, "Le Millefiori," MC 98000, Monaco, and, through a subsidiary, at 9821 Katy Freeway, Houston, Texas 77024.

33.     Defendant IHC Services, Inc. is a corporation organized under the laws of the State of New York, with its headquarters and principal place of business at 192 Lexington Avenue, Suite 600, New York, New York 10016-6823.  IHC is named as a defendant herein based on its role in the bid-rigging scheme pursuant to which, supposedly acting as a vendor intermediary, it received millions of dollars in compensation for its participation in a conspiracy to secure valuable contracts for its "clients" by bribery and other illegal means.

34.     Defendant IHC Services S.r.l. ("IHC S.r.l.") is a subsidiary or division of IHC Services, Inc., with an office at Via dei Piattia 9, 20123 Milan, Italy.  IHC S.r.l. is named as a defendant due to its active role in facilitating the bid-rigging scheme, including the channeling of funds between IHC's "clients" and Yakovlev.  Defendant Testa frequently visited the IHC office in Milan in furtherance of a conspiracy to secure U.N. contracts for its "clients."

35.     Defendant Ezio Testa was President and Chief Executive Officer of IHC from in or about 1998 through June 3, 2005, and is currently a director of IHC.  Testa was

previously employed from in or about 1978 to 1998 by Defendant Torno S.p.A.   From in or about 1992 to 1998, Testa was employed by Torno S.p.A. as a senior manager.   At some point prior to 1998, Torno S.p.A. purchased the company now known as IHC, and Testa (after becoming President and CEO of IHC) maintained close contacts with Torno S.p.A. regarding the matters at issue in this action.   Testa knowingly acted, inter alia, during the Relevant Period on behalf of and in conspiracy with the other defendants identified in paragraphs 36-43 and 45-48, and with their knowledge, consent and assistance.   Testa served as the primary IHC contact with ESS, Cogim and Corimec, and was instrumental in implementing IHC's role in the bid-rigging scheme that resulted, inter alia, in the award of procurement contracts to ESS, Cogim and Corimec that should have been awarded to ES-KO.   Testa maintains an apartment at 1365 York Avenue, Apartment 21K, New York, New York 10021-4029.

36.   Defendant Angelita Quinteros, also known as Angelita Castro ("Quinteros"), was a Vice-President of IHC Services, Inc. from in or about 1998 through June 3, 2005, and actively assisted IHC in perpetrating its role in the bid-rigging scheme through, inter alia, knowingly serving as a conduit together with Defendant Dmitry Yakovlev (whom she supervised) for the dissemination of confidential U.N. information to ESS, Cogim and Corimec and otherwise assisting Testa and IHC in causing the illicit award of contracts to ESS, Cogim and Corimec that should have been awarded to ES-KO.   Quinteros maintains a residence at 510 Vanderbilt Avenue, Staten Island, New York 10304-3524.

37.   Defendant William J. Etherson ("Etherson") was a Vice-President of IHC Services, Inc. from in or about 1998 through 2004 and thereafter served as its retained financial consultant and actively assisted IHC in perpetrating its role in the bid-rigging scheme through, inter alia, knowingly facilitating the illicit payments made to IHC and, through IHC and IHC S.r.l., bribes and other illegal remuneration paid to Yakovlev to secure the award of contracts to

ESS, Cogim and Corimec that should have been awarded to ES-KO.   Etherson maintained the records and accounts of IHC, including records of payments received by IHC from its "clients" which had participated in the bid-rigging scheme.   Together with Defendant Quinteros, he supervised Defendant Dmitry Yakovlev.   Etherson maintains a residence at 7 Wainscott Lane, East Setauket, New York 11733-3811.

38.   Defendant Giandomenico Picco ("Picco") is a veteran U.N. diplomat who worked at the U.N. initially from 1973 until 1992.   Picco then served as a Chairman of IHC's Board of Directors during the period from as early as 1997 through 2002, and he continued to assist IHC and its "clients" thereafter in matters that are the subject of this action and knowingly actively assisted IHC in perpetrating its role in the bid-rigging scheme and facilitated IHC's obtaining confidential U.N. information and the illicit award of U.N. procurement contracts to ESS, Cogim and Corimec that should have been awarded to ES-KO.   During part of this same period, Picco commenced a second period of U.N. employment as U.N. Under-Secretary and personal representative of Kofi Annan, thus extending his considerable influence in the U.N. and maintaining his ability to assist IHC's "clients."   Picco maintains a residence at 65 West 13th Street, Apartment 10D, New York, New York 10011-7908.

39.   Defendant Torno Internazionale S.p.A., formerly known as Torno S.p.A. ("Torno S.p.A.") is an international construction and civil engineering company with business projects worldwide (including in the United States), incorporated under the laws of Italy and with an office at Via Valtellina 17, 20159 Milan, Italy.   At some point prior to 1998, while it was engaged in business in New York and elsewhere in the United States, Torno S.p.A. purchased the recently merged International Manufacturing and Equipment Company (IMECO) and Hofortech, known after such merger as IHC, from its majority shareholder, Ernest Ulrich. Yakovlev and IHC, either prior to Torno S.p.A.'s acquisition of IHC or thereafter, had joined

forces, initially to facilitate the award of lower value U.N. contracts to IHC for the supply of automotive parts to U.N. Peacekeepers. After Torno S.p.A.'s acquisition of IHC, collaborating with Yakovlev, IHC greatly expanded its illicit scheme to broker the sale of millions of dollars of goods and services as part of the expanded contracts for U.N. peacekeeping projects throughout the world and the Oil-for-Food Programme.[4]

40.  Defendant Torno S.A.H. ("Torno") is a corporation organized under the laws of Luxembourg, with offices at 398 Route d'Esch, BP2501, L-1025, Luxembourg and Via dei Piatti 9, 20123 Milan, Italy. Since at least June 3, 2005, Torno also used the same office as IHC S.r.l. in Milan as its business address. During the Relevant Period, Torno, which is a "holding company," controlled IHC through its ownership of 100% of IHC's common stock. Prior to June 3, 2005, Torno was majority owned by Defendants Dario Fischer ("Fischer") and Engelbert Shreiber, Jr. ("Schreiber"), and/or Torno S.p.A. Both Torno and Torno S.p.A., through Defendants Fischer, Testa and otherwise, were aware of the bid-rigging scheme and participated and benefited from IHC's role in the bid-rigging scheme.

41.  Defendant Dario Fischer is an Italian lawyer and entrepreneur who, inter alia, has acted as liquidator of various Torno branch entities. He was a Director of IHC from in or before 1998 through June 3, 2005, and visited New York in furtherance of his role in IHC and in connection with the scheme as alleged herein. During the Relevant Period, Fischer controlled IHC through, among other means, his ownership and/or control of Torno and/or Torno S.p.A., and actively directed and assisted IHC and other IHC officers and employees named herein in perpetrating their role in the bid-rigging scheme, and was aware of the illicit conduct by all the

---

[4] Designed by the U.N. to supply humanitarian aid to Iraqis suffering as a result of sanctions imposed against the regime of Saddam Hussein, the Oil-for-Food Programme became a notorious spawning ground for a wide variety of official and commercial corruption and abuse. Defendant Picco, who had been one of the early architects of the Oil-for-Food Programme, after taking over as Chairman of IHC, together with Yakovlev, further assisted IHC and its "clients" by facilitating IHC's access to confidential U.N. information and the illicit award of both U.N. peacekeeping and OIP contracts.

