182.   Technical proposals were publicly opened in the Bid Room of the Procurement Division at U.N. headquarters in New York at 10:00 a.m. on or about April 15, 2004. Yakovlev was the custodian of the contract proposals.

183.   The IHC Defendants and Yakovlev improperly provided ESS with illicit assistance and preferential treatment and engaged in other misconduct in order to illegally control, manipulate and influence the award of the Burundi Main Contract to ESS. In exchange for such illicit assistance, IHC and Yakovlev received illegal consideration from ESS.

184.   At the time the Burundi Main Contract was awarded, ES-KO was successfully performing the Burundi Interim Contract.

185.   On or about June 4, 2004, Yakovlev notified ES-KO that the Burundi Main Contract had been awarded to ESS.

186.   But for the operation of Defendants' scheme to manipulate and control the outcome of U.N. contract awards, the Burundi Main Contract would have been awarded to ES-KO.

187.   After the Procurement Division had awarded the Burundi Main Contract to ESS and ESS had commenced operations under the contract, Yakovlev, with the IHC Defendants' knowledge, consent and assistance, provided information directly to senior ESS executives, alerting them to problems with ESS's performance.

188.   Specifically, at 11:23 p.m. on the evening of April 27, 2005, Yakovlev sent Andrew Seiwert an e-mail which simply read "Dear Andy, for your urgent comments, pls."

189.   An extensive U.N. "Contractor Performance Report" and related documents were attached to the April 27, 2005 e-mail.  These materials detailed ESS's multiple failures to perform as promised on the contract.  The checklist and related documents were labeled "strictly confidential, not for release outside of the U.N."

190. By the next morning, there were indications of alarm at the offices of ESS.

191. Former defendant Seiwert immediately passed this e-mail on to former defendants Steve Kemp and Len Swain, noting that "[t]he recommendation of the local team is to not use ESS as a food-rations contractor again. Your urgent attention to this would be appreciated – please formulate an official reply to the U.N. (sent via myself to Alex Yakovlev) and comment by this weekend in detail on all the items with agreed actions and deadlines and assigned responsibilities on items which may not have been solved to date."

192. Kemp, at the time, was a Regional Operations Director with ESS. He had previously visited Burundi in an effort to rectify issues that had arisen with respect to ESS's failure to adequately perform its contract. Swain worked directly for Compass Group.

193. Seiwert also sent a copy of the email to Testa, who shared such email with other of the IHC Defendants.

194. The IHC Defendants and ESS should not have had access to this confidential information regarding ESS's failure to perform its contract.

195. ES-KO conservatively estimates its lost gross revenue on this contract as $93,617,167.

196. ES-KO suffered damages because it was not awarded the long-term ONUB contract as a result of the scheme in an amount, exclusive of pre-judgment interest, of not less than $14,042,575. ES-KO also suffered damages in the additional amount, exclusive of pre-judgment interest, of not less than $44,000 as a result of being induced by the scheme to reduce its gross margins by not less than 5% on the interim ONUB contract.

**H.    Sudan**

197. The U.N. Mission in the Sudan ("UNMIS") was established by the Security Council in March 2005 to support implementation of the Comprehensive Peace

Agreement signed by the Government of Sudan and the Sudan People's Liberation Movement/Army in January 2005 and to perform certain functions relating to humanitarian assistance and the protection and promotion of human rights.

198.    On or about December 26, 2003, the Procurement Division issued RFPS-592 for the provision of rations to 9,800 UNMIS peacekeeping troops for estimated deployment on or about February 2004 to in or about 2008 ("Sudan Bid 1"). Yakovlev was identified in RFPS for Sudan Bid 1 as the procurement officer who was the Point of Contact.

199.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about February 26, 2004.

200.    Technical proposals were publicly opened in the Bid Room of the Procurement Division at U.N. headquarters in New York on or about February 26, 2004.

201.    After the proposals were submitted, the U.N. procurement official assigned to review the technical proposals evaluated ESS's proposal as technically incompetent and documented his evaluation on U.N. records.

202.    Thereafter, when Yakovlev learned of such negative evaluation, he repeatedly attempted to pressure such official to reverse his evaluation and approve the ESS proposal as technically competent. The official refused to accede to these demands.

203.    To circumvent the negative evaluation, on or before November 4, 2004, Yakovlev arranged for the cancellation of Sudan Bid 1 and for the issuance of a new RFP, RFPS-724 ("Sudan Bid 2"). Once the bidding process had been repeated, Yakovlev then arranged for the new proposals to be submitted for technical evaluation at a time when the official who had previously provided the negative evaluation was not on the technical review team.

204.    Yakovlev was identified in the RFP for Sudan Bid 2 as the procurement officer who was the Point of Contact.

205.    In response to Sudan Bid 2, on or about December 17, 2004, ES-KO re-submitted its bid for the Sudan contract.

206.    Technical proposals were publicly opened in the Bid Room of the Procurement Division at U.N. headquarters in New York on or about December 17, 2004.

207.    The Procurement Division awarded this contract to ESS.

208.    ESS, which illegally had obtained the U.N. contracts, was not competent to service such contracts, and found itself overextended and unable to perform multiple contracts to the satisfaction of various U.N. peacekeeping missions.

209.    As part of a broader investigation concerning corruption vis-à-vis the Oil-for-Food Programme in Iraq, the International Relations Committee issued a report on December 7, 2005.

210.    As part of its research for the report, the International Relations Committee subpoenaed and received production of numerous documents from IHC.

211.    Those documents produced by IHC to the International Relations Committee included an e-mail dated November 27, 2004, in which Steve Bickerstaff ("Bickerstaff"), a Compass Group employee, summarized a meeting with Terry Allen ("Allen"), the U.N. Ration Contracts Officer for peacekeepers in Sudan, for his supervisors at ESS.

212.    According to Bickerstaff's November 27, 2004 e-mail, the meeting did not begin auspiciously:

> "Terry commenced with raising various points regarding our other contracts where ESS had problems, from Liberia to the current Kosovo contract, and stated that many questions were being asked in N[ew] Y[ork] as to our ability to mobilize another contract given our track record."

213.    However, Allen subsequently provided Bickerstaff with specific information about ES-KO's proposal in response to the first RFP for Sudan Bid 1:

"Terry stated that the contract was divided into regions due to certain companies having "very good" plans for some regions. He particularly indicated [ES-KO] here for the South. Their proposal was for a supply chain out of Entebbe using a charter plane for supply to the [South of] Sudan. This is a co-location of its supply base for its Congo contract."

214.    In his e-mail to his superiors at Compass Group, Bickerstaff also reported on a separate meeting with Andrew Robertson ("Robertson"), the Country Coordinator for U.N. Office for Project Services ("UNOPS"). Specifically, Bickerstaff informed his superiors at Compass Group that:

"[Robertson] stated that it would be received very well in the U[nited] N[ations] if we put an additional appendix to our bid stating that we wish to assist [in the] develop[ment of] the country and can assist in such ways as training of local suppliers and farmers on food production, HSE standard, transport of goods, etc."

215.    Bickerstaff's superiors at ESS quickly forwarded this e-mail to Testa.

216.    The IHC Defendants and the Yakovlevs facilitated the provision of confidential information by U.N. employees, including but not limited to Terry Allen and Andrew Robertson, to ESS regarding ESS's prospective bid for this contract so that ESS was able to underbid ES-KO, in exchange for which ESS, through the IHC Defendants, paid substantial bribes and/or other illegal consideration or remuneration to Yakovlev.

217.    The IHC Defendants should not have had access to any such information regarding either ES-KO's bid or how to improve ESS's own bid, and knew it was improper for them to be in possession of and utilize this information.

218.    The Procurement Division awarded this contract to ESS on or around December 31, 2004.

219.    The U.N. Office of Internal Oversight Services conducted an audit of rations management at UNMIS in November-December 2005.