Defendants named herein and directly benefited from IHC's role in the bid-rigging scheme. Fischer maintains a residence at Via Giovanni da Procida No. 11, 20149 Milan, Italy.

42.     Defendant Engelbert Schreiber, Jr. controlled IHC during part or all of the Relevant Period through, among other means, his ownership and control of Torno and/or Torno S.p.A., and actively assisted IHC in perpetrating its role in the bid-rigging scheme and was aware of the illicit conduct by the other Defendants named herein and benefited from IHC's role in the bid-rigging scheme.  Schreiber has business ties to Ahmed Idris Nasreddin, who reportedly has served as a money launderer for Al Qaeda.  Schreiber resides or maintains his business address at Kirchstrasse 37, Vaduz, Lichenstein and/or Via del Piatti 9, 20213 Milan, Italy.

43.     Defendant Alliance Investment Development Ltd. ("Alliance"), a corporation incorporated under the laws of the British Virgin Islands and headquartered in the British Channel Islands, acquired IHC from Torno as of June 3, 2005.  Alliance through, inter alia, its nominee directors has actively participated in its ownership role of IHC.  Alliance was incorporated under the name Strategic Internal Alliance Limited and changed its name to "Alliance Investment Development Ltd." on the date preceding its acquisition of IHC.  Alliance has a mailing address at 3rd Floor, Wolverton Place, Market Square, St. Peter Port, Guernsey GY1 1H6.

44.     The Defendants named in paragraphs 33 to 43 shall be collectively referred to as the "IHC Defendants."  The IHC Defendants are named as defendants herein based on, inter alia, their active participation in the scheme and/or their knowing assistance to the scheme and/or their role in secreting or receiving funds that were paid to or through IHC or the

IHC Defendants for their role in facilitating the scheme, and/or otherwise benefiting from the scheme.[5]

45.     Defendant Cogim is a company registered in Italy and having an office at 8 Via Ricassi, 1-29010, San Nicolo di Rottofiero, Piacenza, Italy.  Cogim is owned by Filippo Braghieri and by a Swiss fiduciary, Meridiana Investment.  Cogim specializes in the provision of prefabricated buildings and related services to the construction, oil and gas industries, as well as military and other governmental organizations and has touted itself as a "world leader in logistical infrastructure."  Cogim submitted bids at issue in this action to the U.N. in New York, attended bid opening meetings in New York and acted (via Filippo Braghieri and his father Leopoldo Braghieri) through, inter alia, certain of the IHC Defendants in New York.  Cogim secured the award of at least one U.N. procurement contract that should have been awarded to ES-KO solely as a resulted of Cogim's bribery of Yakovlev, utilizing the assistance of the IHC Defendants.

46.     Defendant Corimec is a company registered in Italy and having an office at Via Caorsana 19, 29012 Fossadello di Caorso (PC), Italy.  Corimec specializes in the provision of prefabricated and modular buildings for use by military forces.  Corimec submitted bids at issue in this action to the U.N. in New York, attended bid opening meetings in New York, and acted through certain of the IHC Defendants in New York.  Corimec secured the award of at least three U.N. procurement contracts that should have been awarded to ES-KO solely as a result of Corimec's bribery of Yakovlev, utilizing the assistance of the IHC Defendants.

47.     Defendant Alexander Yakovlev was an employee of the U.N. from in or about 1985 to 2005.  During the Relevant Period, Yakovlev was employed as Team Leader for

---

[5] Reference to the "IHC Defendants" should be understood to include Defendant Alliance with respect to only such portion of the Relevant Period during which Alliance owned IHC or otherwise participated in the bid-rigging scheme.

the Field Procurement Section and other sections of the Procurement Division of the U.N. and, as alleged herein, illegally exploited his position to procure financial and other benefits for himself. Yakovlev currently resides at 38 Ellsworth Avenue, Yonkers, New York.

48.     Defendant Dmitry Yakovlev is Alexander Yakovlev's son.  As alleged herein, Dmitry Yakovlev participated in the scheme by, among other means, serving as a conduit to IHC of illicitly obtained proprietary, non-public information belonging to ES-KO.  Defendant Dmitry Yakovlev currently resides at 38 Ellsworth Avenue, Yonkers, New York.

49.     Defendants John Does 1 to 100 are other Defendants who are liable to ES-KO based upon their participation in the scheme and conspiracy alleged herein but whose identities are currently unknown to ES-KO.  Such John Doe Defendants exclude the entities or individuals identified in paragraph 26 supra.

## ALLEGATIONS COMMON TO ALL COUNTS

**I.      U.N. Peacekeeping Forces and the Procurement Division**

50.     Since 1948, the U.N. has conducted approximately sixty-one peacekeeping operations.  At present, approximately 80,094 uniformed personnel from 114 different countries are deployed by the U.N. in fifteen separate peacekeeping operations.  The U.N. provides these peacekeeping troops with fresh food rations and drinking water together with associated logistical support services on a daily basis.

51.     The U.N. procures goods and services for its peacekeeping missions through competitive "closed-bid" solicitations from qualified vendors. Vendors must apply to the Procurement Division and be approved before they can bid on contracts with the U.N.  In 2004, the U.N. Procurement Division procured $1.37 billion in goods and services, approximately 85% of which was for the Department of Peacekeeping Operations, and more than $2 billion in goods and services were procured in 2005.  During the Relevant Period, a handful of U.N. employees

were responsible for most of the procurement decisions pertaining to peacekeeping missions at U.N. Headquarters in New York.

52.    All of the contracts impacted by Defendants' scheme involved solicitations in the form of either an Invitation to Bid (an "ITB") or a Request for Proposal (an "RFP").   The formal response to an RFP for food services includes both a technical and a financial proposal.  Procedures established by the U.N. to protect the confidentiality and integrity of the closed-bid system require the submission of the technical and financial proposals in separate, sealed envelopes.   Technical proposals submitted to the Procurement Division are opened publicly in the Procurement Division Bid Room, located in New York.  U.N. procedures state that the sole purpose of the public opening is "to record the proposals submitted by the due date and time." The procedures further mandate that (i) "[n]o price will be extrapolated or announced at the time of the public opening," (ii) "only technical proposals will be opened to record the name of the proposers" and (iii)  "[f]inancial proposals will not be opened at the public opening."

53.    Generally, each RFP is the responsibility of a designated U.N. Procurement Officer who plays a critical role in the contract award process. Upon receipt of a request for procurement, the Procurement Officer is responsible for selecting the companies to be invited to submit bids, prepares the bidding documents and sends them out. The Procurement Officer assigned to the RFP is identified to bidders as the "Point of Contact" and bidders are instructed to direct any questions regarding the RFP to such Procurement Officer.  At the time of the public opening, the designated Procurement Officer takes custody of all copies of both technical and financial proposals and has a duty to maintain their confidentiality.