220.    That audit uncovered a large number of serious issues pertaining to ESS's performance of this contract, including, but not limited to, the following:

(i)    The Procurement Division's presentation to the Headquarters Committee on Contracts had understated the U.N.'s financial commitment to ESS by $17 million;

(ii)    In clear contravention of U.N. policy, ESS had begun supplying UNMIS troops in May 2005, even though no formal contract had ever been signed, thus needlessly exposing the U.N. to significant legal risks in the event of a dispute with ESS;

(iii)    A dispute had arisen with respect to certain warehouse operations, giving rise to a contingent liability to ESS totaling $6 million over the life of the contract;

(iv)    UNMIS had paid ESS approximately $960,000 in avoidable expenditures for water;

(v)    UNMIS had paid ESS approximately $830,000 for warehouse operations even though the warehouses in question were neither complete nor operational;

(vi)    ESS had imported food and water with inadequate shelf life, with the result that the U.N. had paid for rations that had to be destroyed; and

(vii)    ESS had not made adequate arrangements to store composite ration packs at proper temperatures, with the result that rations had needlessly spoiled. Other ration packs were missing and unaccounted for.

221.    ES-KO would have been awarded this contract but for Defendants' illegal conduct.

8159522

222.   ES-KO estimates its lost gross revenue on this contract as not less than $201,000,000.

223.   ES-KO suffered damages in connection with this contract as a result of the scheme in an amount of not less than $30,150,000, exclusive of pre-judgment interest.

I.   **Kosovo**

224.   The U.N. Mission in Kosovo ("UNMIK") was established in June 1999 when the Security Council authorized an interim civilian administration led by the U.N. under which the Kosovars could progressively enjoy substantial autonomy from Serbia.

225.   On or about September 6, 2000, the Procurement Division issued RFP-UNMIK007/00/JC for the provision of catering services to 1,150 UNMIK special police units in Kosovo for the period of December 1, 2000 to November 30, 2002, with options for two one-year renewal periods.

226.   ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about September 25, 2000.

227.   This contract was subsequently awarded to ES-KO.

228.   ES-KO successfully performed this contract and consequently secured a two year-renewal.  In total, this contract generated $18,027,000 in revenue.

229.   As a direct result of the scheme, ES-KO was forced to reduce its gross profit margin on this contract by not less than 5%.

230.   ES-KO suffered damages in connection with this contract as a result of the scheme in an amount of not less than $901,000 exclusive of  pre-judgment interest.

231.   On or about April 2, 2004, the Procurement Division issued RFP-0103/04/NM to solicit proposals for the continuing provision of rations to special police units in

Kosovo for the period, from December 1, 2004 to December 1, 2006, following the conclusion of the existing contract.

232.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about May 10, 2004.

233.    During the four-year period preceding the submission of its proposal for this RFP, ES-KO had been satisfactorily performing its obligations under the existing UNMIK contract and had current, relevant experience in Kosovo on which to rely in preparing its technical and financial proposals.

234.    Yakovlev, through the IHC Defendants, improperly provided ESS with illicit assistance and preferential treatment and engaged in other misconduct in order to illegally control, manipulate and influence the award of the UNMIK contract to ESS. In exchange for such illicit assistance, IHC and Yakovlev received illegal consideration from ESS.

235.    This contract was subsequently awarded to ESS.

236.    But for the operation of Defendants' scheme to manipulate and control the outcome of U.N. contract awards, the UNMIK contract would have been awarded to ES-KO.

237.    ES-KO conservatively estimates its lost gross revenue on this second contract as not less than $14,608,000.

238.    ES-KO suffered damages in connection with this contract as a result of the scheme in an amount of not less than $2,191,200, exclusive of pre-judgment interest.[11]

---

[11] Since the filing of this lawsuit, the U.N. has terminated ESS's performance of the foregoing nine contracts that had been improperly awarded to ESS, and put such contracts out for re-bid. To the extent that ES-KO has been awarded any of such contracts on re-bid and performs and is compensated for such performance, ES-KO's damages against Defendants for such contracts may be mitigated.

V.    **Additional Contracts From Which ES-KO Sustained Damages Based on the Forced Reduction of its Gross Margins**

A.    **Sierra Leone**

239.    In 1999, the Security Council established the U.N. Mission in Sierra Leone ("UNAMSIL") to cooperate with the government of Sierra Leone and the other parties in a prolonged civil war in implementing the Lomé Peace Agreement and to assist in the implementation of a plan for disarmament, demobilization and reintegration.

240.    On or about November 19, 1999, the Procurement Division issued an RFP for the provision of rations to approximately 11,000 UNAMSIL peacekeeping troops for the period from April 1, 2000 to March 31, 2003 (the "UNAMSIL Contract").

241.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about January 5, 2000.

242.    Initial technical proposals were publicly opened in the Bid Room of the Procurement Division at U.N. headquarters in New York on or about January 6, 2000.

243.    Prior to the time of the submission of its proposal, ES-KO learned that ESS would be submitting bids for Sierra Leone and for East Timor (for which, as alleged supra, an RFP had been issued on November 18, 1999). ES-KO was unaware that ESS was involved in a scheme with the IHC Defendants to secure contracts through bribery, misappropriated confidential information and other illicit means but believed that it would face authentic and legitimate bidding from ESS for the UNAMSIL Contract.  Based on what ES-KO believed would be legitimate and authentic price competition from ESS, ES-KO reduced its margins by not less than 5% in formulating its proposal for the UNAMSIL Contract.

244.    The Procurement Division awarded the UNAMSIL Contract to ES-KO on or about March 10, 2000.

245.    ES-KO performed the UNAMSIL Contract satisfactorily, which generated $120,870,000 in revenue.

246.    Based on its forced reduction in its gross margin, ES-KO has been damaged in connection with the UNAMSIL Contract as a result of the scheme in an amount not less than $6,043,000, exclusive of pre-judgment interest.

**B.    Congo**

247.    The Security Council established the U.N. Organization Mission in the Democratic Republic of the Congo ("MONUC") in November 1999, to maintain liaison with The Democratic Republic of the Congo and five regional States in observing the Lusaka Ceasefire Agreement and to carry out other tasks incorporating U.N. personnel authorized in earlier Security Council resolutions.

248.    On or about March 13, 2000, the Procurement Division issued RFPS-28 for the provision of rations to 5,037 MONUC peacekeeping troops for the period of March 12, 2001 to March 12, 2004 (the "MONUC I Contract").

249.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about May 18, 2000.

250.    Initial technical proposals were publicly opened in the Bid Room of the Procurement Division at U.N. headquarters in New York on or about May 18, 2000.

251.    On or about August 4, 2000, the U.N. issued an amendment to the RFP for the MONUC I Contract, adding two additional delivery locations, and at the same time requested the bidders to provide a "Best and Final Offer."   ES-KO submitted its amended and Best and Final Offer on or about August 14, 2000.  Typically, in response to a request for a Best and Final Offer, ES-KO lowers its original price by approximately 1-2%.  However, as a direct result of Defendants' scheme, ES-KO was forced to reduce the selling price for the items provided under

8159522                                                    54

this contract by approximately 12% in total. At the time of submitting this drastically reduced bid, ES-KO was unaware of the scheme and mistakenly believed that it was responding to authentic and legitimate pricing competition from ESS.

252.    The Procurement Division awarded the MONUC I Contract to ES-KO on or about October 18, 2000.

253.    ES-KO performed the MONUC I Contract satisfactorily and this contract generated $29,361,000 in revenue.

254.    Based on its forced reduction in its gross margin, ES-KO has been damaged in connection with this contract as a result of the scheme in an amount of not less than $3,523,000, exclusive of pre-judgment interest.

255.    On or about September 23, 2003, the Procurement Division issued RFPS-558 for the provision of rations to 10,040 peacekeeping troops in Congo from March 13, 2004 to March 12, 2007, with an option to extend for an additional two years (the "MONUC II Contract"). The MONUC II Contract was for the continuation of services following the conclusion of the MONUC I Contract.

256.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about October 31, 2003. At the time of the submission of its proposal, ESS had just been awarded a series of contracts by the U.N. ES-KO was unaware that these contracts had been secured by ESS, with the IHC Defendants' assistance, through illegal means and believed that these awards had been obtained through authentic and legitimate pricing competition. Based on this mistaken belief, ES-KO reduced its margins by not less than 12% in formulating its proposal for the MONUC II Contract.