54.    The Procurement Officer then initiates evaluations of the proposals submitted. Evaluation of the bids is a multi-stage process which starts with an examination of

"procedural" or "general" compliance, proceeds to "substantive" evaluation and then to a financial evaluation. Assessing the "procedural," "general" and "substantive" compliance of a bid requires complex, multi-faceted inquiries, as well as, to some extent, the exercise of judgment by an experienced and objective Procurement Officer who is required to maintain neutrality regarding the competing bidders and to preserve the confidentiality of the bids.

55.    Upon completion of his/her evaluation, the Procurement Officer then presents final recommendations, through the Chief of the Procurement Division and, together with his/her financial evaluation, to the HCC.  The HCC may either approve the recommendation of the Procurement Officer or ask for further clarifications.  Following a decision by the HCC, the Procurement Division issues an award letter to the successful vendor and negotiates the terms of the final, written contract between the vendor and the U.N.

56.    Upon award of the contract, a selected vendor is required to post a performance bond of 10 percent of the contract value, recoverable only after its contractual obligations have been fully performed.

57.    Payments to vendors providing goods and services, including vendors providing food rations, are generally made through banking facilities and accounts in New York.

## II.    The Corrupt Alliance between the IHC Defendants and Yakovlev

58.    On repeated occasions during his U.N. career, Yakovlev approached, or was approached by, prospective vendors to the U.N., or prospective vendors to the U.N. through IHC, to render "assistance" in connection with these vendors' bids for U.N. contracts. Exploiting his role in administering the contract award process, Yakovlev used a variety of illicit means to give such vendors decisive advantages over all others which determined the award of the contracts.   In some instances, through the IHC Defendants, such IHC "clients" were selectively provided by Yakovlev with confidential internal information as to the U.N.'s

objectives, preferences and expectations regarding a particular contract opportunity which enabled such vendors to be presented in a false light as the most suitable bidder.  Additionally, Yakovlev eliminated competing proposals submitted by competitors by "disqualifying" them based on supposed technical deficiencies and choosing not to offer the opportunity to correct them. Conversely, Yakovlev, with the assistance of the IHC Defendants, allowed IHC's "clients" to "correct" the supposed technical deficiencies in their bids which had resulted in the disqualification of their competitors. Yakovlev also exercised his "discretion" with regard to more complex aspects of the proposals under evaluation, to rank competing proposals unfairly. These means, all of which were in contravention of U.N. procedures and were accompanied by bribes or other forms of illegal remuneration paid to Yakovlev, enabled Yakovlev to falsely identify the proposals of IHC's "clients" as superior and to facilitate their approval.

59.    In addition to the foregoing means of manipulating the award process, Yakovlev, once bidding was supposed to be closed and the bid prices of other competitors were known to Yakovlev, would share this information with the IHC Defendants so as to enable IHC to have its "clients," including ESS, Cogim and Corimec, improperly amend their bids and undercut the bids of their competitors, such as ES-KO.

60.    In a related form of abuse of the contract award process, Yakovlev would supply ESS, through the IHC Defendants, with proposals which had been successfully submitted by ES-KO in connection with the award to ES-KO of short-term interim contracts for newly-established U.N. missions. These interim contracts typically preceded the longer-term contracts entered into to supply on-going peacekeeping missions.  ESS would then illegally and improperly use the confidential pricing and other information contained in ES-KO's interim contract proposals, through continued coordination with the IHC Defendants, as a template to formulate ESS's own technical and pricing proposals for the longer-term contracts. In this

manner, ESS, through IHC and the IHC Defendants, repeatedly succeeded in gaining the award of long-term contracts that otherwise would have been awarded to ES-KO.

61.     As a Team Leader for the Field Procurement Section of the Procurement Division, Yakovlev was the sole or primary Procurement Officer responsible for processing the technical and financial proposals received in response to RFPs issued by the Procurement Division for the contracts at issue in this case.  With respect to other contracts as to which Yakovlev was not the Procurement Officer, Yakovlev also played a significant role in the process, enabling him to manipulate and secure the award of such contracts to IHC's "clients."

62.     During the Relevant Period, prospective suppliers to the U.N. could engage the services of Yakovlev by signing on as "clients" of IHC.  Yakovlev had previously formed a close working relationship with IHC in connection with their mutual involvement in prior corrupt arrangements, including, inter alia, those entered into in the context of the corrupt U.N. Oil-for-Food Programme.  Until it was suspended as a registered vendor by the U.N., IHC specialized in "brokering" supply contracts with the U.N. Procurement Division.  In fact, IHC was actually engaged to use its special, illicit access to Yakovlev and other U.N. insiders to illegally or improperly influence, manipulate and control the award of the U.N. contracts on which its "clients" bid.

63.     Crucial to IHC's ability to gain special access to U.N sources, including the OIP, and to attract large corporations as "clients" to IHC and deliver results for them by improperly securing preferential treatment, was the involvement of Giandomenico Picco. During his first assignments with the U.N., Picco spent much of his time in the Middle East and led the first rounds of negotiations with Saddam Hussein's regime to set up the Oil-for-Food Programme, which commenced operations in 1996.  Following his initial tenure with the U.N., Picco founded a New York-headquartered consulting firm, GDP Associates, which claimed to

have offices in Iraq, and other locations in the Middle East, Europe and Southeast Asia.  Picco served as a director of IHC in 1997 and then as Chairman of the IHC Board of Directors from 1998 until at least 2001, and thereafter assisted IHC in continuing to have access to confidential inside information at the U.N., thereby knowingly facilitating the continuation of IHC's role in the scheme.  By virtue of his role at IHC, Picco was aware, inter alia, that ES-KO was the target of IHC's efforts to improperly subvert ES-KO's efforts to be awarded contracts that in the end were awarded to IHC "clients" ESS, Cogim and Corimec.  In August 1999, while IHC's Chairman, Picco accepted a high-profile appointment from Kofi Annan to serve as a U.N. Under-Secretary.  During the interval in which Picco was both an official U.N. representative for Kofi Annan and chairman of the IHC Board, Picco also advised private clients, including David Chalmers, owner of Bayoil (USA), Inc. and Bayoil Supply & Trading Limited (collectively, "Bayoil"), in their dealings under the Oil-for-Food Programme.  Chalmers and Bayoil were indicted on May 4, 2005 in the Southern District of New York for participating in an illegal kickback scheme in connection with the Oil-for-Food Programme, in part as a result of information provided by Picco to Chalmers.  Chalmers and Bayoil are currently awaiting trial.

64.     Picco's role in the scheme was to pave the way for Testa's machinations by, inter alia, providing Testa with introductions to well-placed U.N. officials and access to confidential information from sources in the U.N. regarding matters of extreme interest to IHC's "clients," including details of proposed Procurement Division and OIP contracts for materials and services that both Picco and Testa knew were not supposed to be shared outside the U.N.  At all times during the Relevant Period, Picco and Testa acted with the knowledge, consent and assistance of the other IHC Defendants.