257.    Technical proposals were publicly opened in the Bid Room of the Procurement Division at U.N. headquarters in New York on or about October 31, 2003. Yakovlev was the Point of Contact for the MONUC II Contract.

258.    ES-KO was notified by the Procurement Division of its receipt of the award on or about December 11, 2003.

259.    This contract generated $189,844,000 in revenue.

260.    ES-KO has been damaged in connection with this contract as a result of the scheme in an amount estimated to be not less than $22,781,000, exclusive of pre-judgment interest.

C.    **Haiti**

261.    The U.N. Stabilization Mission in Haiti ("MINUSTAH") was established in April 2004 when the Security Council found that Haiti's internal instability continued to constitute a threat to international peace and security in the region.  The Mission requested that authority over Haiti's peacekeeping force be transferred from the Multinational Interim Force to MINUSTAH on June 1, 2004.

262.    On or about March 24, 2004, the Procurement Division issued RFPS-626 for the provision of rations to 1,500 peacekeeping troops in Haiti from July 4, 2004 to July 3, 2006.  Yakovlev was the procurement officer who was the Point of Contact for this contract.

263.    ES-KO submitted its technical and financial proposals in separate, sealed envelopes on or about April 30, 2004.

264.    Technical proposals were publicly opened in the Bid Room of the Procurement Division at U.N. headquarters in New York on or about April 30, 2004.

265.    The Procurement Division thereafter awarded this contract to ES-KO.

266.   It is estimated that revenue generated during the term of this contract will be approximately $85,761,000.

267.   In formulating its financial proposal for the MINUSTAH RFP, ES-KO reduced its margins by not less than 5% in an attempt not to be underbid. Such reduced margins were adopted by ES-KO, unaware of the ongoing scheme, in the mistaken belief that it was responding to authentic and legitimate pricing competition from ESS.

268.   ES-KO suffered damages in connection with this contract as a result of the scheme in an amount of not less than $4,288,000, exclusive of pre-judgment interest.

## VI.  Contracts Lost by ES-KO to Cogim and Corimec

269.   In addition to the foregoing, ES-KO has learned since the filing of the initial Complaint in this action that it also lost at least four U.N. contracts for prefabricated buildings that were awarded to either Cogim or Corimec during the Relevant Period as a result of the Defendants' bid-rigging scheme.   In each case, Yakovlev, with the IHC Defendants' assistance, illegally secured the award of such contracts to Cogim and Corimec as a result of the scheme.   The IHC Defendants, including IHC, Testa, Quinteros, Etherson and Picco, all conducted substantial activities in New York on behalf of Cogim and Corimec with respect to the scheme as it affected the award of each of the four contracts discussed in detail below.   But for such scheme, which, like the rest of the scheme, was actively concealed by Defendants, ES-KO would have been awarded each of such contracts.   ES-KO estimates that the revenue lost as a result of not having been awarded such contracts for prefabricated buildings was approximately $95 million.   ES-KO's damages for such contracts are approximately $19 million (excluding pre-judgment interest).   On or about March 16, 2007, the U.N. removed Cogim from its list of approved contractors, and suspended Corimec as well.

**A.     Cogim**

270.    On or about June 20, 1999, the Procurement Division issued an ITB for the provision of prefabricated kitchen modules and "ablution units" to multiple U.N. sites over five years.  Yakovlev was the "Point of Contact" for this ITB.

271.    ES-KO submitted its technical and financial proposals to the Procurement Department in New York in separate, sealed envelopes on or about July 13, 1999.

272.    Cogim submitted its technical and financial proposals to the Procurement Department in New York in separate, sealed envelopes on or about July 13, 1999.

273.    ES-KO's and Cogim's technical and financial proposals for this contract were opened at U.N. Headquarters in New York on or about July 13, 1999.

274.    ES-KO's bid was technically compliant.

275.    ES-KO submitted the lowest-priced  bid for the "ablution units."

276.    Notwithstanding its technical compliance and competitive pricing, on or about August 30, 1999, ES-KO received a fax from Yakovlev in New York, informing ES-KO that Cogim had been awarded this contract over ES-KO.

277.    On or around September 7, 1999, ES-KO wrote Yakovlev to request a meeting at U.N. Headquarters in New York to review why ES-KO had not been awarded this contract.

278.    At that meeting in New York, Yakovlev informed ES-KO that its bid had been eliminated on the basis of its alleged non-compliance with the technical requirements for this contract. In fact, the ES-KO bid had been fully compliant but had been eliminated by Yakovlev  in order to illegally manipulate the result in favor of Cogim.

279.    Andrew Toh, who has been suspended by the U.N. pending a full investigation of his role in the scheme, signed this contract on behalf of the U.N.

280.   Prior to initial exposure of IHC's role in the scheme in 2005, Cogim was listed as one of IHC's "clients" on IHC's website.

281.   During the criminal trial of Vladimir Kuznetsov for money laundering, Yakovlev testified that he had been contacted in New York by Leopold Braghieri, Cogim's top executive (who formerly had worked for Corimec), who had sought Yakovlev's illicit assistance in obtaining this contract.  Yakovlev further testified he had received $250,000 from Cogim in exchange for that "assistance."

282.   After being awarded this contract, Cogim submitted regular invoices to the U.N. in New York, and thereafter Cogim received payments from the U.N. over several years under this contract and profited thereby, a portion of which it paid to IHC and/or Yakovlev over time in exchange for IHC's and/or Yakovlev's illicit "services" in procuring this contract.  In reality, each payment Cogim made to IHC and/or Yakovlev was a bribe for their role in illicitly securing the award of such contract for Cogim.

283.   But for the operation of Defendants' illegal scheme to manipulate and control the outcome of U.N. contract awards, this contract would have been awarded to ES-KO.

284.   ES-KO conservatively estimates its lost gross revenue on this contract as not less than $18,100,000.

285.   ES-KO suffered damages in connection with this contract as a result of the scheme in an amount of not less than $3,620,000, exclusive of pre-judgment interest.

## B.    Corimec

286.   On or about September 16, 1999, the Procurement Department issued an RFP for the provision of prefabricated kitchen modules.  Yakovlev was the "Point of Contact" for this RFP.

287.   ES-KO submitted its technical and financial proposals to the Procurement Division in New York in separate, sealed envelopes on or about October 4, 1999.

288.   IHC submitted Corimec's technical and financial proposals to the Procurement Division in New York in separate, sealed envelopes on or about October 4, 1999.

289.   ES-KO's and Corimec's technical and financial proposals for this contract were opened at U.N. Headquarters in New York on or about October 4, 1999.

290.   This contract was subsequently awarded to Corimec.

291.   Andrew Toh, who has been suspended by the U.N. pending a full investigation of his role in the scheme, signed this contract on behalf of the U.N.

292.   IHC served as Corimec's "vendor intermediary" with regard to this bid.

293.   After being awarded this contract, Corimec submitted regular invoices to the U.N. in New York, and thereafter, Corimec received payments from the U.N. over several years under this contract and profited thereby, a portion of which it paid as bribes to IHC and/or Yakovlev over time in exchange for IHC's and/or Yakovlev's illicit "services" in procuring this contract.  In reality, each payment Corimec made to IHC and/or Yakovlev was a bribe for their role in illicitly securing the award of such contract to Corimec.

294.   But for the operation of Defendants' illegal scheme to manipulate and control the outcome of U.N. contract awards, this contract would have been awarded to ES-KO.

295.   ES-KO conservatively estimates its lost gross revenue on this contract as not less than $3,100,000.

296.   ES-KO suffered damages in connection with this contract as a result of the scheme in an amount of not less than $620,000, exclusive of pre-judgment interest.

297.    On or about November 20, 2001, the Procurement Department issued RFPG-103, requesting bids for the provision of prefabricated buildings for U.N. peacekeeping missions.