65.     The illicit collaboration between Yakovlev and IHC greatly expanded once Picco became a director of IHC, in the corrosively corrupt environment of the Oil-for-Food Programme.[6]

66.     To ensure Yakovlev's continued cooperation and loyalty and to fully exploit the relationship between Yakovlev and IHC, during portions of the Relevant Period, IHC placed and kept Dmitry Yakovlev ("Dmitry"), Yakovlev's son, on the IHC payroll.  Dmitry, who had not yet finished college and lived with his parents in Yonkers, New York, was first employed by IHC during the summer of 2000, shortly after the U.N. signed a supply contract with IHC (for which Yakovlev was the procurement officer) for IHC to sell the U.N. nearly $1.2 million in portable generators for peacekeeping missions.  From in or about May-August 2001 and in or about December 2002-December 2003, Dmitry's job title at IHC was Assistant to the Vice-President.

67.     Dmitry did double duty for IHC, supposedly "analyzing" proposals received from IHC's "clients" on the subject of technical compliance with the specifications of the ITB or the RFP and by providing a direct line of confidential technical and financial bid information to and from his father regarding directly related confidential matters of extreme interest to IHC's "clients."  Even after he was no longer employed by IHC, Dmitry received from and made numerous calls to IHC's offices, some of which were closely followed by calls to and from his father at the U.N. Headquarters in New York City.  Dmitry, knowing that information he obtained from his father was being imparted to IHC "clients," including ESS, Cogim and Corimec, provided this information to other IHC Defendants, in particular Testa and Quinteros,

---

[6] IHC, as vendor intermediary for major corporations such as New Holland, Daewoo, SDMO, Fiat-Hitachi, and Varisco, may have succeeded, with the illicit, inside assistance of Yakovlev, in brokering substantial contracts for one or more of these companies as well as part of the Oil-for-Food Programme.

who then passed the information to employees of ESS and other IHC "clients," such as Cogim and Corimec.

68.    The illicit assistance provided by IHC included, but was not limited to, obtaining information from Yakovlev regarding the proprietary, highly confidential bid proposals submitted by competitors of IHC's "clients." This information was passed on to IHC "clients" to enable them to appear to underbid their competitors' proposals in the closed bidding process used by the U.N. to award the contracts in question.

69.    Additionally, the enormous fees paid by ESS and other IHC "clients," both overtly, supposedly for legitimate "technical assistance," and covertly, via offshore and other payments, including payments processed by IHC's Milan office and through IHC S.r.l., provided the funds pursuant to which IHC could pay bribe money to Yakovlev without leaving a "money trail" from ESS or IHC's other "clients" such as Cogim and Corimec.  Responsibility for arranging for payments to Yakovlev to various offshore and European accounts set up by Yakovlev belonged primarily to Testa and IHC's officer and thereafter consultant Etherson, and such arrangements were known to the other IHC Defendants.  IHC's  network of international corporate vendors gave it almost unlimited opportunities to launder money in furtherance of the scheme.   Yakovlev maintained accounts for receipt of bribe money in Switzerland, Liechtenstein, Austria, Cyprus and Moscow as well as in the Caribbean.

## III.    ESS Partners with IHC to Corruptly Secure the Award of  Proposals for Food Service Contracts that Should Have Been Awarded to ES-KO

70.    In the late 1990s, Compass Group targeted the growth in U.N. peacekeeping missions as an attractive opportunity for ESS, a subsidiary operated by Compass Group as a division. Compass Group had acquired the assets of independent food service contractors to the U.N. and believed that it had thereby inherited the capability to enter into what

it analyzed as being a lucrative line of business.  Yet, despite all of Compass Group's ambitions, enormous resources and related institutional experience, for years ESS was utterly unable to qualify and register as a U.N. vendor, or to win U.N. contracts.

71.     Starting in 1999, Compass Group enjoyed a remarkable and sudden reversal in its fortunes with the U.N. Procurement Division, when, after engaging IHC as a so-called "vendor intermediary," it succeeded in securing the award of a subcontract to provision ships being used by the U.N. to house personnel and/or troops associated with U.N peacekeeping mission in East Timor ("UNTAET").[7]   IHC subsequently acted on behalf of ESS regarding the award of the U.N. contracts at issue here for the provision of food and related services to peacekeeping missions.

72.     The ships themselves were being supplied pursuant to a U.N. contract awarded to Intership Limited ("Intership"), another IHC client for whom IHC functioned as a U.N. vendor intermediary.  Andrew Toh, who has been suspended by the U.N. pending a full investigation of his role in the scheme, signed this contract on behalf of the U.N.

73.     Tax authorities in East Timor have reported that during 2000, Intership paid commissions or "spotter's fees" totaling $650,000 to unknown persons in connection with the UNTAET contract.  At least part of such "fees" were transferred by IHC to covert bank accounts maintained by Yakovlev in consideration for Yakovlev's assistance in procuring the contract.

---

[7] The Procurement Division's website advises vendors and prospective vendors against the use of "vendor intermediaries."  See http://www.un.org/Depts/ptd/.  The website appears to address the conduct of IHC in providing the following warning: "There are indications that certain parties have approached prospective vendors offering to act as intermediaries in dealings with the U.N.  Some of these intermediaries purport to have various arrangements with the U.N. or to possess support facilities within U.N. missions or projects which can place a vendor in a more advantageous position in competitive bidding exercise. Vendors are advised that the U.N. prefers to deal directly with principals to the extent possible. Vendors are therefore urged to consult with the Procurement Service before deciding to submit offers or negotiate contracts through any intermediary." Id.

74.     The award of the Intership subcontract was approved by the Procurement Division in or about late 1999.  Although at the time of the Intership contract award ESS had no prior experience as a vendor to the U.N. and, according to the Procurement Division's own records, was not registered as a U.N. vendor until September 17, 2001, IHC, as "vendor intermediary," was able to secure for ESS the subcontract to provide food services for the U.N. Peacekeepers in East Timor.

75.     Shortly thereafter, under the sponsorship of IHC, ESS submitted a proposal for a major food rations contract for UNTAET. ES-KO, aware that industry behemoth Compass Group had entered the market through its ESS division, sharply reduced its margins in bidding for the UNTAET contract and was surprised when the award nevertheless went to ESS.

76.     The award of the East Timor contract to ESS was a watershed event for the IHC and ESS team. It was followed in rapid succession by successful ESS bids for major food rations contracts for peacekeeping missions in Lebanon (2002), Syria (2002), Eritrea/Ethiopia (2003), Liberia (2003), Kosovo (2004), Burundi (2004), Sudan (2004) and Cyprus (2005) that but for the scheme would have been awarded to ES-KO, and as a result of which ESS profited from the scheme.

77.     Unaware of the scheme to which the IHC Defendants, Yakovlev and ESS were parties, ES-KO submitted technical and pricing proposals in response to each of the RFPs on which ESS ultimately won the contract.  Preparation of each of these proposals drew upon ES-KO's extensive databases, expertise and resources and each such proposal contained and was based upon confidential, proprietary and non-public information of ES-KO.