298.    ES-KO submitted its technical and financial proposals to the Procurement Division in New York in separate, sealed envelopes on or about December 28, 2001.

299.    Corimec submitted its technical and financial proposals to the Procurement Division in New York in separate, sealed envelopes on or about December 28, 2001.

300.    ES-KO's and Corimec's technical and financial proposals for this contract were opened at U.N. Headquarters in New York on or about December 28, 2001.

301.    This contract was subsequently awarded to Corimec.

302.    Sanjay Bahel, who has been suspended by the U.N. pending a full investigation of his role in the scheme, signed this contract on behalf of the U.N.

303.    After being awarded this contract, Corimec submitted regular invoices to the U.N. in New York, and thereafter, Corimec received payments from the U.N. over several years under this contract and profited thereby, a portion of which it paid as bribes to IHC and/or Yakovlev over time in exchange for IHC's and/or Yakovlev's illicit "services" in procuring this contract. In reality, each payment Corimec made to IHC and/or Yakovlev was a bribe for their role in illicitly securing the award of such contract for Corimec.

304.    But for the operation of Defendants' illegal scheme to manipulate and control the outcome of U.N. contract awards, this contract would have been awarded to ES-KO.

305.    On or about December 5, 2001, the Procurement Department issued RFPG-105, seeking bids for the provision of refurbished prefabricated buildings.

306.   ES-KO submitted its technical and financial proposals to the Procurement Department in New York in separate, sealed envelopes on or about January 5, 2002.

307.   Corimec submitted its technical and financial proposals to the Procurement Department in New York in separate, sealed envelopes on or about January 5, 2002.

308.   ES-KO's and Corimec's technical and financial proposals for this contract were opened at U.N. Headquarters in New York on or about January 5, 2002.

309.   This contract was subsequently awarded to Corimec.

310.   After being awarded this contract, Corimec submitted regular invoices to the U.N. in New York, and thereafter, Corimec received payments from the U.N. over several years under this contract and profited thereby, a portion of which it paid to IHC and/or Yakovlev over time in exchange for IHC's and/or Yakovlev's illicit "services" in procuring this contract, and the last of which was paid to Corimec in 2006.  In reality, each payment Corimec made to IHC and/or Yakovlev was a bribe for their role in illicitly securing the award of such contract for Corimec.

311.   But for the operation of Defendants' illegal scheme to manipulate and control the outcome of U.N. contract awards, this contract would have been awarded to ES-KO.

312.   ES-KO conservatively estimates its lost gross revenue on the latter two contracts as not less than $74,000,000.

313.   ES-KO suffered damages in connection with these two contracts as a result of the scheme in an amount of not less than $14,800,000, exclusive of pre-judgment interest.

**VII. The Sale of IHC Just Prior to the Collapse of the Scheme**

314.    On or about September 13, 2004 ESS publicly announced its "new best in class" business partnership with IHC. In reality, the so-called "new" ESS-IHC business partnership was merely one means by which ESS sought to disguise the illegal bribes and other illegal payments made by ESS through IHC to Yakovlev.

315.    On or about June 3, 2005, in the aftermath of the indictment of Picco's clients Chalmers and Bayoil in connection with alleged illegal kickbacks under the U.N. Oil-for-Food Programme, IHC's stock was purchased by Alliance Investment Development Ltd., a company registered in the British Virgin Islands, formerly known as Strategic International Alliance Limited, with its primary business address in Guernsey in the British Channel Islands. The sale was structured and timed to distance Torno and Torno S.p.A., Dario Fischer, Engelbert Schreiber and others from the scheme in the midst of federal criminal and other regulatory scrutiny as to misconduct in various U.N. procurement programs. For this purpose as well as for other presently unknown purposes, ownership interest in IHC was transferred away from certain participants in the scheme thus attempting to insulate those participants from discovery through the use of corporate shells and nominee entities representing undisclosed principals. Peter Harris and Andrew Seiwert represented the buyers of IHC in that transaction, and Harris was identified as the sole director of Strategic International Alliance Limited. Also present at the closing to finalize the transaction were representatives of a British Virgin Islands entity named Oak Directors Limited which maintains a registered office at the same location in Road Town, Tortola, British Virgin Islands, as Alliance Investment Development Ltd. Dario Fischer represented Torno S.A.H. at the closing.

316.    Strategic International Alliance, Ltd. ("SIAL") an "off-the-shelf" holding company, was registered in the British Virgin Islands on May 12, 2005. SIAL changed its name

to "Alliance Investment Development Ltd." ("Alliance"), the day before the stock purchase, on June 2, 2005.

317.    The sole director of SIAL/Alliance was another "off-the-shelf" company, Oak Directors Ltd. ("Oak Directors").  Oak Directors is a corporation incorporated under the laws of the British Virgin Islands.

318.    The sole shareholder of SIAL/Alliance was a third "off-the-shelf" company, Oak Nominees, Ltd. ("Oak Nominees").  Oak Nominees is a corporation incorporated under the laws of the British Virgin Islands.  Oak Nominees is a nominal shareholder, which acts only on the instructions of—and serves to conceal the identities of—John Doe Defendants, who are IHC's true owners, and participants in the scheme.  Oak Directors, Oak Nominees and SIAL/Alliance's company secretary, Oak Secretaries, Ltd., which is also incorporated under the laws of the British Virgin Islands, and Alliance, are all located at the same office address in St. Peter Port, Guernsey, Channel Islands.

319.    Oak Directors remains the sole director of SIAL/Alliance, and Oak Nominees remains the sole shareholder of SIAL/Alliance.

## CLAIMS FOR RELIEF

### COUNT I

### (CIVIL RICO BASED ON THE DEFENDANTS' PARTICIPATION IN THE AFFAIRS OF THE PROCUREMENT DIVISION)

### (AS AGAINST IHC DEFENDANTS, COGIM, CORIMEC, ALEXANDER YAKOVLEV, DMITRY YAKOVLEV, AND JOHN DOE DEFENDANTS)

320.    ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 319 above.

8159522                                                64

321.   During the relevant period, the Procurement Division of the U.N. has been an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which was engaged in, or the activities of which affected, interstate or foreign commerce.

322.   The Procurement Division was established and is maintained and operated by the U.N. to procure goods and services for, among others, all U.N. peacekeeping missions worldwide.  At all relevant times, the Procurement Division had established procedures designed to protect the integrity of the U.N. procurement process and to cause providers and other contractors to be selected on the basis of a fair and impartial evaluation of relevant factors. These procedures include the requirement that companies seeking the award of a procurement contract provide the U.N. with proposals that include information sufficient in scope and detail to allow the U.N. to evaluate whether the company has the necessary capability, experience, knowledge, expertise and  financial strength to perform the contract satisfactorily.

323.   At all relevant times, Yakovlev and John Doe Defendants who were or are employees of the Procurement Division (the "Employee Defendants") were employed by the Procurement Division.

324.   At all relevant times, the IHC Defendants and other John Doe Defendants associated with IHC and "clients" of IHC, including Cogim and Corimec, which engaged IHC as their vendor intermediary to procure, by illegal means, the award of U.N. contracts (the "Client Participants"), were associated with the Procurement Division through their participation in and their direct and/or indirect control over the affairs of the Procurement Division, including, without limitation, the award of U.N. procurement contracts.

325.   The means by which the Defendants and the Client Participants exercised influence and control over, and participated in, the affairs of the Procurement Division included, but were not limited to: (i) the payment of bribes to Employee Defendants to secure their

assistance throughout the procurement process; (ii) the procurement by the IHC Defendants of ES-KO's proprietary information through the use of bribes paid to the Employee Defendants; (iii) the unauthorized use by the IHC Defendants of such proprietary information in the preparation of contract proposals to be submitted by or on behalf of the Client Participants under the false pretense that such proposals were prepared based upon the capability, experience, knowledge and expertise of the Client Participants; (iv) the improper modification of contract proposals which had already been submitted for the purpose of having such modified proposals presented for evaluation and/or approval by U.N. officials under false pretense that such proposals had been submitted concurrently with ES-KO's proposals; and (v) the concealment of the foregoing activities from ES-KO and from other officials of the U.N. having authority over the procurement process.