78.     ES-KO incurred substantial costs and committed substantial resources in the preparation of its technical and financial proposals based on its understanding and belief in the integrity of the U.N. procurement system.  Specifically, ES-KO believed, based upon U.N.

policies and procedures, that technical proposals for the food rations contracts were opened publicly in the Bid Room of the Procurement Division at U.N. Headquarters in New York (or, on occasion, at the mission headquarters as set forth herein) for the sole purpose of establishing for the record that the proposals had been submitted by the due date. ES-KO further believed that, in accordance with U.N. policies, the details of the technical proposal were not to be made public at any time and that no information would be shared with or communicated to any other bidder regarding the technical or financial aspects of any competing bid. ES-KO further believed that each contract award would be based on technical merit and competitive pricing.

79.     In response to ESS's apparent success in underbidding ES-KO (evident as a result of the award of contracts to ESS), ES-KO was forced to significantly reduce its profit margins when calculating its pricing proposals relative to prior successful proposals.  ES-KO adopted this reduced pricing in the good faith belief that it was responding to authentic and legitimate pricing competition from Compass Group, the self-proclaimed largest food services company in the world, rather than, as is now known, the pervasive and egregious violation by Defendants of the integrity of the bidding procedures established by the U.N.  As a result of being induced to change its pricing structure based upon the scheme, as alleged in further detail in paragraphs 83 to 268 infra, ES-KO was forced to lower its bids in its proposals for other contracts awarded to it for the provision of services to missions in Sierra Leone, Kosovo, Cyprus, Congo, Eritrea, Liberia, Burundi and Haiti.

80.     In addition to the conduct directly related to procuring new contracts, Yakovlev and the IHC Defendants took other steps in furtherance of the conspiracy to conceal ESS's inability to perform its contractual obligations and to otherwise ensure the illegal scheme would not be detected. For example, Yakovlev, coordinating his efforts with ESS through the IHC Defendants, suppressed formal complaints made by Field Headquarters regarding the

performance of ESS and immediately alerted ESS to enable it to attempt to remedy problems prior to audit of ESS by the U.N. Yakovlev even took steps to improperly relieve ESS of some of its financial contractual obligations. On at least one occasion, Yakovlev returned or caused to be returned a $3.7 million performance bond to ESS eight months early, in contravention of U.N. regulations.

81.    In furtherance of its sudden appearance and meteoric rise as a U.N. contractor, ESS trumpeted its association with IHC, which propelled it from a neophyte in the field to a major U.N. contractor which was awarded eight out of the eleven U.N. food supply contracts from 2002 to 2005. On or about September 13, 2004, ESS issued a press release in which it announced a newly-established "New Best in Class" business partnership with New York-based IHC. In reality, the so-called "new" ESS-IHC business partnership was one vehicle by which ESS sought to disguise the illegal bribes and other illegal payments made by ESS and IHC in connection with this so-called business partnership.

82.    ESS was not the only IHC client to be involved in the scheme to obtain U.N. contracts through corrupt means, as a result of which ES-KO lost yet further U.N. contracts and was deprived of other business opportunities. During the Relevant Period, IHC's "clients" which were competitors of ES-KO included Cogim and Corimec, Italian suppliers of prefabricated buildings. Yakovlev has publicly admitted to receiving approximately $250,000 in bribes from Cogim in 2000 and 2001 in consideration for illegal assistance to Cogim in connection with U.N. contract awards, at least one of which, Contract No. PA/C0451/1999, ES-KO also had bid on, and would otherwise have won.[8] In the case of such contract, Yakovlev, with the collusion of the IHC Defendants, arranged for the technical disqualification of bids

---

[8] Yakovlev, in fact, may have received at least $300,000 in payments from Cogim during the period between 2000 and 2003.

other than that of Cogim, resulting in Cogim remaining as the only "qualified" bidder. Cogim's sales to the U.N. during the Relevant Period were substantially in excess of $19 million. Corimec's sales to the U.N. during the Relevant Period were substantially in excess of $77 million. According to Yakovlev, Corimec also paid bribes to Yakovlev to secure U.N. contracts, and the IHC Defendants facilitated Corimec in securing contracts in a similar manner as that utilized with respect to ESS.[9] On or about March 16, 2007, the U.N. removed Cogim from its list of approved contractors, and suspended Corimec as well.

## IV.    Contracts Which But for the Scheme Would Have Been Awarded to ES-KO

83.    In addition to the UNTAET contract, eight other contracts were awarded to ESS, through the IHC Defendants' efforts, as a direct and proximate result of the scheme. In the case of each U.N. contract, IHC served as an illicit "vendor intermediary," was compensated by ESS for its illegal conduct, and was the conduit for bribes and other forms of remuneration to be paid to Yakovlev.

### A.    Liberia

84.    The U.N. Mission in Liberia ("UNMIL") was established by the Security Council in September 2003 to support the implementation of a ceasefire agreement following a civil war between the Liberian government and the National Patriotic Front of Liberia, protect U.N. staff, facilities and civilians, and support humanitarian and human rights activities.

---

[9] The bid-rigging involving Cogim and Corimec, which had been actively concealed by Defendants, first came to light after the filing of the initial Complaint in this action as a result of news reports that, in or about June 2006, two directors of Cogim, Leopold Braghieri and his son, Filippo Braghieri, were served by Italian authorities with writs for international corruption as a result of their role on behalf of Cogim in the bid-rigging scheme, and that Leopold Braghieri had also been involved in the payment of bribes by Corimec to Yakovlev. According to the Italian indictments, Cogim paid bribes of $300,000 to Yakovlev. Yakovlev confirmed that he had received bribes from both Cogim and Corimec during his testimony at the criminal trial of Vladimir Kuznetsov in March 2007.

85.     On or about September 12, 2003 the Procurement Division issued RFPS-550 for the provision of rations to UNMIL peacekeeping troops for the period of January 2004 to December 2006 (the "Liberia Main Contract").

86.     On or about October 8, 2003, while ES-KO was preparing its bid for the Liberia Main Contract, the U.N. Procurement Division issued RFPS-564 for the interim provision of rations to 4,386 UNMIL peacekeeping troops for the period of November 1, 2003 to December 31, 2003 (the "Liberia Interim Contract").

87.     On or about October 15, 2003, ES-KO submitted its technically proficient and financially competitive proposal in response to RFPS-564 and, on or about October 22, 2003, was awarded the Liberia Interim Contract.

88.     The following day, on October 23, 2003, ES-KO submitted its technically proficient and financially competitive proposals for the Liberia Main Contract in separate, sealed envelopes.

89.     The technical proposals of bidders for the Liberia Main Contract were publicly opened in the Bid Room of the Procurement Division at U.N. Headquarters in New York at 11:00 a.m. on or about October 23, 2003.

90.     Yakovlev was the sole point of contact within the Procurement Division for all queries that bidders might have in relation to the proposals for the Liberia Interim and Main Contracts and was the custodian of both the technical and financial proposals during the evaluation periods.

91.     ES-KO's pricing for the Main Liberia Contract was exceptionally competitive for at least two reasons.  First, at the time of preparing and submitting the Liberia Main Contract proposals, ES-KO had heard an alarming rumor from a Northern European shipping agent that ESS was boasting that its intention was to "wipe ES-KO out of Africa," a

region where ES-KO was established as the primary vendor supplying food to the U.N. peacekeeping forces. Therefore, in order to counteract what ES-KO believed at the time to be aggressive, but legitimate, commercially competitive behavior by ESS, ES-KO reduced its margins in the financial proposal for the Liberia Main Contract in an attempt not to be underbid and to defend its market in Africa.