326.    The Defendants influenced, participated and controlled the affairs of the Procurement Division through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962 (c).  The conduct and acts of the Defendants are related to each other as parts of a common or shared purpose, intent and economic motive, namely, to violate and circumvent the legitimate, authorized bidding procedures of the U.N. in order to control the award of procurement contracts for the respective financial benefit of the Defendants.

327.    The racketeering activity of the Defendants consisted of numerous acts which are chargeable under New York law and punishable by imprisonment under such law for more than one year and which fall within the scope of 18 U.S.C. § 1961 (1)(A) and (5), including commercial bribery as proscribed by New York Penal Law §§ 180.03 and 180.08 in that, during the Relevant Period, the IHC Defendants conferred, offered and agreed to make illicit payments of money in amounts in excess of $1,000 to the Employee Defendants, including Yakovlev, with the intent to cause and in fact causing the Employee Defendants to breach their duties to their

employer and to violate the procurement contract award procedures of the U.N. by obtaining and providing to the Client Participants and IHC, for their illicit and illegal use, confidential and proprietary information belonging to ES-KO and otherwise improperly administering U.N. procurement procedures in order to secure valuable procurement contracts for the Client Participants and thereby caused the U.N. economic harm.

328.    The racketeering activity of the Defendants also included numerous acts perpetrated during the Relevant Period which are indictable under 18 U.S.C. § 1341 (relating to mail fraud) and which are within the scope of 18 U.S.C. § 1961(1)(B) and (5), including the use by Defendants of United States mails to: (i) cause or direct the exchange among the Defendants and the Client Participants of misappropriated confidential and/or proprietary information pertaining to proposals for the award of multiple U.N. contracts; (ii) pay bribes and/or other illegal consideration to the Employee Defendants as remuneration for the aforementioned information; (iii) submit, under false pretenses, recommendations and proposals to the U.N. Headquarters Committee on Contracts incorporating pricing and other confidential information misappropriated from ES-KO; and (iv) engage in money laundering with respect to bribe money.

329.    Each of the acts referred to in paragraph 328 hereof constituted the placement in a post office or authorized depository for mail of a matter or thing to be sent or delivered by the post office department for the purpose of executing a scheme to defraud which had been devised by the Defendants, and Defendants caused to be made each of such mailings with the specific intent of furthering the said scheme.

330.    The racketeering activity of the Defendants also included numerous acts perpetrated during the Relevant Period which are indictable under 18 U.S.C. § 1343 (relating to wire fraud) and which fall within the scope of 18 U.S.C. § 1961(1)(B), including the use by Defendants of interstate wires to: (i) make dozens, if not hundreds, of phone calls among

Defendants in connection with the furtherance and/or concealment of the Defendants' scheme to interfere with the legitimate procedures of the Procurement Division for the award of contracts and to conceal such interference; (ii) cause or direct the exchange of confidential and/or proprietary documents and information pertaining to proposals for U.N. contracts; (iii) pay or arrange for the payment of bribes and/or other illegal consideration as remuneration for the aforementioned information; (iv) submit, under the false pretense of constituting the work product of the Client Participants, proposals to the U.N. Headquarters Committee on Contracts incorporating pricing and other confidential information that had been misappropriated from ES-KO; and (v) engage in money laundering with respect to bribe money.

331. Each of the acts referred to in paragraph 330 hereof constituted the transmittal by means of wire communication in interstate commerce of signals, sounds or writings for the purpose of executing the scheme to defraud which had been devised by Defendants, and Defendants caused to be made each of such transmittals with the specific intent of furthering and concealing the said scheme.

332. The conduct of the scheme to control the award of U.N. procurement contracts through a pattern of racketeering activity (the "Scheme") was continuous. It extended over a substantial amount of time, involved multiple acts of bribery, hundreds of acts of mail and wire fraud, was directed at numerous U.N. procurement contracts, and caused numerous separate and distinct injuries. But for the exposure of the Scheme and the intervention of law enforcement authorities, the Scheme would have continued indefinitely.

333. By means of the foregoing violations of RICO, Plaintiff was injured in its business and property in an amount in excess of $131 million.

## COUNT II

## (CIVIL RICO CONSPIRACY)

## (AS AGAINST ALL DEFENDANTS)

334.    ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 333 above.

335.    Defendants conspired to commit the violations of 18 U.S.C. § 1962(c) alleged in paragraphs 320 through 333 above.

336.    At all relevant times, each Defendant agreed and conspired to participate, directly and indirectly, in the conduct of the Procurement Division through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

337.    The Defendants committed and/or caused to be committed a series of overt acts in furtherance of the conspiracy alleged herein and to effect the objectives of the Scheme.

338.    By means of the foregoing violations of RICO, Plaintiff was injured in its business and property in an amount in excess of $131 million.

## COUNT III

## (CIVIL RICO BASED ON CERTAIN DEFENDANTS' ASSOCIATION–IN–FACT AS A CRIMINAL ENTERPRISE)

## (AS AGAINST THE CORE ENTERPRISE DEFENDANTS)

339.    ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 338 above.

340.    At all relevant times, Yakovlev, Dmitry Yakovlev, and the IHC Defendants (the "Core Enterprise Defendants"), associated with each other to form an association-in-fact which was an "enterprise" (referred to herein as "Enterprise I") within the

meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and which was engaged in, or the activities of which affected, interstate or foreign commerce.

341.    Enterprise I continued as a unit with a core of the same membership as an on-going combination from late 1999 until intercepted by law enforcement in 2005.

342.    At all relevant times, the Core Enterprise Defendants participated in the conduct of Enterprise I through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962 (c).

343.    The conduct and acts of the Core Enterprise Defendants are related to each other as parts of a common or shared purpose, intent and economic motive, namely, to violate and circumvent the legitimate, authorized bidding procedures of the U.N. in order to control the award of procurement contracts for the respective financial benefit of the Core Enterprise Defendants.   The financial interests of Enterprise I were served by diverting awards of U.N. contracts from lowest-bidding qualified vendors to the Client Participants, including ESS, Cogim and Corimec, who had agreed to pay bribes to Yakovlev and other Core Enterprise Defendants and to remunerate the IHC Defendants for their illicit assistance in circumventing U.N. award procedures.

344.    The illicit assistance provided by the Core Enterprise Defendants included, without limitation: (i) obtaining for the benefit of the Client Participants, confidential, proprietary information supplied to the U.N. by other participants in the U.N. bidding process; (ii) modifying contract proposals submitted by Client Participants after their official submission for the purpose of underbidding other legitimate competitive proposals; and (iii) submitting for approval, under false pretenses, such modified Client Participant proposals to officials of the U.N.

345.    The racketeering activity of the Core Enterprise Defendants consisted of numerous acts which are chargeable under New York law and punishable by imprisonment under such law for more than one year and which fall within the scope of 18 U.S.C. § 1961 (1)(A) and (5), including commercial bribery as proscribed by New York Penal Law §§ 180.03 and 180.08 in that, during the Relevant Period, IHC Defendants, acting through their respective agents and employees, on multiple occasions, conferred, offered and agreed to make illicit payments of money in amounts in excess of $1,000, to employees of the U.N., including Yakovlev and the foregoing John Doe Defendants, with the intent to influence and in fact causing such employees to breach their duties to their employer and to violate the procurement contract award procedures of the U.N. by obtaining and providing to the Client Participants and IHC Defendants, for such persons' illicit and illegal use, confidential and proprietary information belonging to ES-KO and otherwise improperly administering U.N. procurement procedures in order to secure valuable procurement contracts for the Client Participants and thereby caused the U.N. economic harm.