92.     Second, as alleged supra, at the time ES-KO submitted its technical and financial proposals for the Liberia Main Contract it had been officially informed that it had been awarded the Liberia Interim Contract.  Based on such information and recognizing that the Liberia Main Contract called for the continuation of services it would be providing pursuant to the Liberia Interim Contract, ES-KO was able to exclude from its proposal the substantial costs of mobilization.

93.     On or about November 14, 2003, the Procurement Division awarded ESS the Liberia Main Contract. In a departure from usual practice, other bidders for the contract were not immediately notified of the award.

94.     On or about November 18, 2003, it came to ES-KO's attention that an ESS manager was making public statements regarding a pending U.N. contract award. Specifically, the same Northern European shipping agent who had heard of the earlier-stated intention of ESS to "wipe ES-KO out of Africa," now reported that an ESS manager had stated that ESS had been awarded the Liberia Main Contract.

95.     Upon hearing this rumor, on or about November 18, 2003, ES-KO immediately tried to contact Yakovlev by telephone to clarify the matter.  When Yakovlev did not respond, ES-KO e-mailed him at his U.N. e-mail address, with copies of the e-mail sent to Dmitri Dovgopoly, Chief of the Field Procurement Section, and Christian Saunders, Chief of the Procurement Division, asking the same question.  Later on November 18, 2003, Dmitri

Dovgopoly responded, with copies of his e-mail sent to Yakovlev and Christian Saunders, declining to answer the question and informing ES-KO that "you will be informed of the results as appropriate."

96.     On the following day, November 19, 2003, ES-KO received formal notice from the U.N. that the Liberia Main Contract had been awarded to ESS, which was purportedly the "lowest bidder."

97.     The award to ESS of the Liberia Main Contract came as a great shock to ES-KO for a number of reasons.  First, at the time of the award to ESS, ES-KO had been performing the interim contract for approximately three weeks and had already established an excellent level of service to the mission there.  Furthermore, when the award for the Liberia Interim and Main Contracts was being decided, ES-KO was faithfully fulfilling all of its obligations under an ongoing food supply contract for the U.N. in neighboring Sierra Leone.  As a vendor which had successfully performed numerous other U.N. contracts in the region and as the only vendor, due to its ongoing operations in the same region, capable of submitting a competitive proposal for commencing additional operations at short notice, ES-KO considered itself uniquely positioned to submit the most competitive proposal.  Furthermore, unlike ES-KO, ESS had no such comparable experience.

98.     Finally, ES-KO assumed that ESS's financial proposal for this contract would have had to include significant mobilization costs since ESS, unlike ES-KO, had no concurrent operations in the region.  This factor, combined with ES-KO's highly competitive pricing on the proposal, led ES-KO to conclude that it would have been virtually impossible for ESS's financial proposal to match its own.

99.     On November 20, 2003, ES-KO e-mailed Dmitri Dovgopoly, with copies of the e-mail again sent to Yakovlev and Christian Saunders, asking that ES-KO be provided with an analysis of its technical compliance.

100.    Thereafter, on November 24, 2003, ES-KO sent another e-mail to Dmitri Dovgopoly, with copies of the e-mail again sent to Yakovlev and Christian Saunders, asking for a de-briefing with respect to the Liberia Main Contract.

101.    Despite ES-KO's request, ES-KO was never invited to participate in a de-briefing session, and was never provided with an evaluation of its technical proposal or pricing.

102.    Unbeknownst to ES-KO, on November 6, 2003, prior to the formal review by HCC and the award of the Liberia Main Contract to ESS, Testa sent an e-mail to former defendant Andrew Seiwert of ESS which reveals the egregious breach by Yakovlev, the IHC Defendants and ESS of the confidentiality requirements applicable to the bidding process and exposes the nature of the conspiracy. The e-mail was brief and direct. "Dear Andy," it said, "This will go to the Committee next Tuesday. All the best." The Committee referred to was the U.N. Headquarters Committee on Contracts, which approves all major purchases by the Procurement Division.

103.    Three documents were attached to Testa's November 6, 2003 e-mail.

104.    The first document was a draft of the official recommendation by the U.N. Procurement Division that a $62 million, three-year contract for supplying food and water for up to 15,000 peacekeepers in Liberia be awarded to ESS. The contract also included two renewable one-year options.

105.    The second document was a detailed U.N. evaluation of the technical abilities of twelve different firms, including ES-KO and ESS, to meet U.N. requirements for feeding separate peacekeeping missions in Liberia, Ethiopia, Eritrea and the Congo.

106.   The third document was a detailed summary of the sealed bids that three bidders, including ESS and ES-KO, had submitted in response to RFPS-550.   This summary included ESS's modified bid pricing which Yakovlev and/or a John Doe Defendant, acting at Yakovlev's direction, had substituted in ESS's original financial bid.

107.   The proposal that ESS submitted with the benefit of this illegally-obtained information contained numerous line items which were just pennies below ES-KO's proposal, and could not have been made without access to ES-KO's bid details.  ESS's total proposal was less than 1.5% below the proposal submitted by ES-KO.

108.   ESS's proposal was and could only have been created as a result of ESS's having illegally obtained ES-KO's confidential, non-public proprietary bidding information from Yakovlev, through the IHC Defendants.  For example, the figures shown in the "Price Chart for Changes in Troop Strength" in the Cost Summary of ES-KO's financial proposal for the Liberia Main Contract had been calculated by ES-KO based solely upon proprietary, empirical data uniquely available to it, based upon its own prior experience and could not be replicated by any arithmetical formula. It was therefore impossible for ESS to arrive at virtually identical figures without improper and illegal access to and reliance on ES-KO's proprietary and confidential work product, which it obtained through the IHC Defendants' and Yakovlev's efforts.

109.   ES-KO would have been awarded the main UNMIL contract but for the illegally obtained, proprietary and confidential non-public bidding information that was improperly provided by the IHC Defendants and the Yakovlevs to ESS and Defendants' other, related illegal conduct.

110.   The Liberia Interim Contract was initially only for a period of two months. However, due to ESS's failure to mobilize on time for the contract start date of January 1, 2004 in accordance with a four to six week mobilization period that ESS had represented to the U.N.

that it required, the U.N. asked ES-KO to extend and continue its services to UNMIL for an additional month.  ES-KO agreed to the extension and performed the requested services for an additional month.

111.   ESS's performance of its contractual obligations in Liberia was abysmal and U.N. officials monitoring such performance complained of systemic failures by ESS.  For example, on or about June 4, 2004, after four months of ESS's performance under the Liberia Main Contract, a "Notice of Unsatisfactory Performance and Material Breach of Contractual Obligations" was sent to ESS by the Chief Administrative Officer, the highest civilian official of UNMIL.[10]

112.   ES-KO estimates its lost gross revenue on the Liberia Main Contract as not less than $120,411,000. ES-KO suffered damages because it was not awarded the Liberia Main Contract as a result of the scheme in an amount, exclusive of pre-judgment interest, of not less than $18,061,650.  The Liberia Interim Contract generated $2 million in revenue.  ES-KO also suffered damages in the additional amount, exclusive of pre-judgment interest, of not less than $100,000, as a result of being induced by the scheme to reduce its gross margins on the Liberia Interim Contract by not less than 5%.