346.    The racketeering activity of the Core Enterprise Defendants also included numerous acts perpetrated during the Relevant Period which are indictable under 18 U.S.C. § 1341 (relating to mail fraud) and which are within the scope of 18 U.S.C. § 1961(1)(B) and (5), including the use by Core Enterprise Defendants of United States mails to: (i) cause or direct the exchange among the Core Enterprise Defendants of misappropriated confidential and/or proprietary information pertaining to proposal for the award of multiple U.N. contracts; (ii) pay bribes and/or other illegal consideration or remuneration for the aforementioned misappropriated information; (iii) submit, under the false pretense of constituting the work product of the Client Participants, proposals to the U.N. Headquarters Committee on Contracts incorporating pricing

and other confidential information that had been misappropriated from ES-KO; and (iv) engage in money laundering with respect to bribe money.

347.    Each of the acts referred to in paragraph 346 hereof constituted the placement in a post office or authorized depository for mail of a matter or thing to be sent or delivered by the post office department for the purpose of executing a scheme to defraud which had been devised by the Core Enterprise Defendants, and the Core Enterprise Defendants caused to be made each of such mailings with the specific intent of furthering such scheme.

348.    The racketeering activity of the Core Enterprise Defendants also included numerous acts perpetrated during the Relevant Period which are indictable under 18 U.S.C. § 1343 (relating to wire fraud) and which fall within the scope of 18 U.S.C. § 1961 (1)(B), including the use by the Core Enterprise Defendants of interstate wires to: (i) make dozens, if not hundreds, of phone calls among the Core Enterprise Defendants and the Client Participants in connection with the furtherance and/or concealment of the Core Enterprise Defendants' scheme to interfere with the legitimate procedures of the Procurement Enterprise for the award of contracts and to conceal such interference; (ii) cause or direct the exchange of confidential and/or proprietary documents and information pertaining to bids on multiple U.N. contracts; (iii) pay bribes and/or other illegal consideration or remuneration for the aforementioned information; (iv) submit, under the false pretense of constituting the work product of the Client Participants, proposals to the U.N. Headquarters Committee on Contracts incorporating the misappropriated pricing and other proprietary information of ES-KO; and (v) engage in money laundering with respect to bribe money.

349.    Each of the acts referred to in paragraph 348 hereof constituted the transmittal by means of wire communication in interstate commerce of signals, sounds or writings for the purpose of executing Enterprise I, which had been devised by the Core

Enterprise Defendants, and the Core Enterprise Defendants caused to be made each of such transmittals with the specific intent of furthering and concealing the Scheme.

350.    The conduct of Enterprise I was continuous.  It extended over a substantial amount of time, involved multiple acts of bribery, hundreds of acts of mail and wire fraud, was directed at numerous contracts, caused numerous separate and distinct injuries, and constituted Enterprise I's regular way of conducting business. But for the exposure of the Scheme and the intervention of law enforcement authorities, Enterprise I would have continued indefinitely.

351.    By means of the foregoing violations of RICO, Plaintiff was injured in its business and property in an amount in excess of $131 million.

## COUNT IV

## (CIVIL RICO CONSPIRACY)

## (AS AGAINST COGIM AND CORIMEC)

352.    ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 351 above.

353.    Defendants Cogim and Corimec conspired to commit the violations of 18 U.S.C. § 1962(c) alleged in paragraphs 339 through 351 above.

354.    At all relevant times, Cogim and Corimec agreed and conspired to participate, directly and indirectly, in the conduct of Enterprise I through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

355.    Cogim and Corimec committed and/or caused to be committed a series of overt acts in furtherance of the conspiracy alleged herein and to effect the objectives of Enterprise I including, without limitation, the payment of bribes in exchange for the illicit assistance of the Core Enterprise Defendants in obtaining the award of U.N. procurement contracts.

356.  By means of the foregoing violations of RICO, Plaintiff was injured in its business and property in an amount in excess of $131 million.

## COUNT V

### (CIVIL RICO BASED ON THE ASSOCIATION–IN–FACT OF ALL DEFENDANTS AS A CRIMINAL ENTERPRISE)

### (AS AGAINST ALL DEFENDANTS)

357.  ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 356 above.

358.  During the Relevant Period, Defendants associated with each other to form an association-in-fact which was an "enterprise" (referred to herein as "Enterprise II") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and which was engaged in, or the activities of which affected, interstate or foreign commerce.

359.  This Enterprise II continued as a unit with a core of the same membership for a substantial amount of time as an on-going combination.

360.  At all relevant times, Defendants and the Client Participants participated in the conduct of Enterprise II through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962 (c).

361.  The conduct and acts of the Defendants are related to each other as parts of a common or shared purpose, intent and economic motive, namely, to violate and circumvent the legitimate, authorized bidding procedures of the U.N. in order to control the award of procurement contracts for the respective financial benefit of the Defendants. The interests of the participants in Enterprise II were served by diverting contract awards which would have been made to ES-KO to the Client Participants by illicit means including, without limitation, the use and exploitation of misappropriated confidential, proprietary information supplied to the U.N. by

other participants in the U.N. bidding process, including ES-KO, and by the payment of bribes to employees of the U.N. having responsibility for contract awards, including Yakovlev and the John Doe Defendants, in exchange for obtaining and providing to IHC and the Client Participants the misappropriated information and for other improper assistance in securing contracts.

362.    The racketeering activity of the Defendants consisted of numerous acts which are chargeable under New York law and punishable by imprisonment under such law for more than one year and which fall within the scope of 18 U.S.C. § 1961 (1)(A) and (5), including commercial bribery as proscribed by New York Penal Law §§ 180.03 and 180.08 in that, during the Relevant Period, the Client Participants and IHC Defendants, acting through their respective agents and employees, on multiple occasions, conferred, offered and agreed to make illicit payments of money in amounts in excess of $1,000, to employees of the U.N., including Yakovlev and the John Doe Defendants, with the intent to influence and in fact causing such employees to breach their duties to their employer, and to violate the procurement contract award procedures of the U.N. by obtaining and providing to the Client Participants and IHC Defendants, for such Defendants' illicit and illegal use, confidential and proprietary information belonging to ES-KO and otherwise improperly administering U.N. procurement procedures in order to secure valuable procurement contracts for the Client Participants and thereby caused the U.N. harm.

363.    The racketeering activity of the Defendants also included numerous acts perpetrated during the Relevant Period which are indictable under 18 U.S.C. § 1341 (relating to mail fraud) and which are within the scope of 18 U.S.C. § 1961(1)(B) and (5), including the use by Defendants of United States mails to:  (i) cause or direct the exchange among the Defendants of misappropriated confidential and/or proprietary information pertaining to proposal for the

award of multiple U.N. contracts; (ii) pay bribes and/or other illegal consideration or remuneration for the aforementioned misappropriated information; (iii) submit, under the false pretense of constituting the work product of the Client Participants, proposals to the United Nations Headquarters Committee on Contracts incorporating pricing and other confidential information that had been misappropriated from ES-KO; and (iv) engage in money laundering with respect to bribe money.

364.    Each of the acts referred to in paragraph 363 hereof constituted the placement in a post office or authorized depository for mail of a matter or thing to be sent or delivered by the post office department for the purpose of executing a scheme to defraud which had been devised by Defendants, and Defendants caused to be made each of such mailings with the specific intent of furthering such scheme.

365.    The racketeering activity of the Defendants also included numerous acts perpetrated during the Relevant Period which are indictable under 18 U.S.C. § 1343 (relating to wire fraud) and which fall within the scope of 18 U.S.C. § 1961 (1)(B), including the use by Defendants of interstate wires to (i) make dozens, if not hundreds, of phone calls among Defendants in connection with the furtherance and/or concealment of the Defendants' scheme to interfere with the legitimate procedures of the Procurement Enterprise for the award of contracts and to conceal such interference; (ii) cause or direct the exchange of confidential and/or proprietary documents and information  pertaining to bids on multiple U.N. contracts; (iii) pay bribes and/or other illegal consideration or remuneration for the aforementioned information; (iv) submit, under the false pretense of constituting the work product of the Client Participants, proposals to the United Nations Headquarters Committee on Contracts incorporating the misappropriated pricing and other proprietary information of ES-KO; and (v) engage in money laundering with respect to bribe money.