**B.    Cyprus**

113.   The U.N. Peacekeeping Force in Cyprus ("UNFICYP") was set up in 1964 to prevent inter-communal fighting between the Greek Cypriot and Turkish Cypriot communities. UNFICYP's responsibilities expanded following the hostilities of 1974. UNFICYP remains on the island to supervise ceasefire lines, maintain a buffer zone and undertake humanitarian activities.

---

[10]   Notwithstanding such poor performance, ESS continued to be awarded food supply contracts, since Yakovlev was the point of contact for procurement contracts processed at U.N. Headquarters.

114.    On or about September 10, 2001, UNFICYP issued RFP-01/15 for the provision of food supplies on an interim basis to 1,250 UNFICYP peacekeeping troops for the period of March 1, 2002 to March 1, 2004, with an option to extend for a further twelve months ("UNFICYP I").

115.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about October 1, 2001.

116.    Unlike the procedure employed for other contracts, technical proposals were publicly opened on or about October 4, 2001 in the Chief Administration Conference Room at the UNFICYP Headquarters at the old Nicosia Airport.  UNFICYP thereafter awarded this contract to ES-KO.

117.    ES-KO achieved a satisfactory level of performance and consequently the option to extend the contract for a further year was exercised. This contract generated $5,265,740 in revenue.

118.    Following the completion of UNFICYP I, on or about September 6, 2004, UNFICYP issued RFP-18/04 for the provision of rations to 1,230 troops for the period of March 1, 2005 to March 1, 2007, with an option to extend for a further twelve months ("UNFICYP II").

119.    ES-KO relied on its immediate prior experience successfully provisioning UNFICYP in preparing its technical and financial proposals.

120.    ES-KO was told that the proposals it had submitted to Nicosia, which included prices, were subsequently forwarded to New York for final scrutiny by the Procurement Division.  The UNFICYP II proposals were not subject to approval by the HCC.

121.    ES-KO submitted technical and financial proposals in separate, sealed envelopes on or about October 11, 2004 with subsequent proposals submitted on or about November 11, 2004 to reflect a decrease in force level from 1,230 to 860 troops.

122.   Technical proposals in response to the UNFICYP II were subsequently publicly opened in the Chief Administration Conference Room at the UNFICYP Headquarters at the old Nicosia Airport.

123.   Yakovlev and the IHC Defendants improperly provided ESS with illicit assistance and preferential treatment and engaged in other misconduct in order to illegally control, manipulate and influence the award of the UNFICYP II contract to ESS. In exchange for such illicit assistance, IHC and Yakovlev received illegal consideration from ESS.

124.   Based upon an ESS proposal prepared with the illicit use of ES-KO's confidential, proprietary information and other related misconduct by Defendants, the Procurement Division awarded UNFICYP II to ESS.

125.   But for the operation of Defendants' scheme to manipulate and control the outcome of U.N. contract awards, the UNFICYP II contract would have been awarded to ES-KO.

126.   ES-KO estimates its lost gross revenue on the UNFICYP contract as not less than $5,838,540.

127.   ES-KO suffered damages because it was not awarded the UNFICYP II contract as a result of the scheme in an amount, exclusive of prejudgment interest, of not less than $875,781.   ES-KO also suffered damages in the additional amount, exclusive of prejudgment interest, of not less than $198,000 as a result of being induced by the scheme to reduce its gross margins by not less than 5% on the UNFICYP I contract.

C.     **East Timor**

128.   The U.N. Transitional Administration in East Timor ("UNTAET") was established in October 1999 to administer East Timor, exercise legislative and executive

authority during the transition period to independence from Malaysia, and support capacity-building for self-government.

129.   On or about November 18, 1999, the Procurement Division issued an RFP for the provision of rations to 8,284 UNTAET peacekeeping troops from June 2000 to June 2005.

130.   Andrew Toh, who has been suspended by the U.N. pending a full investigation of the scheme, signed this RFP on behalf of the U.N.  All inquiries and proposals in response to this RFP were to be directed to Yakovlev in New York.

131.   ES-KO submitted its technical and financial proposals for award of the UNTAET contract in separate, sealed envelopes on or about January 15, 2000.

132.   Technical proposals were publicly opened in the Bid Room of the Procurement Division at U.N. headquarters in New York on or about January 17, 2000.

133.   Yakovlev, through the IHC Defendants, improperly provided ESS with illicit assistance and preferential treatment and engaged in other misconduct in order to illegally control, manipulate and influence the award of the UNTAET contract to ESS. In exchange for such illicit assistance, IHC and Yakovlev received illegal consideration from ESS.

134.   Based upon an ESS proposal prepared with the illicit use of ES-KO's confidential, proprietary information and other related misconduct by Defendants, the Procurement Division awarded this contract to ESS. ES-KO was advised by Yakovlev on or about March 7, 2000 that it had not been awarded the contract.

135.   But for the operation of Defendants' scheme to manipulate and control the outcome of U.N. contract awards, the UNTAET contract would have been awarded to ES-KO.

136.   ES-KO conservatively estimates its lost gross revenue on this contract as not less than $83,690,501.

137.   ES-KO has suffered damages in connection with this contract as a result of the scheme in an amount, exclusive of pre-judgment interest, of not less than $12,553,575.

**D.     Eritrea**

138.   The Security Council established the U.N. Mission in Ethiopia and Eritrea ("UNMEE") in June 2000 to maintain liaison with Ethiopia and Eritrea and establish a mechanism for verifying the ceasefire between them.  In September 2000, the Council authorized deployment within UNMEE of up to 4,200 military personnel to monitor the cessation of hostilities and to help ensure the observance of security commitments.

139.   On or about October 6, 2001, the Procurement Division issued RFPS-124 for the provision of rations to 4,000 UNMEE peacekeeping troops for the period February 1, 2001 to January 31, 2002, plus two option years of renewal (the "UNMEE I Contract").  The Procurement Officer and Point of Contact for the UNMEE I Contract was a U.N. official other than Yakovlev.

140.   ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about November 14, 2000.  In formulating its financial proposal for the UNMEE I Contract, ES-KO reduced its margins by not less than 5% in an attempt not to be underbid.  Such reduced margins were adopted by ES-KO, unaware of the ongoing scheme, in the belief that it was responding to authentic and legitimate pricing competition from ESS.

141.   The Procurement Division awarded the UNMEE I Contract to ES-KO on or about December 21, 2001.

142.   ES-KO successfully performed the UNMEE I Contract and consequently the two one-year renewal options were exercised.  The UNMEE I Contract generated $23,145,000 in revenue.

143.   On or about September 16, 2003, the Procurement Division issued RFPS-552 for the provision of rations to UNMEE troops for the period from January 2004 to December 2006 (the "UNMEE II Contract"). The UNMEE II Contract was a two-year contract with an additional one-year renewal option.