366.    Each of the acts referred to in paragraph 365 hereof constituted the transmittal by means of wire communication in interstate commerce of signals, sounds or writings for the purpose of executing Enterprise II, which had been devised by Defendants, and Defendants caused to be made each of such transmittals in furtherance of the Scheme with the specific intent to rig bids and to conceal such Scheme.

367.    The conduct of Enterprise II was continuous.    It extended over a substantial amount of time, involved multiple acts of bribery, hundreds of acts of mail and wire fraud, was directed at numerous contracts, caused numerous separate and distinct injuries, and constituted Enterprise II's regular way of conducting business. But for the exposure of the scheme and then intervention of law enforcement authorities, Enterprise II would have continued indefinitely.

368.    By means of the foregoing violations of RICO, Plaintiff was injured in its business and property in an amount in excess of $131 million.

## COUNT VI

## (CIVIL RICO CONSPIRACY)

## (AS AGAINST ALL DEFENDANTS)

369.    ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 368 above.

370.    Defendants conspired to commit the violations of 18 U.S.C. § 1962(c) alleged in paragraphs 357 through 368 above.

371.    At all relevant times, each Defendant agreed and conspired to participate, directly and indirectly, in the conduct of Enterprise II through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

372.    Defendants committed and/or caused to be committed a series of overt acts in furtherance of the conspiracy alleged herein and to effect the objectives of the Scheme.

373.    By means of the foregoing violations of RICO, Plaintiff was injured in its business and property in an amount in excess of $131 million.

## COUNT VII

## (ROBINSON-PATMAN ACT)

## (AS AGAINST DEFENDANTS COGIM AND CORIMEC AND IHC DEFENDANTS)

374.    ES-KO repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 373 above.

375.    ES-KO is a "person" within the meaning of 15 U.S.C. § 7.

376.    Defendants Cogim and Corimec and the IHC Defendants are "persons" within the meaning of 15 U.S.C. § 7.

377.    ES-KO, Cogim and Corimec are competitors in the global market for the supply of food rations and other products to the U.N.

378.    IHC, Cogim and Corimec were engaged in commerce during the Relevant Period.

379.    In the course of such commerce, the IHC Defendants, on behalf of Cogim and Corimec, directly, or indirectly through an agent, representative or other intermediary paid or granted a commission, brokerage or other compensation of significant value to Yakovlev, and or an agent, representative or other intermediary acting for or on his behalf.

380.    This commission, brokerage or other compensation consisted of bribes paid to Yakovlev, and retained by Yakovlev for his personal benefit.    The commission, brokerage or other compensation was not paid in exchange for services rendered in connection with the sale or purchase of goods.

381.    At all times during the Relevant Period, Yakovlev was an agent of the U.N., and owed fiduciary duties to the U.N. in such capacity.  Accepting the bribes from Cogim, Corimec and the IHC Defendants constituted a breach of Yakovlev's fiduciary duty to the U.N.

382.    Yakovlev at all times concealed from the U.N. his acceptance of the bribes.

383.    Payment of the bribes constituted a per se violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

384.    Through their Robinson-Patman Act violations, Cogim, Corimec and the IHC Defendants injured, destroyed or prevented competition in the market for the supply of food rations and other goods and services to U.N. peacekeeping missions.  As a result of these violations, ES-KO lost U.N. food rations contracts worth approximately $574 million and other U.N. contracts for the provision of prefabricated buildings worth approximately $95 million, plus additional significant amounts resulting from costs incurred in the preparation of bid submissions for contracts that were fraudulently obtained and fraudulently retained by the Client Participants. In addition, ES-KO was forced to reduce its bids on other contracts with a total value of approximately $473 million, causing ES-KO additional losses.

385.    ES-KO's injuries resulted from the direct, substantial and reasonably foreseeable effect of the anti-competitive and unlawful conduct of  Cogim, Corimec and IHC on United States and/or foreign commerce.

386.    As a result of their conduct,  Cogim, Corimec and the IHC Defendants are liable for ES-KO's losses in an amount to be determined at trial.

387.    Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, ES-KO is entitled to recover threefold its damages plus costs and attorneys' fees from Cogim, Corimec, and the IHC Defendants, as well as injunctive relief.

## COUNT VIII

## (ROBINSON-PATMAN ACT)

## (AS AGAINST DEFENDANT ALEXANDER YAKOVLEV)

388.    ES-KO repeats and realleges, as if fully set forth hereto, the allegations contained in paragraphs 1 through 387 above.

389.    ES-KO is a "person" within the meaning of 15 U.S.C. § 7.

390.    Yakovlev is a "person" within the meaning of 15 U.S.C. § 7.

391.    ES-KO, Cogim and Corimec are competitors in the global market for the supply of prefabricated buildings to U.N. peacekeeping missions.

392.    Yakovlev was engaged in commerce during the Relevant Period.

393.    In the course of such commerce, Yakovlev, and or an agent, representative or other intermediary acting for or in his behalf, received or accepted a commission, brokerage or other compensation of significant value from the IHC Defendants, on behalf of the Client Participants.

394.    This commission, brokerage or other compensation consisted of bribes paid directly by the Client Participants or indirectly through the IHC Defendants to Yakovlev, and retained by Yakovlev for his personal benefit.  The commission, brokerage or other compensation was not paid in exchange for services rendered in connection with the sale or purchase of goods.

395.    At all times during the Relevant Period, Yakovlev was an agent of the U.N., and owed fiduciary duties to the U.N. in such capacity.  Accepting the bribes constituted a breach of Yakovlev's fiduciary duty to the U.N.

396.    Yakovlev at all times concealed from the U.N. his acceptance of the bribes.

397.   Receipt of the bribes constituted a per se violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

398.   Through his Robinson-Patman Act violation, Yakovlev injured, destroyed or prevented competition in the market for the supply of food rations and other goods and services to U.N. peacekeeping missions.  As a result of this violation, ES-KO lost U.N. food rations contracts worth approximately $574 million and additional U.N. contracts worth approximately $95 million, plus additional significant amounts resulting from costs incurred in the preparation of bid submissions for contracts that were fraudulently obtained and fraudulently retained by the Client Participants.  In addition, ES-KO was forced to reduce its bids on other contracts with a total value of approximately $473 million, causing ES-KO additional losses. ES-KO's injuries resulted from the direct, substantial and reasonably foreseeable effect of the anti-competitive and unlawful conduct of Yakovlev on United States and/or foreign commerce.

399.   As a result of his conduct, Yakovlev is liable for ES-KO's losses in an amount to be determined at trial.

400.   Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, ES-KO is entitled to recover threefold its damages plus costs and attorneys' fees from Yakovlev, as well as injunctive relief.

## COUNT IX

### (TORTIOUS INTERFERENCE WITH
### PROSPECTIVE BUSINESS ADVANTAGE)

### (AS AGAINST DEFENDANTS COGIM, CORIMEC, AND IHC DEFENDANTS)

401.   ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 400 above.

402.    ES-KO had a lengthy business relationship with the U.N., inter alia, as the primary supplier of food, water and related services to peacekeeping troops around the world.

403.    Defendants Cogim, Corimec, and the IHC Defendants interfered with that business relationship through their Scheme.

404.    Specifically, the Scheme, inter alia, enabled the IHC Defendants to obtain and misuse ES-KO's confidential pricing and other information from Yakovlev and engage in other related conduct on behalf of ESS, Cogim and Corimec, in exchange for substantial bribes and/or other illegal consideration or remuneration.  Moreover, Cogim and Corimec otherwise interfered with ES-KO's business relationship with the U.N. through, inter alia, bribes paid to Yakovlev.

405.    Defendants acted knowingly, dishonestly, unfairly and improperly.

406.    As a result of Defendants' dishonest, unfair and improper acts, ES-KO was damaged by the loss of multiple contracts that otherwise would have been awarded to it and was forced to reduce its profit margins on other contracts in order to obtain their award.  ES-KO is entitled to recover its damages caused by the tortious acts of other named Defendants in this Count in an amount, exclusive of prejudgment interest of not less than $131 million.  The conduct of Cogim, Corimec and the IHC Defendants was outrageous, wanton and willful, constituted morally culpable conduct to an extreme degree and, consequently, ES-KO also should be awarded punitive damages in an amount of not less than $500 million to be determined at trial.