144.   Yakovlev was the Procurement Officer and Point of Contact for the UNMEE II Contract.

145.   ES-KO, having successfully discharged its duties with regard to the UNMEE I Contract, had accurate, detailed and up-to-date data on which to rely in preparing its technical and financial proposals for the UNMEE II Contract.

146.   ES-KO submitted its technical and financial proposals for the UNMEE II Contract in separate, sealed envelopes on or about October 27, 2003.

147.   Technical proposals were publicly opened in the Bid Room of the Procurement Division at U.N. headquarters in New York on or about October 27, 2003. As Procurement Officer for the UNMEE II Contract, Yakovlev was the custodian of the bidders' proposals.

148.   Yakovlev and the IHC Defendants improperly provided ESS with illicit assistance and preferential treatment and engaged in other misconduct in order to illegally control, manipulate and influence the award of the UNMEE II contract to ESS. In exchange for such illicit assistance, IHC and Yakovlev received illegal consideration from ESS.

149.   The proposal that ESS submitted contains numerous line items priced at just pennies below the prices quoted in ES-KO's proposal. ESS's pricing could only have resulted from its illegal access, through the IHC Defendants and Yakovlev, to ES-KO's confidential, non-public proprietary bidding information. ES-KO's pricing was based entirely upon proprietary, empirical cost data uniquely available to ES-KO, derived from its unique

experience in the region, and could not have been replicated without access to ES-KO's proposal.

150. The Procurement Division thereafter awarded the UNMEE II Contract to ESS.

151. But for the operation of Defendants' scheme to manipulate and control the outcome of U.N. contract awards, the UNMEE II Contract would have been awarded to ES-KO.

152. The UNMEE II Contract was awarded to ESS on November 14, 2003 for activation on December 15, 2003. Within weeks of activation, it was apparent that ESS was unable to mobilize in accordance with its contractual undertaking. On January 26, 2004 Yakovlev requested ES-KO's assistance in the form of an extension of the lease of reefer containers deployed for contingent level storage. Yakovlev also improperly assisted ESS in obtaining a price adjustment for items that ESS had already committed to providing at a set cost.

153. ES-KO estimates its lost gross revenue on the UNMEE II Contract as not less than $36,614,351.

154. ES-KO suffered damages because it was not awarded the UNMEE II Contract as a result of the scheme in an amount, exclusive of pre-judgment interest, of not less than $5,492,153. ES-KO further estimates that it sustained damages in the additional amount, exclusive of pre-judgment interest, of not less than $1,157,000, as a result of being induced by the scheme to reduce its gross margin on the UNMEE I Contract by not less than 5%.

155. ES-KO sustained additional damages, as a result of the scheme, in the approximate amount of $900,000 in connection with the failure by Yakovlev, as part of the conspiracy, to authorize appropriate adjustments to the UNMEE I Contract price, in accordance with U.N. policies after the three-year renewal option was exercised, based on movements of foreign currency exchange rates during the contractual period.

### E.    Syria

156.    The U.N. Disengagement Observer Force ("UNDOF") was established in 1974 following the agreed disengagement of Israeli and Syrian forces in the Golan Heights. UNDOF continues to supervise the implementation of the agreement and maintain the ceasefire.

157.    On or about October 22, 2002, the Procurement Division issued RFPS-415 for the provision of food supplies to 1,000 UNDOF peacekeeping troops for the period of January 2003 to December 2005.    A U.N. officer other than Yakovlev was initially the Procurement Officer and Point of Contact for RFPS-415. Thereafter, Yakovlev assumed these roles and became the custodian of proposals.

158.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about November 14, 2002.

159.    Technical proposals were publicly opened in the Bid Room of the Procurement Division at U.N. headquarters in New York on or about November 15, 2002.

160.    The Procurement Division thereafter awarded this contract to ESS.

161.    But for the operation of Defendants' scheme to manipulate and control the outcome of U.N. contract awards, the UNDOF contract would have been awarded to ES-KO.

162.    ES-KO conservatively estimates its lost gross revenue on this contract as not less than $7,053,771.

163.    ES-KO suffered damages in connection with this contract as a result of the scheme in an amount, exclusive of pre-judgment interest, of not less than $1,058,066.

### F.    Lebanon

164.    The U.N. Interim Force in Lebanon ("UNIFIL") was created to confirm Israel's withdrawal from Southern Lebanon in 1978, and help the Lebanese Government restore its effective authority in the area.

165.   On or about October 22, 2002, the Procurement Division issued RFPS-414 for the provision of food supplies to 2,000 UNIFIL peacekeeping troops for the period of January 2003 to December 2005.

166.   ES-KO submitted its technical and financial proposals in response to RFPS-414 in separate, sealed envelopes on or about November 14, 2002.

167.   Technical proposals were publicly opened in the Bid Room of the Procurement Division at U.N. headquarters in New York on or about November 15, 2002.

168.   A U.N. official other than Alexander Yakovlev was initially the Procurement Officer and Point of Contact for RFPS-414 and was subsequently replaced in these roles by Yakovlev, who became the custodian of the submitted proposals.

169.   Yakovlev and the IHC Defendants improperly provided ESS with illicit assistance and preferential treatment and engaged in other misconduct in order to illegally control, manipulate and influence the award of the UNIFIL contract to ESS. In exchange for such illicit assistance, IHC and Yakovlev received illegal consideration from ESS.

170.   The Procurement Division awarded this contract to ESS.

171.   But for the operation of Defendants' scheme to manipulate and control the outcome of U.N. contract awards, the UNIFIL contract would have been awarded to ES-KO.

172.   ES-KO estimates its lost gross revenue on this contract as not less than $10,950,000.

173.   ES-KO suffered damages in connection with this contract as a result of the scheme in an amount, exclusive of pre-judgment interest, of not less than $1,642,500.

**G.     Burundi**

174.   The genocide in Rwanda spilled over militarily into Burundi.   The Security Council established the U.N. Operation in Burundi ("ONUB") in May 2004 in order to

support and help to implement the efforts undertaken by Burundians to restore lasting peace and bring about national reconciliation following the Rwandan genocide.

175.   On or about March 23, 2004, the Procurement Division issued RFPS-624 for the provision of rations on an interim basis to 4,500 ONUB peacekeeping troops in Burundi for the period May 10, 2004 to July 9, 2004 (the "Burundi Interim Contract").   Christian Saunders, then Chief of the Procurement Division, who has since been suspended by the U.N. pending a full investigation of the scheme, signed the RFP for the Burundi Interim Contract.   The RFP designated Yakovlev as the procurement officer who was the Point of Contact.

176.   ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about April 2, 2004.

177.   Technical proposals were publicly opened in the Bid Room of the Procurement Division at U.N. headquarters in New York on or about April 2, 2004.

178.   The Procurement Division awarded this contract to ES-KO on or about April 29, 2004.

179.   ES-KO satisfactorily performed the Burundi Interim Contract which generated $885,000 in revenue.

180.   On or about February 18, 2004, prior to issuance of RFPS-624 for the Burundi Interim Contract, the Procurement Division issued RFPS-610 for the provision of rations to 9,900 ONUB peacekeeping troops for the period of July 2004 to July 2007 (the "Burundi Main Contract").   The RFP designated Yakovlev as the Point of Contact.

181.   ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about April 15, 2004.