## COUNT X

## (UNFAIR COMPETITION)

## (AS AGAINST COGIM, CORIMEC, AND THE IHC DEFENDANTS)

407.   ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 406 above.

408.   ES-KO has been providing food and water, related services, and prefabricated buildings to its customers for almost twenty years.

409.   As a result of its extensive experience, know-how and superior resources, ES-KO had a commercial advantage over ESS in bidding on contracts to provide food, water and related services, and a commercial advantage over Cogim and Corimec in bidding on contracts to provide prefabricated buildings to the U.N.

410.   Frustrated by their inability to compete successfully with ES-KO, ESS, Cogim and Corimec, assisted by the IHC Defendants, decided to engage in bribery and the misappropriation of trade secrets, in order to overcome ES-KO's competitive advantages.

411.   Cogim, Corimec, and former defendant ESS thus procured, with the active assistance and collusion of the IHC Defendants and the John Doe Defendants, through bribery the confidential proprietary information of ES-KO, including, but not limited to, pricing information which constituted trade secrets, in order to eliminate ES-KO's competitive advantage.

412.   Defendants' actions were taken in bad faith.

413.   ES-KO is entitled to recover its damages caused by Defendants' unfair competition in an amount, exclusive of pre-judgment interest, of not less than $131 million.

## COUNT XI

## (MISAPPROPRIATION OF TRADE SECRETS)

## (AS AGAINST COGIM, CORIMEC AND IHC DEFENDANTS)

414.  ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 413 above.

415.  As a result of its prior extensive experience in providing food, water, prefabricated buildings and related services to U.N. peacekeeping forces for almost twenty years, ES-KO has attained expertise in minimizing costs of provisioning and in the design of technical and pricing proposals for procurement contracts.

416.  As part of their Scheme, the IHC Defendants systematically procured the pricing and cost information contained in ES-KO's confidential bids on contracts for, inter alia, prefabricated buildings so that they could underbid ES-KO on those contracts.

417.  That pricing and related information constituted a trade secret.

418.  ES-KO is entitled to recover damages in an amount, exclusive of pre-judgment interest, of not less than $131 million, and punitive damages in an amount of not less than $500 million to be determined at trial, or, alternatively, the actual profits of the IHC Defendants on each of the contracts at issue which were awarded to the Client Participants, and as against Cogim and Corimec, the actual profits of Cogim and Corimec on the contracts that should have been awarded to ES-KO.

## COUNT XII

## (UNJUST ENRICHMENT)

## (AS AGAINST COGIM, CORIMEC AND IHC DEFENDANTS)

419.  ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 418 above.

8159522

84

420.    The preparation by ES-KO of each proposal for the award of a U.N. procurement contract required the commitment by ES-KO of substantial personnel and other resources and the incurrence of significant out-of-pocket costs.  The resulting ES-KO contract proposals constitute the valuable property of ES-KO.

421.    The IHC Defendants wrongfully obtained ES-KO proposals through the means of bribing Yakovlev and certain of the John Doe Defendants.

422.    Once having obtained ES-KO contract proposal through such wrongful means, Cogim, Corimec and the IHC Defendants (on behalf of its Client Participants) used such proposals and the information they contained to facilitate Cogim's, Corimec's and ESS's proposals for submission to the Procurement Division.  Through such improper means, Cogim and Corimec were able to undercut ES-KO's bids and secure the award of valuable procurement contracts.  Cogim and Corimec paid the IHC Defendants substantial monies for IHC's illicit role in the Scheme, and IHC received substantial additional sums from ESS for the IHC Defendants' illicit role in the Scheme.

423.    Cogim, Corimec and IHC Defendants were unjustly enriched by obtaining ES-KO's confidential proposals by the means described, and their role in the Scheme.

424.    Under these circumstances, equity and good conscience require that Cogim, Corimec and IHC Defendants make restitution for their unjust enrichment.

425.    ES-KO is entitled to damages for the amount, to be determined at trial, by which Cogim, Corimec, and IHC Defendants were unjustly enriched.

**COUNT XIII**

**(COMMERCIAL BRIBERY)**

**(AS AGAINST COGIM, CORIMEC, AND THE IHC DEFENDANTS)**

426.    ES-KO repeats and realleges, as if fully set forth herein, the allegations contained in paragraphs 1 through 425 above.

427.    Yakovlev, during the Relevant Period, was an agent, employee and fiduciary of the U.N.

428.    The Client Participants and IHC Defendants engaged in commercial bribery in violation of Section 180.03 of the New York Penal Code by conferring benefits upon Yakovlev without the U.N.'s consent, with the intent to influence Yakovlev in connection with his official duties as an employee of the U.N. Procurement Division, and to induce Yakovlev to conspire with the Client Participants and IHC in the perpetration of the Scheme.

429.    The benefits conferred consisted of the payment of money to Yakovlev, either directly by the Client Participants or indirectly through the IHC Defendants, which money was retained by Yakovlev for his personal benefit in violation of Section 180.08 of the New York Penal Code.

430.    The bribes caused economic harm to the U.N., including, inter alia, payment by the U.N. of hundreds of millions of dollars to the Client Participants as compensation under contracts which should not, in accordance with U.N. rules and procedures, have been awarded to the Client Participants and which the Client Participants were unable to perform satisfactorily.

431.    As a direct consequence of the acts of commercial bribery engaged in by the IHC Defendants, contracts which would have been awarded to ES-KO were instead awarded to the Client Participants.

432.   ES-KO is entitled to recover damages in an amount, exclusive of pre-judgment interest, of not less than $131 million, exclusive of pre-judgment interest, or alternatively, the actual profits of the IHC Defendants on each of the contracts at issue which were awarded to the Client Participants, and in the case of Cogim and Corimec, the actual profits made by Cogim and Corimec on the contracts awarded to them.

**WHEREFORE**, ES-KO requests that the Court issue judgment, jointly and severally against the Defendants, as follows:

(i)   On ES-KO's RICO, Robinson-Patman and Clayton Act claims, awarding ES-KO treble damages in an amount to be determined at trial not less than $393 million, and reasonable attorneys' fees, and injunctive relief in the form of an order barring the Defendants from future Robinson-Patman Act violations;

(ii)   On ES-KO's tortious interference claim, awarding ES-KO damages in an amount, exclusive of pre-judgment interest, not less than $131 million, and punitive damages in an amount not less than $500 million to be determined at trial;

(iii)   On ES-KO's unfair competition claim, awarding ES-KO damages in an amount, exclusive of pre-judgment interest, not less than $131 million to be determined at trial;

(iv)   On ES-KO's claim for misappropriation of trade secrets, awarding ES-KO damages in an amount, exclusive of pre-judgment interest, not less than $131 million, or alternatively, the actual profits of Cogim, Corimec, and the IHC Defendants on each of the contracts at issue which were awarded to the Client Participants; and punitive damages in an amount not less than $500 million to be determined at trial;

(v)   On ES-KO's claim for unjust enrichment, damages in an amount to be determined at trial by which Cogim, Corimec, and the IHC Defendants have been unjustly

8159522

87

enriched and the imposition of a constructive trust on such assets and profits of IHC Defendants as are traceable to such unjust enrichment;

(vi)    On ES-KO's claim for commercial bribery, damages in an amount, exclusive of pre-judgment interest, not less than $131 million, or, alternatively, the actual profits of the IHC Defendants on each of the contracts at issue which were awarded to the Client Participants and the actual profits of Cogim and Corimec of the contracts awarded to them;

(vii)    Pre-judgment interest on all of ES-KO's claims; and

(viii)    Awarding ES-KO such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: May 7, 2007
New York, New York

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____
Sigmund S. Wissner-Gross (SW-0001)
May Orenstein (MO-2948)
David E. Miller (DM-7179)
Seven Times Square
New York, New York 10036
(212) 209-4800
Attorneys for Plaintiff ES-KO International Inc.